**E-FILED**
Tuesday, 31 August, 2004  01:29:45 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT B

AGREEMENT OF LIMITED PARTNERSHIP

OF

ILLINOIS SMSA LIMITED PARTNERSHIP

Dated as of February 5, 1987

INDEX

|  |  |  | Page |
|---|---|---|---|
| PREAMBLE. | | . . . . . . . . . . . . . . . . . . . . . . . . | 1 |
| ARTICLE I | | Definitions. . . . . . . . . . . . . . . . . . . | 3 |
| | 1.1 | Act. . . . . . . . . . . . . . . . . . . . . . . | 3 |
| | 1.2 | Additional Capital Contribution. . . . . . . . . | 3 |
| | 1.3 | Affiliate. . . . . . . . . . . . . . . . . . . . | 3 |
| | 1.4 | Agreed Value . . . . . . . . . . . . . . . . . . | 4 |
| | 1.5 | Agreement. . . . . . . . . . . . . . . . . . . . | 4 |
| | 1.6 | AMC . . . . . . . . . . . . . . . . . . . . . . . | 4 |
| | 1.7 | Appraised Value. . . . . . . . . . . . . . . . . | 4 |
| | 1.8 | Capital Account. . . . . . . . . . . . . . . . . | 4 |
| | 1.9 | Capital Contribution . . . . . . . . . . . . . . | 4 |
| | 1.10 | Cellular Radio Decisions . . . . . . . . . . . . | 5 |
| | 1.11 | Cellular Service . . . . . . . . . . . . . . . . | 5 |
| | 1.12 | CGSA . . . . . . . . . . . . . . . . . . . . . . | 5 |
| | 1.13 | Code . . . . . . . . . . . . . . . . . . . . . . | 5 |
| | 1.14 | Default. . . . . . . . . . . . . . . . . . . . . | 5 |
| | 1.15 | Disposition. . . . . . . . . . . . . . . . . . . | 5 |
| | 1.16 | FCC. . . . . . . . . . . . . . . . . . . . . . . | 5 |
| | 1.17 | First Capital Contribution . . . . . . . . . . . | 5 |
| | 1.18 | General Partner. . . . . . . . . . . . . . . . . | 6 |
| | 1.19 | Income and Losses. . . . . . . . . . . . . . . . | 6 |
| | 1.20 | Limited Partner. . . . . . . . . . . . . . . . . | 6 |
| | 1.21 | Negotiated Percentage Interest . . . . . . . . . | 6 |
| | 1.22 | Person . . . . . . . . . . . . . . . . . . . . . | 7 |
| | 1.23 | Partners . . . . . . . . . . . . . . . . . . . . | 7 |
| | 1.24 | Partnership Interest . . . . . . . . . . . . . . | 7 |
| | 1.25 | Percentage Interest. . . . . . . . . . . . . . . | 7 |
| | 1.26 | Proprietary Information. . . . . . . . . . . . . | 7 |
| | 1.27 | Recipient. . . . . . . . . . . . . . . . . . . . | 7 |
| | 1.28 | Second Capital Contribution. . . . . . . . . . . | 7 |
| | 1.29 | Tax Capital Account. . . . . . . . . . . . . . . | 7 |
| | 1.30 | Tax Profits and Tax Losses . . . . . . . . . . . | 8 |
| ARTICLE II | | Formation of Limited Partnership . . . . . . . . | 8 |
| | 2.1 | Formation. . . . . . . . . . . . . . . . . . . . | 8 |
| | 2.2 | Name and Office. . . . . . . . . . . . . . . . . | 8 |
| | 2.3 | Business Purpose . . . . . . . . . . . . . . . . | 8 |
| | 2.4 | Effectiveness of the Agreement . . . . . . . . . | 9 |
| | 2.5 | Term of Partnership. . . . . . . . . . . . . . . | 10 |
| ARTICLE III | | Regulatory Matters . . . . . . . . . . . . . . . | 10 |
| | 3.1 | Contingency. . . . . . . . . . . . . . . . . . . | 10 |
| | 3.2 | Cooperation. . . . . . . . . . . . . . . . . . . | 10 |

Page

ARTICLE IV      Capital of Partnership . . . . . . . . . . . . .   11

4.1     Capital of the Partnership . . . . . . . . . .   11
4.2     First Capital Contribution . . . . . . . . . .   11
4.3     Second Capital Contribution. . . . . . . . . .   11
4.4     Additional Capital Contributions . . . . . . .   11
4.5     Failure to Make Additional
        Capital Contribution . . . . . . . . . . .   12
4.6     Interest upon Failure to Make
        Capital Contribution . . . . . . . . . . .   13
4.7     Minimum Percentage Interest of
        General Partner. . . . . . . . . . . . . .   14
4.8     Amendment of Certificate . . . . . . . . . .   14
4.9     Capital Contributions in Cash; Exception . . . .   14
4.10    Limitation on Liability of Limited
        Partners . . . . . . . . . . . . . . . .   15
4.11    Additional Limited Partners. . . . . . . . . .   15
4.12    Procedure to Admit New Limited Partner . . . . .   16

ARTICLE V       Allocations and Distributions. . . . . . . . .   18

5.1     Capital Accounts . . . . . . . . . . . . . .   18
5.2     Allocations of Income and Losses . . . . . . . .   18
5.3     Allocations of Income and Losses
        on Winding Up. . . . . . . . . . . . . . .   18
5.4     Allocations of Tax Profits and Tax
        Losses . . . . . . . . . . . . . . . . .   18
5.5     Allocations of Tax Credits . . . . . . . . . .   19
5.6     Tax Allocations for Contributed
        Property . . . . . . . . . . . . . . . .   19
5.7     Distributions. . . . . . . . . . . . . . .   20
5.8     No Return of Capital or Interest on
        Capital Contribution . . . . . . . . . . . .   20

ARTICLE VI      Management, Powers, Duties, Reimbursement
                and Rights; Transactions with Partners . . . .   21

6.1     Management . . . . . . . . . . . . . . . .   21
6.2     Powers of the General Partner. . . . . . . . .   22
6.3     Fiduciary Duty of General Partner. . . . . . . .   24
6.4     Liability of General Partner . . . . . . . . .   24
6.5     Reimbursement. . . . . . . . . . . . . . .   24
6.6     Ownership or Conduct of Other Businesses . . . . .   25
6.7     Exculpation and Indemnification. . . . . . . . .   26
6.8     Rights of Limited Partners . . . . . . . . . .   27
6.9     Limited Partners Not to Take Part in
        Business . . . . . . . . . . . . . . . .   28

-ii-

Page

ARTICLE XI      Dissolution and Termination. . . . . . . . . .    48

   11.1      Dissolution. . . . . . . . . . . . . . . . . .    48
   11.2      Distributions Upon Dissolution . . . . . . . . .    50
   11.3      Distributions in Cash or in Kind . . . . . . . .    51
   11.4      Time for Liquidation . . . . . . . . . . . . . .    52
   11.5      Termination. . . . . . . . . . . . . . . . . .    52
   11.6      General Partner Not Liable for
             Distributions. . . . . . . . . . . . . . . . .    52
   11.7      General Partner's Right to Continue
             to Provide Cellular Service. . . . . . . . . .    52

ARTICLE XII     Power of Attorney. . . . . . . . . . . . . . .    52

   12.1      Grant of Power of Attorney . . . . . . . . . . .    52
   12.2      Irrevocable and Coupled With an Interest . . . .    54
   12.3      Survival of Power of Attorney. . . . . . . . . .    54
   12.4      Limitation on Power of Attorney. . . . . . . . .    55

ARTICLE XIII    Amendments . . . . . . . . . . . . . . . . . .    55

   13.1      Amendments . . . . . . . . . . . . . . . . . .    55
   13.2      Execution of Amended Agreements. . . . . . . . .    56

ARTICLE XIV     Technology and Information . . . . . . . . . .    56

   14.1      Technology License . . . . . . . . . . . . . . .    56
   14.2      Proprietary Information. . . . . . . . . . . . .    56

ARTICLE XV      Miscellaneous Provisions . . . . . . . . . . .    57

   15.1      Warranties . . . . . . . . . . . . . . . . . .    57
   15.2      Table of Contents and Headings . . . . . . . . .    58
   15.3      References . . . . . . . . . . . . . . . . . .    58
   15.4      Successors and Assigns . . . . . . . . . . . . .    58
   15.5      Severability . . . . . . . . . . . . . . . . . .    58
   15.6      Waiver . . . . . . . . . . . . . . . . . . . .    58
   15.7      Applicable Law . . . . . . . . . . . . . . . . .    59
   15.8      Entire Agreement . . . . . . . . . . . . . . . .    59
   15.9      Notices. . . . . . . . . . . . . . . . . . . .    59
   15.10     Arbitration. . . . . . . . . . . . . . . . . .    60
   15.11     Counterparts . . . . . . . . . . . . . . . . . .    61

AGREEMENT ESTABLISHING

ILLINOIS SMSA LIMITED PARTNERSHIP


THIS AGREEMENT is made as of the 5th day of February, 1987, by and between Ameritech Mobile Phone Service of Illinois, Inc., a corporation organized and existing under the laws of the State of Illinois and having its principal place of business at 1515 Woodfield Road, Schaumburg, Illinois 60173 ("AMPS"), Inland Cellular Telephone Co., a corporation organized and existing under the laws of the State of Illinois and having its principal place of business at 1400 West Anthony Drive, Post Office Box 3000, Champaign, Illinois 61281 ("Inland"), Mt. Pulaski Cellular Company, a corporation organized and existing under the laws of the State of Illinois and having its principal place of business at 228 South Chicago Street, Post Office Box 100, Lincoln, Illinois 62656 ("Mt. Pulaski"), U S West NewVector Group, Inc., a corporation organized and existing under the laws of the State of Colorado and having its principal place of business at 3350 161st Avenue S.C., Bellevue, Washington 98008-1329 ("NewVector") and Midwest Cellular Associates, a general partnership organized and existing under the laws of the State of Illinois and having its principal place of business at 121 South Seventeenth Street, Mattoon, Illinois 61938 ("Midwest").

WHEREAS, AMPS is a wholly-owned subsidiary of Ameritech Mobile Communications, Inc. and is engaged in planning for the provision of Cellular Service (as hereinafter defined);

WHEREAS, Ameritech Mobile Communications, Inc. through AMPS, desires to provide Cellular Service;

WHEREAS, Inland, Mt. Pulaski, NewVector and Midwest desire to participate in providing such Cellular Service;

WHEREAS, the parties have entered into a Settlement Agreement dated as of February 5, 1987 providing for the Partnership hereby contemplated;

WHEREAS, the Federal Communications Commission ("FCC") in its Cellular Radio Decisions (as hereinafter defined) stated that (a) a pressing need exists for expeditious implementation of cellular service, (b) one of the two frequency allocations for providing cellular service within designated metropolitan areas would be assigned to a wireline carrier having an exchange presence in that metropolitan area, (c) it is expected that the wireline carriers would commence providing cellular service promptly, and (d) it strongly urged wireline carriers eligible and desiring to provide cellular service in any such designated metropolitan area to reach mutually acceptable arrangements to provide such service;

WHEREAS, the Partners (as hereinafter defined) desire to further the objectives of the FCC set forth in the Cellular Radio Decisions by expeditiously providing cellular service to the public and believe that this Agreement, as so encouraged by the FCC, is consistent with the FCC's cellular communications policy and is lawful and in the public interest;

WHEREAS, the areas with respect to which the Partners hereto presently provide wireline telephone service are contiguous or proximately located, a community of interests exists therein, and such areas

can most economically and efficiently be served by a unified cellular system; and

WHEREAS, the Partners desire to form a limited partnership in order to fund, establish and provide Cellular Service;

NOW THEREFORE, it is mutually agreed that:

## ARTICLE I

## DEFINITIONS

1.1  "Act" means the Illinois Revised Uniform Limited Partnership Act, as amended.

1.2  "Additional Capital Contribution" of a Partner means any amount that such Partner is entitled to contribute to the capital of the Partnership pursuant to Section 4.4.

1.3  "Affiliate" means, when used with reference to a specified Person, (a) any Person that directly or indirectly through one or more intermediaries controls or is controlled by or is under common control with the specified Person, (b) any Person that is an officer of, partner in, or trustee of, or serves in a similar capacity with respect to, the specified Person or of which the specified Person is an officer, partner or trustee, or with respect to which the specified Person serves in a similar capacity and (c) any Person that, directly or indirectly, is the beneficial owner of 10% or more of any class of equity securities of, or otherwise has a substantial beneficial interest in, the specified Person or of which the specified Person is directly or indirectly the owner of 10% or more of any class of equity securities or in which the specified Person has a substantial beneficial interest.  Notwithstanding the foregoing, for purposes of Article VIII the term "Affiliate" shall exclude an individual and, further provided that no Disposition to an

Affiliate shall take place unless such Affiliate meets all FCC requirements.

1.4 "Agreed Value" means, at any particular time and with respect to any real or personal property (other than cash) contributed to the Partnership by a Partner, zero dollars ($0.00).

1.5 "Agreement" means this Agreement of Limited Partnership, as originally executed and as amended, modified, supplemented or restated from time to time, as the context requires.

1.6 "AMPS" means Ameritech Mobile Phone Service of Illinois, Inc., a corporation organized and existing under the laws of the State of Illinois.

1.7 "Appraised Value" of any assets distributed to the Partners in kind pursuant to Section 11.3 means the value placed upon such assets by the appraisers hired by the General Partner pursuant to Section 11.3 to appraise such assets.

1.8 "Capital Account" of a Partner means, at any particular time, the amount of the Capital Contribution of such Partner at such time (a) reduced by (i) any Losses allocated to such Partner and (ii) any distributions made to such Partner by the Partnership and (b) increased by any Income allocated to such Partner and (c) as adjusted pursuant to Section 4.12.

1.9 "Capital Contribution" of a Partner means, at any particular time, the sum of (a) the amount of cash then contributed to the Partnership by such Partner plus (b) the Agreed Value of any real or personal property other than cash then contributed to the Partnership by such Partner; provided, however, that no cash or real or personal property contributed to the Partnership by a Partner shall be included

- 4 -

in the Capital Capital Account of such Partner prior to the date it was due to the Partnership.

1.10 "Cellular Radio Decisions" means the decisions and orders of the FCC set forth in An Inquiry Into The Use of The Bands 825-845 MHZ and 870-890 MHZ for Cellular Communications Systems; and Amendment of Parts 2 and 22 of the Commission's Rules Relative to Cellular Communications Systems (CC Docket No. 79-318), 86 F.C.C.2d 469 (1981), as modified in 89 F.C.C.2d 58 (1982), as further modified in 90 F.C.C.2d 571 (1982) and as such decisions and orders may be further amended, modified or supplemented, as the context requires.

1.11 "Cellular Service" means any and all service authorized by the FCC under Part 22 of its cellular rules as promulgated under the Cellular Radio Decisions and provided pursuant to the terms of this Agreement.

1.12 "CGSA" means the Cellular Geographic Service Area(s) designated in Appendix B.

1.13 "Code" means the Internal Revenue Code of 1986, as amended from time to time.

1.14 "Default" has the meaning set forth in Section 9.2.

1.15 "Disposition" means any sale, exchange, assignment or any other transfer of all or any portion of any Limited Partner's Partnership Interest to any Person.

1.16 "FCC" means the Federal Communications Commission or any successor thereto.

1.17 "First Capital Contribution" of a Partner means the amount set forth in Appendix A opposite such Partner's name in the column entitled "First Capital Contribution".

1.18 "General Partner" means Ameritech Mobile Phone Service of Illinois, Inc., a corporation organized and existing under the laws of the State of Illinois, and any Person admitted as an additional or substitute general partner of the Partnership in accordance with this Agreement and the Act, in such Person's capacity as a general partner of the Partnership.

1.19 "Income" and "Losses" mean the income and losses, respectively, of the Partnership, determined in accordance with generally accepted accounting principles; provided, however, that (a) Income and Losses will be determined as though real and personal property other than cash contributed to the Partnership as part of the Capital Contribution of a Partner had been purchased by the Partnership at the Agreed Value of such property and (b) Income and Losses will be deemed to include income and losses that would have accrued to the Partnership if any assets distributed in kind to the Partners in accordance with Section 11.3 had been sold by the Partnership on the date of such distribution for an amount equal to their Appraised Value.

1.20 "Limited Partner" means each of Inland, Mt. Pulaski, NewVector, and Midwest and any Person admitted as an additional or substitute limited partner of the Partnership in accordance with this Agreement and the Act, in such Person's capacity as a limited partner of the Partnership.  Any Person may be both a General Partner and a Limited Partner of the Partnership.

1.21 "Negotiated Percentage Interest" of a Partner means the new ownership interest percentage of a new Limited Partner as negotiated by the General Partner to be effective upon admission of a new partner pursuant to Section 4.11.

1.22 "Person" means any individual, partnership, corporation, trust or other entity.

1.23 "Partners" means the General Partner and all Limited Partners, unless otherwise provided herein. "Partner" shall mean any one of the Partners. If one Person is both a General Partner and a Limited Partner, the term "Partner," when used with reference to such Person, shall be deemed to refer to such Person in each of such capacities severally.

1.24 "Partnership Interest" of a Partner means the entire ownership interest of such Partner in the Partnership at any particular time.

1.25 "Percentage Interest" of a Partner means, at any particular time, the ratio that such Partner's Capital Account bears at such time to the aggregate Capital Accounts of all the Partners.

1.26 "Proprietary Information" has the meaning set forth in Section 14.2.

1.27 "Recipient" means any Person who receives all or any portion of any Limited Partner's Partnership Interest by sale, exchange, assignment or any other transfer from any Limited Partner.

1.28 "Second Capital Contribution" of a Partner means the amount set forth in Appendix A opposite such Partner's name in the column entitled "Second Capital Contribution."

1.29 "Tax Capital Account" of a Partner means a capital account maintained for such Partner in accordance with tax accounting principles and shall include, at any particular time, the amount of cash or real or personal property other than cash then contributed to the Partnership by such Partner (a) reduced by (i) any Tax Losses allocated to such Partner

and (ii) any distributions made to such Partner by the Partnership and (iii) nondeductible expense items chargeable to capital (b) increased by (i) any Tax Profits allocated to such Partner and (ii) tax exempt income.

1.30 "Tax Profits" and "Tax Losses" mean the profits and losses, respectively, of the Partnership for federal income tax purposes including, without limitation, each item of Partnership income, gain, loss and deduction.

ARTICLE II

FORMATION OF LIMITED PARTNERSHIP

2.1  Formation.  The Partners mutually covenant and agree and hereby do form a limited partnership pursuant to the provisions of the Act, in accordance with the further terms and provisions hereof.

2.2  Name and Office.  (a)  The name of the Partnership is Illinois SMSA Limited Partnership and its business shall be carried on in this name with such variations and changes as the General Partner deems necessary to comply with applicable law  or as the General Partner deems desirable for any reasonable business purpose.

(b)  The principal office and place of business of the Partnership shall be maintained at 1515 Woodfield Road, Schaumburg, Illinois 60173, or at such other location as the General Partner may from time to time select, upon prior written notice to the Limited Partners.

2.3  Business Purpose.  The purpose of the Partnership shall be to fund, establish and provide Cellular Service and to engage in any and all activities related or incidental thereto.  It is understood and agreed that Cellular Service provided by the Partnership shall initially be limited to the CGSAs, but may, subject to the provisions of this

- 8 -

Agreement and applicable licensing requirements, be expanded in the sole
discretion of the General Partner to include other areas within the
MSAs.

The Partners hereby each agree to file a separate wireline applica-
tion for any cellular market contiguous to the MSAs which are the
subject of this Agreement. In the event that any Partner is selected by
lottery or otherwise as the permittee or licensee for any such market,
such Partner hereby agrees to use best efforts to transfer all its
interest in such market, subject to FCC approval, to the Partnership.
In no event shall any Partner who transfers its interest in any cellular
market to the Partnership claim any right to increased participation in
the Partnership or any other form of compensation for such transfer.

2.4  Effectiveness of the Agreement.  The Partners recognize that
Sections 1.65 and 22.29 of the FCC's Rules, 47 C.F.R. 1.65 and 22.29,
require that this Agreement be approved by the FCC. Therefore, except
to the extent necessary to obtain approval of this Agreement and any
other necessary governmental approval for potential Partnership
activity, and except as otherwise provided in this Section 2.4, the
obligations of the Partners pursuant to this Agreement shall be contin-
gent upon the FCC having entered an order approving or having otherwise
approved this Agreement and the transfer of wireline interests in the
Springfield, Bloomington/Normal, Champaign/Urbana/Rantoul, and Decatur
MSAs, and the FCC having authorized dismissal or withdrawal of any
individual application by the Partners to provide Cellular Service.
Notwithstanding the foregoing, (a) upon signing of this Agreement, each
Partner shall contribute to the Partnership, in cash, its First Capital
Contribution as provided in Section 4.2 and the General Partner shall

- 9 -

file a certificate of limited partnership on behalf of the Partnership
pursuant to the Act and make all other filings and qualifications with
governmental authorities it deems necessary or desirable, (b) the
Partners specifically acknowledge that the contingency of their other
obligations pending FCC approval shall not permit any Partner to take
any action inconsistent with the provisions of this Agreement during the
period of time before this Agreement is approved by the FCC and (c) the
Partners shall support the Partnership's applications for approval of
this Agreement before the FCC and any other governmental authority.

2.5 Term of Partnership. The term of the Partnership shall be
from the date of the first filing, pursuant to the Act, of a certificate
of limited partnership on behalf of the Partnership until February 5,
2037, unless sooner terminated as hereinafter provided.

## ARTICLE III

### REGULATORY MATTERS

3.1 Contingency. The permits or licenses to be issued by regula-
tory authorities in connection with the provision of Cellular Service
may be contingent during the pendency of litigation or regulatory action
concerning the present wireline allocation; however, except as otherwise
provided in Section 2.4, the pendency of such litigation or regulatory
action shall not affect the Partners' obligations under this Agreement.

3.2 Cooperation. The Partners pledge their best efforts and
mutual cooperation to obtain all necessary approvals and make all the
filings to provide Cellular Service.

## ARTICLE IV

### CAPITAL OF PARTNERSHIP

4.1 Capital of the Partnership. The capital of the Partnership shall be the amounts contributed to the Partnership by the Partners as Capital Contributions from time to time as provided in this Agreement.

4.2 First Capital Contribution. Concurrently with the execution of this Agreement, each Partner shall contribute to the capital of the Partnership, in cash, its First Capital Contribution.

4.3 Second Capital Contribution. The General Partner may at any time require that each of the Partners contribute to the capital of the Partnership its Second Capital Contribution. Each Partner's Second Capital Contribution shall be due on the date set forth in a written notice from the General Partner to the Limited Partners, which date shall be not less than thirty days from the date of such notice and shall be the first day of a month.

4.4 Additional Capital Contributions. From time to time additional capital may be required by the Partnership to fund expansion or operation of Cellular Service. In the event the General Partner determines that additional capital is so needed, it shall give each other Partner written notice of the additional capital needed and each Partner shall be entitled to contribute to the capital of the Partnership as an Additional Capital Contribution an amount equal to (but not less than) the product of (i) the total amount of such additional capital times (ii) such Partner's then current Percentage Interest. Each Partner's Additional Capital Contribution shall be due on the date set forth in the notice from the General Partner, which date shall not be less than thirty days from the date of such notice and shall be the first day of a

- 11 -

month; provided, however, that in no event shall the time period between the date of the mailing of notice and the due date be less than forty-five days.  Each Limited Partner shall notify the General Partner, within fifteen days of receipt of the notice from the General Partner, whether or not such Limited Partner will make such Additional Capital Contribution when due.  Such notification to the General Partner shall be binding upon the Limited Partner.

4.5  __Failure to Make Additional Capital Contribution__.  Should any Partner notify the General Partner that it does not intend to make an Additional Capital Contribution, or fail to pay its Additional Capital Contribution when due, all or any portion of the other Partners may contribute pro rata, according to their then current respective Percentage Interests, an aggregate amount equal to the Additional Capital Contribution not made by the non-participating Partner or Partners, thereby increasing in such proportion the other Partners' Percentage Interests.  The amount contributed by a participating Partner shall be determined by multiplying the Additional Capital Contribution not made by the non-participating Partner or Partners by a ratio, the numerator of which is the participating Partner's Percentage Interest and the denominator of which is the aggregate of the Percentage Inter- ests of all participating Partners.  Any such contribution shall be due on the date set forth in a notice from the General Partner to the Partner making such contribution, which date shall not be less than two days from the date of such notice and shall be the first day of a month. The General Partner may make any such contribution as a Limited Partner, if it so desires.  Such non-participating Partner shall be limited in its right to provide Additional Capital Contributions in the future

- 12 -

pursuant to Section 4.4 to its Percentage Interest at the time that the General Partner gives notice of any such future Additional Capital Contribution.

4.6    Interest upon Failure to Make Capital Contribution.  If any Partner (a) fails to make its Second Capital Contribution when due or (b) notifies the General Partner pursuant to Section 4.4 that it will make an additional Capital Contribution to the Partnership but fails to make such Additional Capital Contribution when due, it shall pay to the Partnership upon demand an amount equal to the interest that would accrue on a principal amount equal to its Second Capital Contribution or such Additional Capital Contribution, as the case may be, from the date the same was due until (i) in the case of an Additional Capital Contribution, the earlier of (A) date such Additional Capital Contribution is paid, or is deemed to have been paid in full pursuant to the last sentence of this Section 4.6 or (B) the date such Partner withdraws from the Partnership, voluntarily or involuntarily, or (ii) in the case of a Second Capital Contribution, until the date such Partner withdraws from the Partnership, voluntarily or involuntarily.  Such interest shall be equal to the sum of (x) the average (rounded to the nearest one-hundredth of 1%) of the respective rates per annum announced by each of Citibank, N.A., The Chase Manhattan Bank, N.A. and Morgan Guaranty Trust Company of New York as its prime rate from time to time during the relevant period, plus (y) 1% per annum.  Notwithstanding the provision for interest contained in this Section 4.6, no Partner shall have the right to make its Second Capital Contribution or any Additional Capital Contribution after the date that its Second Capital Contribution or such Additional Capital Contribution, as the case may be, was due and nothing

contained in this Section 4.6 shall be in limitation of the provisions of Article IX. For the purposes of this Section 4.6, if one Partner contributes capital to the Partnership pursuant to Section 4.5 as a result of the failure of another Partner to make an Additional Capital Contribution, the Additional Capital Contribution of the Partner who failed to make such additional Capital Contribution shall be deemed to have been paid to the extent of such contribution.

4.7 <u>Minimum Percentage Interest of General Partner</u>. Notwithstanding anything to the contrary contained in this Agreement, the General Partner shall make sufficient Capital Contributions to the Partnership so that its Percentage Interest in its capacity as General Partner shall at all times, while it is a General Partner, be at least one percent.

4.8 <u>Amendment of Certificate</u>. Each Partner hereby agrees to execute, promptly upon the written request of the General Partner, all certificates of amendment to the Partnership's certificate of limited partnership and all other documents deemed necessary by the General Partner to reflect additional capital contributed to the Partnership pursuant to Section 4.3, 4.4 or 4.5, whether or not such certificates or other documents are required to comply with applicable law.

4.9 <u>Capital Contributions In Cash; Exception</u>. All contributions to the capital of the Partnership shall be in cash and not real or personal property other than cash and shall be paid to the General Partner in immediately available funds for the account of the Partnership; provided, however, that AMPS (either in its capacity as General Partner or in its capacity as a Limited Partner or both) may contribute, in lieu of or in addition to cash, real or personal property other than cash as all or part of its Second Capital Contribution at its Agreed

- 14 -

Value. Any such real or personal property other than cash shall be deemed to be the equivalent for the purposes of this Agreement of a contribution in cash to the capital of the Partnership in the amount of its Agreed Value.

4.10 <u>Limitation on Liability of Limited Partners</u>. Except as otherwise provided in Sections 4.6 and 8.6, the liability of each Limited Partner to provide funds or any other property to the Partnership shall be limited to the amount of Capital Contributions which the Limited Partner makes or is required to make pursuant to Sections 4.2 and 4.3 or makes or agrees to make pursuant to Section 4.4 or 4.5. No Limited Partner shall have any further liability to contribute cash or other property to the Partnership for, or in respect of, the liabilities or obligations of the Partnership or shall be personally liable for any obligations of the Partnership.

4.11 <u>Additional Limited Partners</u>. In providing Cellular Service within the MSAs, the General Partner may invite one or more wireline carriers to become additional limited partners hereunder subject to approval by all Limited Partners. In providing Cellular Service in areas adjoining the MSA, the General Partner shall have the right to invite one or more wireline carriers who are not affiliated with the General Partner to become additional limited partners hereunder subject to the approval of the General Partner plus two Limited Partners, only one of which is Inland, Mt. Pulaski or any transferee or successor of Inland or Mt. Pulaski. Subject to the further provisions of this Section 4.11, each Limited Partner hereby agrees to execute and deliver any amendment to this Agreement deemed by the General Partner to be necessary or desirable to reflect any such admission. The terms and

- 15 -

conditions of the admission of any wireline carrier shall be as
determined by the General Partner, subject to Section 8.7 and subject to
the approval of the General Partner plus two Limited Partners, only one
of which is Inland, Mt. Pulaski or any transferee or successor of Inland
or Mt. Pulaski. No such wireline carrier shall be admitted to the
Partnership until such wireline carrier has adopted and agreed in
writing to be bound by all the provisions of this Agreement, as the same
may have been amended, and has delivered to the General Partner all
documents reasonably required by the General Partner or required by the
Act to effect such admission. In the event that the General Partner
proposes the addition of a new Limited Partner, written notice thirty
days prior to the time for final approval by the Limited Partners as
described above shall be given to the existing Limited Partners. Such
written notice shall contain information as to the identity of the
proposed Limited Partner, the Negotiated Percentage Interest (as defined
below) for such Limited Partner, and the price proposed to be paid by
such Limited Partner.

    4.12 Procedure to Admit New Limited Partners. The following
procedure shall be followed in the event a new Limited Partner is to be
admitted to the Partnership pursuant to Section 4.11:

    a) Prior to admission of a new Limited Partner, the General Partner
shall determine the new Limited Partner's Negotiated Percentage Interest
and the price to be paid for such Negotiated Percentage Interest;
provided, however, that the price paid shall not be less than the net
book value attributable to such percentage interest.

    b) As of the last day of the month prior to the effective date of
admission of a new Limited Partner (the "Cutoff Date") there will be a

- 16 -

specific accounting of Income and Losses for both financial reporting and tax accounting purposes in conformance with Section 5.2; provided, however, that such specific accounting shall be in lieu of a Section 5.2 allocation and shall cover the shorter of (i) the fiscal year to the Cutoff Date or, (ii) the period beginning on the day following the date of the last specific accounting to the Cutoff Date.

c) Based upon the specific accounting provided for in Section 4.12(b), the General Partner shall allocate to the Capital Account of the new Limited Partner, as of the effective date of admission, the dollar amount necessary to establish the new Limited Partner's Capital Account at the Negotiated Percentage Interest taking into account the allocations and distributions made pursuant to Section 4.12(d) and Section 4.12(e).

d) The difference between the amount paid by the new Limited Partner and the established Capital Account of the new Limited Partner shall be distributed among the Capital Accounts of those Partners in the Partnership who were Partners on the Cutoff Date in proportion to their Capital Accounts.

e) If the General Partner determines that cash is not needed by the Partnership, then, prior to establishing the new Limited Partner's Capital Account in accordance with the provisions of this Section 4.12, the General Partner may make a distribution of all or any portion of the excess cash to all Partners who were such on the Cutoff Date in proportion to their Capital Accounts.

- 17 -

## ARTICLE V

## ALLOCATIONS AND DISTRIBUTIONS

5.1  Capital Accounts.  The General Partner shall establish a Capital Account and a Tax Capital Account for each Partner upon receipt of such Partner's First Capital Contribution and shall maintain such accounts in accordance with this Agreement.

5.2  Allocations of Income and Losses.  Income and Losses for each fiscal year of the Partnership shall be apportioned ratably to each day of such year and each day's share of such Income and Losses shall be allocated to the Partners in proportion to their respective Percentage Interests on such date.

5.3  Allocations of Income and Losses on Winding Up.  If, upon the dissolution of the Partnership and the winding up of its affairs, assets of the Partnership are distributed to the Partners in kind in accordance with Section 11.3, the General Partner shall determine the Income and Losses that would have accrued to the Partnership if such assets had been sold by the Partnership on the date of such distribution for an amount equal to their Appraised Value.  Such Income and Losses shall be allocated to the Partners in proportion to their respective Percentage Interests on the date of such distribution and shall be reflected in their Capital Accounts.

5.4  Allocations of Tax Profits and Tax Losses.  Except as otherwise provided in Section 5.6 and except as otherwise required by regulations prescribed under Section 706(d) of the Code, or its succes- sors, Tax Profits and Tax Losses for each fiscal year of the Partnership shall be apportioned ratably to each day of such year and each day's

share of such Tax Profits and Tax Losses shall be allocated to the Partners in proportion to their respective Percentage Interests on such date.

5.5 Allocations of Tax Credits. Tax credits for federal income tax purposes for each fiscal year of the Partnership shall be apportioned ratably to each day of such year and each day's share of such tax credits shall be allocated to the Partners in proportion to their respective Percentage Interests on such date, except that:

(a) To the extent that the Code and the regulations prescribed thereunder otherwise provide, such tax credits shall be allocated in accordance with the Code and regulations; and

(b) Any investment tax credit shall be allocated only to those Partners who were partners (for federal income tax purposes) on the date the property with respect to which such credit was earned was placed in service by the Partnership, in proportion to their respective Percentage Interests on such date.

5.6 Tax Allocations for Contributed Property. (a) Depreciation and gain or loss recognized for federal income tax purposes with respect to property contributed to the Partnership shall be allocated to the Limited Partners (other than a Limited Partner who is also the General Partner) as though such property had been purchased by the Partnership at its Agreed Value. The remainder of any depreciation and gain or loss recognized for federal income tax purposes with respect to such contributed property shall be allocated to the General Partner in respect of its General Partner's Interest and Limited Partner's Interest proportionately.

- 19 -

(b)  Notwithstanding paragraph (a) above, to the extent that Section 704(c) of the Code, or its successors, and regulations prescribed thereunder otherwise require, such Tax Losses and Tax Profits with respect to such property contributed to the Partnership shall be allocated in accordance with such Code sections, or its successors, and regulations.

5.7  Distributions.  Subject to Sections 9.4, 9.5, 11.2 and 11.3, funds of the Partnership from all sources (other than Capital Contributions), less appropriate reserves as are determined by the General Partner to be reasonably necessary for administrative and operating expenses, loan payments and other costs and expenses and contingencies, shall be distributed no less than quarterly and as promptly as practicable after the end of each fiscal quarter.  Each distribution pursuant to this Section 5.7 shall be made to the Partners in proportion to the weighted average of their respective Percentage Interests during the relevant fiscal quarter (or during any other fiscal period with respect to which a distribution may be made).

5.8  No Return of Capital or Interest on Capital Contribution. No Limited Partner shall have any right to demand or receive the return of its Capital Contribution to the Partnership.  It is the intent of the Partners that no distribution or allocation (or any part of any distribution or allocation) made to any Partner pursuant to this Article V shall be deemed a return or withdrawal of capital, even if such distribution or allocation represents (in whole or in part) an allocation of depreciation or any other non-cash item accounted for as a loss or deduction in calculating

- 20 -

the Partnership's income and that no Partner shall be obligated to
pay any such amount to or for the account of the Partnership or any
creditor of the Partnership.  However, if any court of competent
jurisdiction holds that, notwithstanding the provisions of this
Agreement, any Partner is obligated to make any such payment, such
obligation shall be the obligation of such Partner and not of any
other Partner or the Partnership.  No Partner shall be entitled to
interest on any Capital Contribution to the Partnership or on such
Partner's Capital Account, notwithstanding any disproportion
therein as between the Partners.

ARTICLE VI

MANAGEMENT, POWERS, DUTIES, REIMBURSEMENT AND RIGHTS;<br>TRANSACTIONS WITH PARTNERS

6.1  Management.  (a) The General Partner shall have exclusive
management and control of the business of the Partnership and all
decisions regarding the management of the affairs of the Partnership
shall be made by the General Partner, except as provided in subsection
(c) of this Section 6.1.  The General Partner shall have all the rights
and powers of a general partner as provided in the Act and as otherwise
provided by law and any action taken by the General Partner shall
constitute the act of and serve to bind the Partnership.  In dealing
with the General Partner acting on behalf of the Partnership, no Person
shall be required to inquire into the authority of the General Partner
to bind the Partnership.  Persons dealing with the Partnership are
entitled to rely conclusively upon the power and authority of the
General Partner as set forth in this Agreement.

(b)  The General Partner on behalf of the Partnership shall be
responsible for obtaining interconnection with the landline network, for

- 21 -

operating and maintaining the Cellular Service system, and for marketing
Cellular Service.  In carrying out the Partnership's responsibility to
provide Cellular Service, the Partners hereto agree that the General
Partner shall perform all activities and functions as the General
Partner may deem necessary or appropriate to market, sell, establish,
operate, maintain and manage the Cellular Service.

(c)  The General Partner shall devote such time to the
Partnership's business as it, in its sole discretion, shall deem to be
necessary to supervise the Partnership and its business in an efficient
manner; but nothing contained in this Agreement shall preclude the
employment, at the expense of the Partnership, of any agent or other
third party (including without limitation any Affiliate of the General
Partner, subject to Section 6.10) to operate and manage all or any
portion of the property, business or operations of the Partnership,
subject to the control of the General Partner and consistent with the
General Partner's fiduciary duty to the Partnership and applicable
regulatory requirements.

6.2  Powers of the General Partner.  In addition to and not in
limitation of those powers vested in the General Partner pursuant to the
other provisions of this Agreement or the Act, the General Partner
hereby is vested with the power:

(a)  to manage, supervise and conduct the affairs of the
Partnership and in connection therewith, to do or cause to be
done any and all acts reasonably deemed by the General Partner
to be necessary or appropriate in furtherance of the purposes
of the Partnership or forbear from doing any act if the
General Partner reasonably deems such forbearance necessary or

- 22 -

appropriate in furtherance of the purposes of the Partnership;
and

(b)  to borrow from any Person (including any Partner or
any Affiliate of any Partner) on behalf of the Partnership on
such commercially reasonable terms and conditions as shall be
approved by the General Partner and to secure any such borrow-
ings by mortgaging, pledging or assigning assets and revenues
of the Partnership to the extent deemed necessary or desirable
by the General Partner (provided, however, that any such
borrowing from a Partner or any Affiliate of a Partner shall
bear interest at a commercially reasonable rate); and

(c)  to employ and dismiss from employment on behalf of
the Partnership any and all employees, agents, independent
contractors, managers, attorneys and accountants; and

(d)  to acquire and hold in the name of the Partnership,
directly or through license, all real and personal property,
equipment, software and other assets required to provide
Cellular Service, including assets contributed to the Partner-
ship by the General Partner; and

(e)  to make all elections (including tax elections),
investigations, evaluations and decisions, binding the
Partnership thereby, that may be necessary or appropriate in
connection with the business purposes of the Partnership; and

(f)  to incur obligations or make payments on behalf of
the Partnership in its own name or in the name of the Partner-
ship; and

- 23 -

(g)  to execute on behalf of the Partnership all documents, agreements and instruments of any kind or character which the General Partner in its discretion shall deem necessary or appropriate in connection with the business purposes of the Partnership; and

(h)  from time to time to increase the coverage area of Cellular Service within any CGSA or to apply for regulatory approval to expand the geographic area of any CGSA, provided that such expansion must be into contiguous areas; and

(i)  To carry on any other activities necessary to, in connection with or incidental to any of the foregoing.

6.3  Fiduciary Duty of General Partner.  The General Partner shall be under a fiduciary duty to conduct the affairs of the Partnership in the interests of the Partnership, including the safekeeping and use of all Partnership funds and assets and the use thereof for the exclusive benefit of the Partnership.

6.4  Liability of General Partner.  Notwithstanding anything to the contrary contained in this Agreement, (a) no provision of this Agreement shall limit or shall be deemed to limit the general liability of the General Partner for the debts and obligations of the Partnership and (b) the General Partner shall be subject to the restrictions and liabilities of a partner in a partnership without limited partners.

6.5  Reimbursement.  The Partnership shall reimburse the General Partner monthly for any reasonable and necessary costs and expenses incurred by the General Partner on behalf of the Partnership in providing Cellular Service plus administrative and general overhead expenses, including, but not limited to, marketing, maintenance, message

- 24 -

charges, facilities, engineering, customary legal, accounting and audit
fees, expenses of development and implementation of billing procedures,
expenses of preparing tax returns and reports, taxes, travel, office
rent, telephone, salaries (including social security, relief, pensions
and other benefits), and other incidental business expenses incurred by
the General Partner on behalf of the Partnership in connection with the
provision of Cellular Service. The allocation of allocated costs shall
be determined in accordance with the schedule entitled Allocation of
Costs attached hereto. Without limitation of the foregoing provisions
of this Section 6.5, the Partnership shall reimburse the General
Partner, promptly upon the receipt by the Partnership of the Partners'
Second Capital Contributions, for all such expenses incurred by the
General Partner prior to the formation of the Partnership in connection
with the future provision of Cellular Service, including without
limitation the expenses incurred in connection with the formation of the
Partnership. Only expenses incurred after February 5, 1987 shall be
reimbursed. Each reimbursement of costs and expenses pursuant to this
Section 6.5 shall be made regardless of whether any distributions are
made to the Limited Partners and shall be in addition to other payments
or benefits described herein. A reasonable return on the capital of the
General Partner advanced on behalf of the Partnership in connection with
activities related to the Partnership shall be considered an expense of
the General Partner incurred on behalf of the Partnership and the
General Partner shall be reimbursed for such expense pursuant to this
Section 6.5.

6.6 Ownership or Conduct of Other Businesses. The General Partner
shall not be required to manage the Partnership as its sole and

- 25 -

exclusive function and may have other business interests and engage in other activities in addition to those relating to the Partnership. Neither the Partnership nor any Partner shall have any right by virtue of this Agreement or the partnership relationship created hereby in or to such other ventures or activities or to the income or proceeds derived therefrom. The pursuit of such ventures, even if competitive with the business of the Partnership, shall not be deemed wrongful or improper; provided that no Partner shall be permitted to provide cellular service directly or indirectly in competition with the Partnership except as may result from an overlap of adjacent cellular systems. No Partner nor any Affiliate of any Partner shall be obligated to present any particular investment opportunity to the Partnership even if such opportunity is of a character which, if presented to the Partnership, could be taken by the Partnership, and each of them shall have the right to take for its own account (individually or otherwise) or to recommend to others any such particular investment opportunity.

6.7  Exculpation and Indemnification. Neither the General Partner, nor any employee, officer, director, partner, stockholder or Affiliate of the General Partner, or of an Affiliate of the General Partner, shall be liable, responsible or accountable in damages or otherwise to the Partnership or any Limited Partner for any act taken or omission to act on behalf of the Partnership within the scope of the authority conferred on such Person by this Agreement or by law or any act or omission that was consented to or approved of by the Limited Partners unless such act or omission was performed or omitted with gross negligence, fraudulently or, in bad faith or constituted willful misconduct. The Partnership shall indemnify and hold harmless any Person who was or is a party or is

threatened to be made a party to any threatened, pending or completed
action, suit or proceeding, whether civil, criminal, administrative or
investigative (including any action by or in the right of the Partner-
ship) by reason of any acts, omissions or alleged acts or omissions
arising out of that Person's activities as a General Partner or as an
employee, officer, director, partner, stockholder or Affiliate of the
General Partner, or of an Affiliate of the General Partner, on behalf of
the Partnership or in the furtherance of the interests of the Partner-
ship, against losses, damages or expenses for which such Person has not
otherwise been reimbursed (including attorneys' fees, judgments, fines
and amounts paid in settlement) actually and reasonably incurred by that
Person in connection with such action, suit or proceeding, so long as
that Person did not act with gross negligence, fraudulently, in bad
faith or in a manner constituting willful misconduct. The termination
of any action, suit or proceeding by judgment, order, settlement, or
upon a plea of nolo contendere or its equivalent, shall not of itself
create a presumption that such Person acted with gross negligence,
fraudulently, in bad faith or in a manner constituting willful miscon-
duct.

    6.8  Rights of Limited Partners. Each Limited Partner shall have
the right to:

        (a)  inspect and copy, from time to time upon reasonable
    demand, any of the Partnership books of record, accounting
    records, financial statements or other records or reports;

        (b)  have upon reasonable demand true and full infor-
    mation regarding the state of business and financial condition
    of the Partnership, and a formal account of Partnership

affairs whenever circumstances render it just and reasonable; and

(c)  audit, at its own expense and once every calendar year, the Partnership books of record, accounting records, and financial statements of the Partnership; and

(d)  have dissolution and winding up by decree of court in accordance with the Act; and

(e)  have a quarterly status report on the operations of the Partnership, and to call a meeting with representatives of the General Partner to consult with the General Partner as to the operation of the Partnership.

6.9  Limited Partners Not to Take Part in Business.  No Limited Partner, acting in its capacity as a Limited Partner, shall participate in the control of the business of the Partnership or have any right or authority to act for or bind the Partnership.

6.10  Service Contract with Affiliate of General Partner.  The General Partner is hereby expressly authorized and empowered (and all prior actions in connection therewith are ratified), on behalf of the Partnership, to enter into an agreement with an Affiliate of the General Partner relating to the provision of administrative and management services to the Partnership provided that reimbursement pursuant to such agreement shall be made only for costs and expenses incurred in providing such services at cost, without allowance for profit.

6.11  Resale of Cellular Service.  Nothing herein shall preclude any Partner or any Affiliate of any partner from reselling Cellular Service or selling or leasing terminal equipment used in connection with Cellular Service independently from the Partnership whether within or

outside any CGSA.  Neither any Partner nor any Affiliates of any Partner shall be funded or staffed by the Partnership for such provision of Cellular Service or resale activity and any transactions between any Partner or any Affiliate of any Partner and the Partnership shall be on prices, terms and conditions equivalent to the prices, terms and conditions of any agreements between the Partnership and other resellers of Cellular Service or sellers or lessors of terminal equipment.

6.12 <u>Cellular Service in Other Areas.</u>  No Partner or Affiliate of a Partner shall provide Cellular Service independently of the Partnership within any CGSA subject to this Agreement.  If any Partner or any Affiliate of any Partner wishes to provide Cellular Service independently of the Partnership within any such CGSA, such Partner shall withdraw from the Partnership in accordance with (and such withdrawal shall be subject to the provisions of) Article IX or X before such Partner or any Affiliate of such Partner makes any application for regulatory approval to provide Cellular Service within any such CGSA. Nothing herein shall preclude any Partner or any Affiliate of any Partner from providing Cellular Service independently of the Partnership in areas other than any CGSA subject to this Agreement.

6.13 <u>Licenses.</u>  The General Partner and Limited Partners shall cause to be transferred to the Partnership's name all licenses, permits or other regulatory approvals that are necessary to provide Cellular Service pursuant to this Agreement and that are held by the General Partner or any such Limited Partner.

## ARTICLE VII

### BANKING, ACCOUNTING, REPORTS, RECORDS AND TAX MATTERS

7.1 Banking.  All funds of the Partnership shall be deposited in such interest-bearing or non-interest-bearing bank account or accounts as shall be established and designated by the General Partner or invested by the General Partner in short-term debt obligations of any issuer (including any Partner or any Affiliate of any Partner) selected by the General Partner including, without limitation, government securities, certificates of deposit of commercial banks (domestic or foreign), commercial paper, bankers' acceptances and other money market instruments.  Withdrawals from any such bank account(s) shall be made upon such signature or signatures as the General Partner may designate. The funds of the Partnership may be consolidated with funds of any other entity affiliated with the General Partner.

7.2 Maintenance of Books and Accounting Method.  The General Partner shall keep or cause to be kept full and accurate accounts of the transactions of the Partnership in proper books of account in accordance with generally accepted accounting principles, as varied by appropriate regulatory authorities.  The General Partner shall also keep or cause to be kept books of account for federal income tax purposes maintained in accordance with tax accounting principles.

7.3 Financial Reports.  The General Partner shall furnish to each Limited Partner annual audited Partnership financial statements examined by a recognized firm of independent certified public accountants and quarterly unaudited Partnership financial statements.  Quarterly unau-

dited financial statements will be furnished to the Limited Partners within forty-five  business days after the close of each quarter and be certified by an officer of the General Partner.  Year-end audited financial statements shall be furnished to the Limited Partners within ninety business days after the close of the fiscal year.  Notwithstanding the foregoing, upon written approval of the General Partner plus two Limited Partners, only one of which is Inland, Mt. Pulaski or any transferee or successor of Inland or Mt. Pulaski, the requirement of year-end audited financial statements may be waived annually for up to two consecutive years.

7.4  <u>Fiscal Year; Partnership Tax Returns.</u>  The fiscal year of the Partnership shall end on December 31 of each year.   The General Partner shall cause to be filed the federal income tax partnership return and all other tax returns required to be filed for the Partnership for all applicable tax years, and shall furnish as promptly as practicable to each Limited Partner a statement of its allocated share of income, gains, losses, deductions and credits for such taxable year.  The General Partner shall cause the Partnership to file returns and to provide, in writing, information to Partners, as required in accordance with Section 6050K of the Code.

7.5  <u>Tax Elections.</u>  The General Partner in its sole discretion may make, on behalf of the Partnership, the election referred to in Section 754 of the Code or any similar provision enacted in lieu thereof, upon the transfer of any Partnership Interest in accordance with this Agreement, if the transferee so requests and agrees to pay the Partnership's expenses in making the accounting adjustments resulting from such

election. Each of the Partners shall upon request supply the
information necessary to give proper effect to such election.

### ARTICLE VIII

#### TRANSFER OF PARTNER'S PARTNERSHIP
#### INTEREST; ADMISSION OF LIMITED PARTNER

8.1 <u>Limitation on Transfer</u>. (a) There shall be no Disposition of
all or any portion of any Limited Partner's Partnership Interest and no
Disposition of any portion of any General Partner's Partnership Interest
whereby the proposed transferee would obtain such interest as a Limited
Partner, and the Partnership need not recognize any such Disposition,
unless:

(i)    the Partner desiring Disposition has delivered to
the General Partner a duly executed and acknowledged counter-
part of the instrument making such Disposition and has given
prior notice to all Partners of its intent to make a
Disposition; and

(ii)  The Partner desiring Disposition has obtained the
written consent of the General Partner to such Disposition,
which consent may not be unreasonably withheld; and

(iii) Any necessary prior consents have been obtained
from the appropriate regulatory authorities.

(iv)  In the case of Inland, the debt obligations
incurred in connection with Ameritech Mobile Communications,
Inc.'s funding of Inland's Capital Contributions shall be
discharged and paid in full prior to the Disposition by Inland
of all or any portion of its Partnership interest.

(v)   In the case of Mt. Pulaski, the debt obligations

incurred in connection with Ameritech Mobile Communications, Inc.'s funding of Mt. Pulaski's Capital Contribution shall be discharged and paid in full prior to the Disposition by Mt. Pulaski of all or any portion of its Partnership interest. (Hereinafter the debt obligations between Mt. Pulaski and Inland are referred to as the "Loan" or collectively as the "Loans".)

(b) The Disposition of all or any portion of a Limited Partner's Partnership Interest shall not release the Limited Partner making the Disposition from any of its liabilities incurred under this Agreement prior to the effective date of the admission of a substitute limited partner, if any, for such Limited Partner's Partnership Interest.

(c) Each Limited Partner shall advise the General Partner, in writing, of any Disposition, in whole or in part, of its Partnership Interest in accordance with Section 6050K of the Code.

8.2 <u>Right of First Refusal</u>. In addition to any other limitation contained in this Agreement, before any Limited Partner makes a Disposition of all or any portion of its Partnership Interest and before any General Partner makes a Disposition of any portion of its Partnership Interest to a proposed transferee who would become a substitute limited partner, it shall offer, by giving written notice to the General Partner, that Partnership Interest (or portion thereof) to all of the other Partners for the price at which and the terms under which the purchaser has offered in writing to pay for such Partnership Interest (or portion thereof). The General Partner, in turn, shall forward such notice to all other Partners. Each Partner shall initially be entitled to purchase that fraction of the Partnership Interest (or portion

thereof) intended to be sold equal to its Percentage Interest divided by the Percentage Interests of all Partners other than the selling Partner. If any Partner declines to exercise its right of purchase hereunder, the other Partners electing to exercise that right shall be entitled to purchase the portion of the Partnership Interest intended to be sold that has been declined by such Partner in amounts allocably determined pursuant to reapplication of the principles set forth in the preceding sentence, excluding from consideration the Percentage Interests of the selling and declining Partners. Each Partner other than the selling Partner shall notify the General Partner and the selling Partner, in writing, of its intention to exercise or not to exercise its purchase rights hereunder within thirty days following its receipt of the offer of sale. The General Partner shall promptly notify each Partner of the elections by the other Partners. The Partners that have not previously declined to exercise their rights of purchase shall, if necessary, notify the General Partner of their intentions with respect to that portion of the selling Limited Partner's Partnership Interest still subject to a right of purchase within ten days of receipt of any such notice from the General Partner. If, at the time the selling Limited Partner offers its Partnership Interest (or portion thereof) to the other Partners pursuant to this Section 8.2, AMPS is the only other Partner, AMPS may in its sole discretion assign its rights of purchase under this Section 8.2 to any other Person or Persons. No portion of a Partner's Partnership Interest (or portion thereof) offered for purchase under this Section 8.2 may be purchased by any other Partner pursuant to this Section 8.2 unless the entire Partnership Interest (or portion

thereof) offered is purchased by one or more Partners or permitted
Assignees of Partner(s).

Notwithstanding the foregoing:   (1) Midwest shall have the sole
right to acquire the first fifteen percent (15%) of the sum total of all
Limited Partners' Partnership Interests proposed or offered for Disposi-
tion subsequent to the formation of the Partnership; and (2) AMPS' right
to acquire the interest of any Limited Partner pursuant to this.
paragraph shall be subject to a right of first refusal for Midwest to
purchase such interest.  Midwest's rights under this paragraph also
shall apply in the circumstances set forth in Section 4.5.

Loan Documents relied upon for funding by and between AMPs or its
Affiliates, Mt. Pulaski and Inland shall not override Midwest's rights
of first refusal except that AMPs or its Affiliates have rights superior
to Midwest's in the event of a default under the Loan documents or in
the event of a repayment by Mt. Pulaski or Inland or their transferees
or successors of such Loan by tender of the partnership interest.  In
either such event, AMPs or its Affiliates agrees to offer such interest
to Midwest for its then current fair market sales value.  In the event
the parties are unable to agree on fair market sales value, such value
shall be determined by an appraiser chosen by the parties for such
purpose.  If the parties are unable to agree on an appraiser, or if the
valuation as determined by the appraiser is not acceptable to one of the
parties, then fair market sales value shall be determined by a panel of
three appraisers, one of which shall be chosen by each of the parties
and the third appraiser shall be chosen by the other two, and the
determination of value by such panel of appraisers shall be binding upon
the parties.

- 35 -

8.2.1  The right of first refusal provided in Section 8.2 of this Agreement shall not apply to the following Dispositions of a Partnership Interest, so long as the transferee of the Partnership Interest has satisfied all of the requirements to become a substitute limited partner under Section 8.5 of this Agreement prior to or contemporaneous with the effective date of the Disposition:

(a)  Disposition of an entire Partnership Interest made to an Affiliate as defined in subsection (a) of Section 1.3;

(b)  Disposition of a Partnership Interest through a bequest or devise of the Partnership Interest to the spouse of an individual (or, if such individual has no spouse but has surviving immediate family members, to one or more members of the immediate family of such individual) who, on the date hereof, owns 50% or more of the capital stock of a Partner;

(c)  Disposition of a Partnership Interest through gift of the Partnership Interest to the spouse of an individual (or, if such individual has no spouse but has surviving immediate family members, to one or more members of the immediate family of such individual) who, on the date the immediate family of such individual) who, on the date hereof, owns 50% or more of the capital stock of a Partner;

(d)  Disposition of an entire Partnership Interest to a trust the beneficiary of which is the spouse or one or more other immediate family members of an individual who, on the date hereof, owns 50% or more of the capital stock of a Partner; or

(e)  Disposition of one-half of the Partnership Interest of Inland to Prarie Cellular Telephone Company.

(f)  Any transfer by way of sale, gift, assignment, exchange or other Disposition of any stock of a Partner, or of any stock of any corporation which controls a Partner, if made:

(i)  to the corporation, the stock of which is being transferred:

(ii)  to a Person who on the date hereof is a shareholder of any corporation which controls a Partner, or a Person who is a spouse, son, daughter, grandchild, brother or sister of any such Person;

(iii)  to a trust established by or for the benefit of any person described in (ii).

(iv)  in the case of Ameritech Information Technologies Corporation stock is a sale of less than a controlling interest in its stock.

In the event that any Disposition permitted under this Section 8.2.1 (except for subsection (e) thereof) would result in a Partnership Interest being owned by more than one person, in addition to the requirements set forth above, such Disposition shall be subject to a requirement that the transferees of the Partnership Interest shall own the Partnership Interest as tenants in common, joint tenants or other form of joint ownership.  No Disposition of any portion of a Partnership Interest so held in joint tenancy, tenancy in common or other form of joint ownership, or any interest therein or, may be made unless such Partnership Interest in its entirety is first offered to the other Partners, pursuant to the provisions of Section 8.3.

8.2.2  Without limiting anything elsewhere provided in Section 8.2, the right of first refusal with respect to a Partnership Interest, as

provided in Section 8.2, shall apply in the case of any of the following transactions:

(a) Any transfer by way of sale, gift, assignment, exchange or other disposition (including without limitation disposition by inheritance, bequest, devise, or intestate succession) of any stock of a Partner, or of any stock of any corporation which controls a Partner, other than as described in Section 8.2.1(f);

(b) Distribution of all or any portion of a Partnership Interest by a trust which is a Partner to any beneficiary of such trust;

(c) Default by either Mt. Pulaski or Inland with respect to the Loan between each of them and Ameritech Mobile Communications, Inc. as provided in Section 8.2; or

(d) Disposition of all or any portion of a Partnership Interest by inheritance, bequest, devise or intestate succession from any individual who has acquired ownership of such Partnership Interest or portion thereof through the operation of Section 8.2.1(b) or (c).

8.2.3 Unless the price at which a Partner having a right to purchase all or any portion of a Partnership Interest is determined by reference to a bona fide third party offer, the price at which a Partner shall have a right to purchase all or any portion of a Partnership Interest shall be the fair market sales value of such Partnership Interest. In the event the parties are unable to agree on fair market sales value, such value shall be determined by an appraiser chosen by the parties for such purpose. If the parties are unable to agree on an appraiser, or if the valuation as determined by the appraiser is not acceptable to one of the parties, then fair market sales value shall be determined by a panel of three appraisers, one of which shall be chosen by each of the parties

- 38 -

and the third appraiser shall be chosen by the other two, and the determination of value by such panel of appraisers shall be binding upon the parties.

8.3  Additional Limitation on Transfer.  Notwithstanding anything to the contrary contained in this Agreement, no Disposition of any Limited Partner's Partnership Interest, or any fraction thereof, may be made if such Disposition, when considered together with all other Disposition of Partnership Interests, would (in the opinion of counsel for the Partnership, which shall be conclusive for this purpose) result in the termination of the Partnership for the purposes of the then-applicable provisions of the Code.

8.4  Limitation on Further Transfer; Liabilities.  A Person who is the Recipient of all or any portion of the Partnership Interest of a Limited Partner, but is not admitted to the Partnership as a substitute Limited Partner pursuant to Section 8.5, shall be subject to all the provisions of this Article VIII to the same extent and in the same manner as any Limited Partner and shall be liable for all the liabilities of the assigning Limited Partner under this Agreement.

8.5  Substitute Limited Partner.  No Recipient of all or any portion of any Limited Partner's Partnership Interest shall have the right to become a substitute Limited Partner, unless:

(a)  The Limited Partner desiring Disposition has granted the Recipient such right in a written instrument of assign-ment, a copy of which has been delivered to the General Partner (the Limited Partner desiring Disposition being hereby given the power to grant such right, subject the further requirements of this Section 8.5); and

- 39 -

(b)  The Limited Partner desiring Disposition has obtained the written consent of the General Partner to such admission, which consent may not be unreasonably withheld; and

(c)  The Recipient has adopted and agreed in writing to be bound by all of the provisions of, and to assume all of the liabilities of the Limited Partner making the Disposition under, this Agreement; and

(d)  All documents reasonably required by the General Partner or required by the Act to effect the substitution of the Recipient as a Limited Partner shall have been executed and delivered to the General Partner at no cost to the Partnership and the Recipient has paid to the General Partner all reasonable expenses (including, without limitation legal fees and filing costs) of the Partnership in connection with such substitution; and

(e)  Any necessary prior consents have been obtained from the appropriate regulatory authorities.

8.6  Indemnification.  Each Limited Partner making a Disposition of all or any portion of its Partnership Interest and each Recipient of the same shall indemnify and hold harmless the Partnership, every other Partner and every employee, officer, director, partner, stockholder and Affiliate of every other Partner (or of any Affiliate of any Partner) against any and all loss, damage or expense (including, without limitation, tax liabilities arising from loss of tax benefits, attorneys' fees, fines, judgments and amounts paid in settlement of litigation or threatened litigation) incurred by the Partnership or such other Person and arising, directly or indirectly, from any sale, exchange, assignment

- 40 -

or other transfer or purported sale, exchange, assignment or other transfer in violation of any law or any provision contained in this Article VIII or from any actual or alleged material misrepresentation or misstatement of facts or omission to state facts made (or omitted to be made) by such Limited Partner or such other Person in connection with any such sale, exchange, assignment or other transfer, or the admission of such other Person as a substitute Limited Partner to the Partnership.

8.7  <u>Effective Date of Admission or Transfer</u>.  The effective date of any admission of a Limited Partner to the Partnership and of any assignment, sale, exchange or other transfer of a Partner's Partnership Interest or portion thereof shall be the first day of the month following the month in which all conditions to such admission or such assignment, sale, exchange or other transfer, respectively, have been satisfied.

### ARTICLE IX

### WITHDRAWAL BY LIMITED PARTNER; DEFAULT

9.1  <u>Voluntary Withdrawal</u>.  Upon thirty days' written notice to each Partner, any Limited Partner may withdraw from the Partnership, subject to any required regulatory approval; provided, however, that: (1) no Limited Partner may withdraw from the Partnership if such with-drawal would result in a termination of the Partnership for federal income tax purposes or a dissolution of the Partnership for purposes of the Act; and (2) in the case of withdrawal by Inland or Mt. Pulaski the withdrawing Limited Partner shall have discharged and paid in full the debt obligations incurred in connection with Ameritech Mobile Communications, Inc.'s funding of Capital Contributions pursuant to the Loan.  The effective date of any such withdrawal shall be the first day

- 41 -

of the month following the month in which all conditions to such with-
drawal have been satisfied.

9.2 Default by Limited Partner. The occurrence of any of the
following events shall constitute a default with respect to a Limited
Partner (a "Default"):

(a) Such Limited Partner fails to make its Second
Capital Contribution when due; or

(b) Such Limited Partner fails to perform any of its
obligations under this Agreement and such default is not
corrected within sixty days after the same is called to the
attention of such Limited Partner by the General Partner by
written notice specifying the relevant failure; provided,
however, that such sixty-day period shall cease to run during
the pendency of any arbitration proceeding instituted pursuant
to Section 15.10 to determine the existence of such a failure;
or

(c) Such Limited Partner becomes insolvent or bankrupt
or unable to pay its debts when due or makes an assignment for
the benefit of creditors.

(d) In the case of Inland and Mt. Pulaski, if they shall
fail to make any Capital Contribution when due at any time
prior to repayment in full of the Loan between them and
Ameritech Mobile Communications, Inc.

Notwithstanding anything herein to the contrary, a
Partner's election pursuant to Section 4.4, within fifteen days of
notice not to make an Additional Capital Contribution shall not be
considered a Default.

- 42 -

9.3 Remedies upon Default. Upon any Default with respect to any Limited Partner, the General Partner shall have all the rights and remedies provided by applicable law, and in addition, shall have the right (but not the obligation) (a) to require the defaulting Limited Partner to withdraw from the Partnership or (b) to arrange for a sale of the defaulting Limited Partner's Partnership Interest pursuant to Section 9.6. Such rights are cumulative and not exclusive of each other or of any other right provided by applicable law. By execution of this Agreement, each Limited Partner agrees that it shall promptly withdraw from the Partnership if so required by the General Partner upon a Default by such Limited Partner. Any such withdrawal shall be effective as of the first day of the month following the month in which the General Partner notifies the defaulting Limited Partner that the General Partner is requiring such Limited Partner to withdraw.

9.4 Distributions on Withdrawal. Upon the withdrawal of a Limited Partner pursuant to Section 9.1 or 9.3, the Limited Partner so withdrawing shall, subject to the provisions of Section 9.5 and the Act, receive distribution in cash of the lesser of (a) its Capital Account, determined in accordance with generally accepted accounting principles, or (b) its Capital Account, adjusted to reflect the Income and Losses that would be allocated to such Partner if the Partnership were dissolved and its affairs wound up in accordance with Article XI as of the date of such withdrawal.

Immediately prior to the effective date of the withdrawal, there will be a specific accounting of Income and Losses for both book and tax purposes in conformance with Section 5.2, provided, however, that such specific accounting shall be in lieu of a Section 5.2

- 43 -

allocation and shall cover the shorter of: (i) the fiscal year to the day prior to the effective date of the withdrawal or, (ii) the period beginning on the day following the date of the last specific accounting to the day prior to the effective date of the withdrawal.

Notwithstanding anything herein to the contrary, the General Partner shall be entitled to retain reasonable amounts which might otherwise be payable on withdrawal should the General Partner deem such advisable in providing for adjustments anticipated after the close of the fiscal year.  A list of such contingencies and amounts retained shall be provided to the withdrawing Partner on the effective date of the withdrawal.  Any amount retained and not expended by the General Partner shall be paid to the withdrawing Partner within twelve months of the date of withdrawal.  The General Partner shall provide to the withdrawing Limited Partner an accounting, in reasonable detail, of any expenditures of withheld funds during such twelve month period except such amounts specifically identifiable as payable or accrued.

9.5  Distributions Over Time.  If any distribution is made pursuant to Section 9.4, amounts payable to the Limited Partner so withdrawing shall be paid to such Limited Partner by the Partnership and may at the General Partner's option be paid in equal annual payments including interest over a period not exceeding three years in order to provide the Partnership sufficient time to raise capital to replace the capital being withdrawn and to ensure the continued provision of Cellular Service.  Such interest shall be equal to the average annual yield to maturity which two leading U.S. Government securities dealers of recog-nized standing, selected by the General Partner, estimate to be the highest yield the General Partner could have obtained if it had

purchased U.S. Treasury obligations in a principal amount equal to the amount payable to the withdrawing Limited Partner with a maturity as near as practicable to the date of the last of such annual payments and trading in the secondary market in a reasonable volume at a price reasonably close to par with payments being made semi-annually, all in accordance with United States domestic practice.

9.6  Sale upon Default.  Upon any Default with respect to any Limited Partner, the General Partner shall have the right (but not the obligation) to arrange a sale of such Limited Partner's Partnership Interest.  In the event that the General Partner elects to arrange such a sale, it shall be on the best terms available, as determined by the General Partner in its sole discretion.  The General Partner, in determining whether any proposed terms are the best available, may take into account the necessity for concluding any such sale promptly. Subject to the provisions of Section 8.2, the purchaser in connection with any such sale may be the General Partner or any Affiliate of the General Partner.  The proceeds of such sale shall be paid to the Partnership to the extent necessary to satisfy the defaulting Limited Partner's obligations to the Partnership and the remainder, if any, of such proceeds shall be paid (after deducting all expenses of sale) to the defaulting Limited Partner.  If the defaulting Limited Partner's obligations to the Partnership exceed the proceeds of such sale (after deducting all expenses of sale), the defaulting Limited Partner shall continue to be liable to the Partnership for any such excess.  Subject to Section 8.7, the Person to whom such defaulting Limited Partner's Partnership Interest is sold shall take all right, title and interest of the defaulting Limited Partner in such Partnership Interest.  The

- 45 -

defaulting Limited Partner shall be deemed to have withdrawn from the Partnership upon such sale and no distribution shall be made to the defaulting Limited Partner upon its withdrawal.

## ARTICLE X

### ADMISSION AND WITHDRAWAL OF GENERAL PARTNER

10.1 Admission of General Partner. (a) The General Partner may admit a Person as an additional General Partner of the Partnership only with the specific written consent of every other Partner. Any such admission shall be subject to any required regulatory approval.

(b) The effective date of any admission of a General Partner to the Partnership and of any assignment, sale, exchange or other transfer of a General Partner's Partnership Interest shall be the first day of the month following the month in which all conditions to such admission or such assignment, sale, exchange or other transfer, respectively, have been satisfied.

10.2 Withdrawal. Notwithstanding anything herein to the contrary, a General Partner may withdraw from the Partnership at any time upon ninety days' written notice to each other Partner. If at the time of such notice, (a) there is at least one other General Partner of the Partnership, (b) the withdrawing General Partner assigns its Partnership Interest to such other General Partner or elects to convert its interest in the Partnership to that of a Limited Partner, and (c) the remaining General Partners unanimously vote to carry on the business of the Partnership, the Partnership shall not be dissolved and the business of the Partnership shall be carried on by the remaining General Partner or General Partners, subject to appropriate regulatory approval. If the withdrawing General Partner elects to convert its interest in the

- 46 -

Partnership to that of a Limited Partner it may do so without regard to
rights of first refusal provided for elsewhere in this Agreement, and
shall upon withdrawal be admitted to the Partnership as a Limited
Partner and shall have all the rights, interest and duties of the other
Limited Partners under this Agreement, with a Capital Account,
Percentage Interest and Tax Capital Account equal to what it had as a
General Partner. If at the time of such notice, (i) there is no other
General Partner or (ii) the withdrawing General Partner neither assigns
its Partnership Interest to the other General Partner nor elects to
convert its interest in the Partnership to that of a Limited Partner, or
(iii) the remaining General Partners do not unanimously vote to carry on
the business of the Partnership, the Partnership shall be dissolved and
its affairs wound up in accordance with Article XI; provided, however,
that the Partnership shall not be dissolved if prior to the withdrawal
of the withdrawing General Partner, the remaining Partners unanimously
designate a Person who agrees (A) to purchase the Partnership Interest
of the withdrawing General Partner, both in its capacity as General
Partner and in its capacity as a Limited Partner, on terms acceptable to
the withdrawing General Partner and (B) to continue the business of the
Partnership as a new general partner of the Partnership. In such event,
subject to any required regulatory approval and to Section 10.1(b), (x)
the withdrawing General Partner shall sell its Partnership Interest,
both in its capacity as a Limited Partner and as a General Partner, to
such Person on the terms agreed, (y) all of the Partners shall by
written consent admit such Person as a general partner of the
Partnership prior to the withdrawal of the withdrawing General Partner,
and (z) upon the withdrawal of the withdrawing General Partner, the

- 47 -

business of the Partnership shall be carried on by such Person as the new General Partner. The General Partner shall not unreasonably withhold its acceptance of terms for purchase of its Partnership Interest by the substitute general partner.

10.3 Encumbrance or Assignment. Neither the encumbrance by the General Partner of all or any portion of its Partnership Interest nor the creation of a security interest therein shall cause the General Partner to cease to be a general partner of the Partnership. Notwithstanding anything to the contrary contained in this Article X or elsewhere in this Agreement, no sale or exchange of the General Partner's Partnership Interest, or any fraction thereof, may be made if such sale or exchange, when considered together with all other sales and exchanges of Partnership Interests, would (in the opinion of counsel for the Partnership, which shall be conclusive for this purpose) result in the termination of the Partnership for the purposes of the then-applicable provisions of the Code.

## ARTICLE XI

### DISSOLUTION AND TERMINATION

11.1 Dissolution. The Partnership shall be dissolved and its affairs wound up upon the first to occur of the following:

(a) the refusal of FCC to approve this Agreement, or the approval by the FCC of this Agreement subject to terms and conditions that are unacceptable to the General Partner and one Limited Partner that is not also the General Partner and the final exhaustion of all available administrative and judicial appeals of such refusal or terms and conditions; or

- 48 -

(b)  the modification of the Cellular Radio Decisions, if such modification materially and adversely affects the Partnership's ability to conduct its business, and the 'final exhaustion of all available administrative and judicial appeals regarding such modification; or

(c)  the final denial by the FCC of any license required by the Partnership to provide Cellular Service or as contemplated hereby to construct the facilities necessary therefor and the final exhaustion of all available administrative and judicial appeals of any such denial; or

(d)  the final denial by any state or other regulatory authority of any approval or license required by the Partnership to provide Cellular Service or to construct the facilities necessary therefor, or the grant of any such approval subject to terms and conditions that are unacceptable to the General Partner and one Limited Partner that is not also the General Partner, and the final exhaustion of all available administrative and judicial appeals of any such denial or terms and conditions; or

(e)  the unanimous agreement in writing by all the Partners to dissolve and terminate the Partnership and the receipt of any approvals required by the FCC or any other regulatory authority for such dissolution and termination; or

(f)  subject to Section 10.2, the death, insanity, withdrawal, bankruptcy, retirement, resignation or expulsion of any General Partner; or

- 49 -

(g)  the expiration of the term of the Partnership pursuant to Section 2.5; or

(h)  the occurrence of an event that dissolves the Partnership pursuant to the terms of Section 10.2; or

(i)  the occurrence of any other event causing the dissolution of the Partnership under the laws of the State of Illinois.

11.2  <u>Distribution Upon Dissolution.</u>    Upon dissolution of the Partnership, the General Partner shall proceed, subject to the provisions of this Article XI, to liquidate the Partnership and, after the final allocation of Income and Losses, apply the proceeds of such liquidation, or to distribute Partnership assets, in the following order of priority:

(a)  To creditors, including Partners who are creditors, to the extent otherwise permitted by law, in satisfaction of liabilities of the Partnership other than liabilities for distributions to Partners under Articles V or IX;

(b)  To the establishment of any reserve which the General Partner may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Partnership.  Such reserve may be paid over by the General Partner to the Northern Trust Bank/Woodfield as escrow agent to be held for disbursement in payment of any of the liabilities described in subsection (a) of this section 11.2 and, at the expiration of such period as shall be deemed advisable by the General Partner, for distribution of the balance, in the manner hereinafter provided in this section 11.2;

- 50 -

(c)  To Partners and former Partners in satisfaction of liabilities of the Partnership for distributions under Articles V and IX;

(d)  to the Partners in the same proportion as the Capital Account of each Partner bears to the total of the Capital Accounts of all of the Partners at the time of such distribution, until the Capital Accounts of all of the Partners are reduced or restored to "zero".

11.3  Distributions in Cash or in Kind.  Upon dissolution, the General Partner may in its discretion (a) liquidate all or a portion of the Partnership assets and apply the proceeds of such liquidation in the priorities set forth in Section 11.2 or (b) hire independent recognized appraisers to appraise the value of Partnership assets not sold or otherwise disposed of (the cost of such appraisal to be considered a debt of the Partnership), and distribute such assets in accordance with the priorities set forth in Section 11.2.  The Partners' Capital Accounts shall be adjusted prior to any such distribution to reflect the Income and Losses allocable to the Partners pursuant to Section 5.3 as a result of such distribution.  The General Partner may determine in its reasonable discretion the manner in which assets distributed in kind will be distributed to the Partners; without limitation of the foregoing, undivided portions of any such asset may be distributed to more than one Partner or any such asset may be distributed in its entirety to one Partner.  The Appraised Value of any assets distributed in kind to a Partner pursuant to this Section 11.3 shall be applied against the amounts distributable to such Partner pursuant to Section 11.2.

11.4  <u>Time for Liquidation.</u>  A reasonable amount of time shall be allowed for the orderly liquidation of the assets of the Partnership and the discharge of liabilities to creditors so as to enable the General Partner to avoid or minimize any losses which otherwise might be incurred.

11.5 <u>Termination.</u>  Upon the dissolution and the commencement of the winding up of the Partnership, the Partnership shall terminate and the General Partner shall execute and cause to be filed a certificate of cancellation of the Partnership pursuant to the Act.

11.6  <u>General Partner Not Liable for Distributions.</u>  The General Partner shall not be liable for any distribution to a Partner required pursuant to subsection (b), (c), or (d) of Section 11.2 and such distribution shall be made solely from available Partnership assets, if any.

11.7 <u>General Partner's Right to Continue to Provide Cellular Service.</u>  Each Limited Partner hereby agrees that, in the event that such Limited Partner withdraws pursuant to Article IX, the General Partner and the remaining Limited Partners shall have the right to provide Cellular Service in the areas in which the Partnership provides, or did provide, Cellular Service, either singly or with others, subject to any necessary regulatory approval.

ARTICLE XII

POWER OF ATTORNEY

12.1  <u>Grant of Power of Attorney.</u>  Each Limited Partner, by its execution hereof, hereby irrevocably constitutes and appoints the General Partner and its successors and assigns as General Partner, with full power of substitution, its true and lawful attorney and agent, in its name, place and stead to make, execute, sign, acknowledge swear to,

- 52 -

file and record on its behalf and on behalf of the Partnership, the
following:

(a) A certificate of limited partnership, a certificate
of doing business under an assumed name and any other certifi-
cate or instrument or amendment thereof which the Partnership
or any of the Partners may be required to file under the laws
of the State of Illinois and any other jurisdiction whose laws
may be applicable or which the General Partner shall deem it
advisable to file; and

(b) Any certificates or other instruments (including
counterparts of this Agreement with such changes as may be
required by the law) and all amendments thereto which the
General Partner deems appropriate or necessary to qualify, or
continue the qualification of, the Partnership as a limited
partnership and to preserve the limited liability status of
the Limited Partners in the jurisdictions in which the Part-
nership may own properties, conduct business and acquire
investment interests; and

(c) Any certificates or other instruments which may be
required to admit additional or substitute Limited or General
Partners pursuant to the terms of this Agreement, to reflect
the withdrawal of any Limited Partner, to reflect any increase
in the relevant Limited Partner's Capital Contribution by
reason of such Limited Partner having made its Second Capital
Contribution, any Additional Capital Contribution or any
contribution it may make pursuant to Section 4.4, to reflect
changes in the respective Percentage Interests of the

- 53 -

Partners, or to effectuate the dissolution and termination of
the Partnership pursuant to Article XI; and

(d)  Any and all amendments to the instruments and
documents described in this Section 12.1, provided such
amendments are either required to be filed, or are consistent
with this Agreement, or have been authorized by the relevant
Limited Partner or Limited Partners; and

(e)  Any and all other instruments and documents which
may be deemed necessary or desirable by the General Partner to
carry out fully the provisions of this Agreement.

12.2  <u>Irrevocable and Coupled With an Interest.</u>  The powers of
attorney granted under Section 12.1 shall be deemed irrevocable and to
be coupled with an interest.

12.3  <u>Survival of Power of Attorney.</u>  The powers of attorney
granted in Section 12.1 shall survive any assignment by a Limited
Partner of the whole or any portion of its Limited Partner's Partner-
ship Interest, except that if such assignment was of all of its Limited
Partner's Partnership Interest and all conditions required for the
admission of the Recipient as a substitute Limited Partner pursuant to
Section 8.5 have been met, the foregoing powers of attorney shall
survive the delivery of such assignment for the purpose of enabling the
General Partner to make, execute, acknowledge, sign, swear to file and
record any and all certificates and other instruments necessary to
effectuate the admission of the Recipient as a Limited Partner and the
withdrawal from the Partnership of the Limited Partner.  Such powers of
attorney shall survive the death, incapacity, dissolution or termination

- 54 -

of a Limited Partner and shall extend to such Limited Partner's
successors and assigns.

12.4  Limitation on Power of Attorney.  Except as set forth in this
Article XII and in Article XIII, the General Partner may not modify the
terms of this power of attorney without the written consent of all the
Limited Partners.

### ARTICLE XIII

### AMENDMENTS

13.1  Amendments.  Other than as authorized in Section 4.11 of
this Agreement, this Agreement may not be amended from time to time by
the General Partner, without the consent of all Limited Partners, except
(a) to add to the representations, duties or obligations of the General
Partner or surrender any right or power granted to the General Partner
by this Agreement or (b) to cure any ambiguity, to correct or supplement
any provision in this Agreement which may be inconsistent with any other
provision in this Agreement, to add any other provisions with respect to
matters or questions arising under this Agreement which will not be
inconsistent with the provisions of this Agreement, or to correct or
modify any provision of this Agreement that may be inconsistent with
federal income tax law or regulation; provided, however, that no amend-
ment shall be adopted pursuant to this sentence unless the adoption
thereof (i) is for the benefit of or not adverse to the interests of the
Limited Partners, (ii) does not adversely affect the interest of any
Limited Partner in Income or Losses, Tax Profits or Tax Losses or tax
credits for federal income tax purposes under Article V or in distribu-
tions under Article V, IX or XI and (iii) does not, in the opinion of
counsel for the Partnership, by its terms alter the limited liability of

- 55 -

the Limited Partners or the status of the Partnership as a partnership for federal income tax purposes. In the event of any such amendment, the General Partner shall notify the other Partners of such amendment at least ten business days prior to filing.

13.2 Execution of Amended Agreements. Each Limited Partner agrees to execute or cause to be executed promptly any amendments to this Agreement and corresponding amendments to all certificates or filings of the Partnership reasonably requested by the General Partner and author- ized under Section 13.1 or any other provision of this Agreement.

## ARTICLE XIV

### TECHNOLOGY AND INFORMATION

14.1 Technology License. The General Partner shall, on behalf of the Partnership, obtain the right to use hardware and software technology associated with Cellular Service. The General Partner is hereby authorized, on behalf of the Partnership, to engage in negotiations and to enter into contracts for licenses to use cellular hardware, software or related processes. In general, such contracts shall be merely right-to-use contracts and will not vest any title in any Partner to this Agreement.

14.2 Proprietary Information. All information relating to the business of the Partnership and its provision of Cellular Service including but not limited to specifications, microfilm, photocopies, keypunch cards, magnetic tapes, drawings, sketches, models, samples, tools, technical information, data, employee records, maps, customer information, financial reports, and market data marked or identified in writing as proprietary (collectively, "Proprietary Information") furnished to or obtained by a Partner from any other Partner, whether

- 56 -

written or oral or in other form, shall remain the disclosing Partner's
property.  All copies of such information whether written, graphic or
other tangible form shall be returned to the disclosing Partner upon the
disclosing Partner's request except that one copy may be retained for
archival purposes.  Unless otherwise agreed, the obligation under this
Section 14.2 not to disclose Proprietary Information (a) shall not
extend beyond five years from the date of receipt of such information
and (b) the obligation does not apply to such Proprietary Information
that was previously known to the receiving Partner free of any obliga-
tion to keep it confidential or has been or is subsequently made public
by the disclosing Partner or a third party.  Such Proprietary
Information shall be kept confidential by the receiving Partner and
shall be used only to conduct the business of the Partnership and
otherwise to fulfill the purposes of this agreement and may be used for
such other purposes only upon such terms as may be agreed upon between
the disclosing Partner and receiving Partner in writing.

### ARTICLE XV

### MISCELLANEOUS PROVISIONS

15.1  Warranties.  Each Partner warrants as follows:

(a)  It has the power and authority to execute, deliver
and perform this Agreement; that all necessary corporate
actions to authorize the execution, delivery and performance
of this Agreement by such Partner, have been duly taken; that
this Agreement has been executed and delivered by duly
authorized officials of such Partner; and that this Agreement
is and shall be enforceable against such Partner hereto in
accordance with its terms.

- 57 -

(b)  This Agreement does not breach any of its existing agreements with other parties.

(c)  In the case of each Limited Partner, it is purchasing its Partnership Interest for long-term investment and it is without present intention of resale or other disposition of such Partnership Interest.

15.2  <u>Table of Contents and Headings.</u>  The table of contents and the headings of the Articles and Sections of this Agreement are inserted for convenience only and shall not be deemed to constitute a part hereof.

15.3  <u>References</u>.  References in this Agreement to Articles, Sections and Appendices are to the articles, sections and appendices of this Agreement, unless otherwise specified.

15.4  <u>Successors and Assigns.</u>  This Agreement shall inure to the benefit of and be binding upon the Partners and any additional or substitute Limited Partner or General Partner and to their respective successors and assigns, except that nothing contained in this Section shall be construed to permit any attempted assignment or other transfer which would be unauthorized by or void pursuant to any other provision of this Agreement.

15.5  <u>Severability.</u>  Every provision of this Agreement is intended to be severable.  If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the remainder of the Agreement.

15.6  <u>Waiver.</u>  No provision of this Agreement shall be deemed to have been waived unless such waiver is contained in a written notice given to the Partner claiming such waiver and no such waiver shall be

- 58 -

deemed to be a waiver of any other or further obligation or liability of the Partner or Partners in whose favor the waiver was given.

15.7 **Applicable Law.** This Agreement and the rights and obligations of the Partners as such shall be interpreted in accordance with the laws of the State of Illinois, without regard to provisions concerning conflicts of law. The Partnership will be bound by and fully comply with any applicable provision of the equal employment opportunity law, including any executive orders issued thereunder.

15.8 **Entire Agreement.** This Agreement constitutes the entire Limited Partnership Agreement between the Partners and shall supersede all previous negotiations, commitments, representations and writings.

15.9 **Notices.** All notices given by any Partner to any other Partner under this Agreement shall be in writing, by registered or certified mail, postage prepaid, addressed as follows (or to such other address as a Partner may specify in such a notice to all other Partners):

```
        General Partner: Ameritech Mobile Phone Service of
                          Illinois, Inc.
                         1515 Woodfield Road, 14th Floor
                         Schaumburg, Illinois 60173
                         Attention:  General Counsel

        Limited Partners: Inland Cellular Telephone Co.
                         1400 West Anthony Drive
                         Post Office Box 3000
                         Champaign, Illinois  61281
                         Attention: President

                         Mt. Pulaski Cellular Company
                         228 South Chicago Street
                         Post Office Box 100
                         Lincoln, Illinois  62656
                         Attention:  President
```

- **59** -

U S West NewVector Group, Inc.
3350 161st Avenue, S.C.
Bellevue, Washington  98008-1329
Attention:  General Counsel

Midwest Cellular Associates
121 South Seventeenth Street
Mattoon, Illinois  61938
Attention:  President

Such notices shall be effective on the third business day subsequent to the date of mailing.

15.10  Arbitration.  (a)  In case any disagreement with respect to Section 9.2(b) 1.4, or 1.7 that cannot be resolved by negotiation, shall arise between any Limited Partner or group of Limited Partners and the General Partner, the General Partner or such Limited Partner or group of Limited Partners may initiate proceedings to submit such disagreement to arbitration by serving written notice of arbitration on the other party, which notice shall include appointment of an arbitrator, naming such arbitrator.  Within thirty days after the date that such notice is effective the Partner (or group of Partners, if applicable) to whom such notice is given shall similarly appoint an arbitrator by giving like written notice to the initiating Partner or Partners; or, failing to make such appointment, the arbitrator initially appointed shall be empowered to act as the sole arbitrator and to render a binding decision.  In such event, such sole arbitrator shall set a date for hearing the dispute not later than ninety days after the date of his appointment and shall render its decision in writing to the disputing Partners not later than sixty days after the last hearing date.

(b)  In the event that the disputing Partners duly appoint arbitrators pursuant to Section 15.10(a) the two arbitrators so appointed shall, within thirty days after the appointment of the later of them to be appointed, select a third arbitrator who shall act as Chairman of the arbitration panel.  Such arbitration panel shall set a time for the hearing of the dispute which shall not be later than sixty days after the date of appointment of the third arbitrator, and the final decision of the arbitrators shall be rendered in writing to the disputing Partners not later than sixty days after the last hearing date.

(c)  In the event that the two arbitrators appointed by the disputing Partners are not able within thirty days after the appointment of the later of them to be appointed to agree on the selection of a third arbitrator, either one of them may request the American Arbitration Association to select a third arbitrator, and the selection of such third arbitrator by such Association shall be binding.

(d)  The place of any arbitration shall be in Chicago, Illinois, or at such other place as agreed to by the disputing Partners.

(e)  The arbitration shall be conducted in accordance with the rules of the American Arbitration Association then prevailing, and the decision of the arbitrator or arbitrators, as the case may be, shall be final and binding on the disputing Partners, and shall be enforceable in the courts of every state and of the United States.

15.11  Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be considered an original.

IN WITNESS WHEREOF, the undersigned have caused this
Agreement to be duly executed by their duly authorized
representatives as of the date first above written.

General Partner:
AMERITECH MOBILE PHONE SERVICE
OF ILLINOIS, INC.

Attest: _____

Title: ASS'T SECRETARY

By: _____

Title: VICE PRESIDENT

Limited Partner:
INLAND CELLULAR TELEPHONE CO.

Attest: _____

Title: _____

By: _~Armer Z. Caper Jr._

Title: _____

Limited Partner:
MT. PULASKI CELLULAR COMPANY

Attest: _____     By: _____
        Title: SECRETARY        Title: PRESIDENT

-64-

Limited Partner:
U S WEST NewVector Group, Inc.

Attest: _____

    John P. Scully,
    Assistant Secretary

By: _____

    John E. DeFeo
    President

Limited Partner:
MIDWEST CELLULAR ASSOCIATES,
an Illinois General Partnership
By:   ILLINOIS CONSOLIDATED
MOBILE COMMUNICATIONS, INC.,
Managing Partner

Attest: _C. R. Chaplin___        By: _____
Title: SECRETARY                 Title: President

## ALLOCATION OF COSTS

I.  Determination of allocable expenses

Total AMCI[**] expenses computed on a GAAP basis [*]
LESS:  Expenses related to new business ventures[*]

Expenses related to cellular operations
LESS:  Expenses charged directly to specific CGSAs[*]

Overhead expenses allocable to CGSAs

II. Allocation Formula

| Department | Methodology |
| --- | --- |
| Public Relations | SMSA Population Proportion |
| Regulatory | Equal Proportion |
| Exec & Legal | Equal Proportion |
| Marketing | SMSA Population Proportion |
| Network | Cell Site Proportion |
| Controller | Equal Proportion |
| Treasurer | SMSA Population Proportion |
| MIS | SMSA Population Proportion |
| Personnel | Two Step Allocation:  1) Allocate to above departments based on number of people; 2) Allocate using the respective department methodology. |

---

[**]Pursuant to article 6.10 of the Partnership Agreement, Ameritech Mobile Phone Service of Illinois, Inc. will enter into an agreement with Ameritech Mobile Communications, Inc. relating to the provision of administrative and management services to the Partnership.

[*]Identifiable through direct coding on invoices using center codes apart from headquarters.

## III. Definitions of Allocation Methodologies

SMSA Population Proportion – The SMSA population for Central Illinois is divided by the SMSA population for all markets to be served by Ameritech Mobile Communications.

Equal Proportion (1/N) – Each of the major markets to be served by Ameritech Mobile Communications shares equally in the expenses.

Cell Sites Proportion – For the indicated year, the number of year-end cells for the Central Illinois system is divided by the total number of year-end cells for all markets served by Ameritech Mobile Communications, Inc.

# APPENDIX A

| Partner's Name | Ownership Percentage Interest | Contribution |
|---|---|---|
| Ameritech Mobile Phone Service of Illinois, Inc. | 51.00% | $ 510.00 |
| Inland Cellular Telephone Co. | 15.00% | $ 150.00 |
| Mt. Pulaski Cellular Company | 15.00% | $ 150.00 |
| U S West NewVector Group, Inc. | 10.75% | $ 107.50 |
| Midwest Cellular Associates | 8.25% | $  82.50 |
| | 100.00% | $1,000.00 |

AMENDMENT NO. 7

TO THE

AGREEMENT ESTABLISHING
Illinois SMSA Limited Partnership

Amendment No. 7 made as of February 9 , 1999 by and among Ameritech Mobile Phone Service of Illinois, Inc. ("AMPS"), AirTouch Communications, Inc. ("AirTouch") and Midwest Cellular Associates ("Midwest") (hereinafter collectively the "Partnership");

WHEREAS, the parties hereto desire to amend the Illinois SMSA Limited Partnership Agreement dated February 5, 1987 (the "Partnership Agreement") to reflect the transfer of the 12.647% limited partnership interest of U S West NewVector Group, Inc. to AirTouch and the transfer of the 13.636% limited partnership interest of Ameritech Mobile Communications, Inc. ("AMC") to AMPS, an affiliate of AMC;

NOW THEREFORE, in consideration of the mutual covenants contained herein, and other good and valuable consideration, the parties hereto agree as follows (certain terms not otherwise defined herein have the meaning set forth in the Partnership Agreement):

1. <u>Amendment to Partnership Agreement</u>.    The Partnership Agreement is hereby amended as follows:

   A. The first paragraph of the Partnership Agreement is amended as follows:

   "THIS AGREEMENT is made as of the 5th day of February, 1987, by and between Ameritech Mobile Phone Service of Illinois, Inc., a corporation organized and existing under the laws of the State of Illinois and having its principle place of business at 2000 W. Ameritech Center Drive, Hoffman Estates, IL 60195-5000 ("AMPS"), AirTouch Communications, Inc., a corporation organized and existing under the laws of the State of California and having its principal place of business at 3350 161st Avenue S.E., Bellevue, Washington 98008-9685 ("Air Touch") and Midwest Cellular Associates, a general partnership organized and existing under the laws of the State of Illinois and having its principal place of business at 121 South Seventeenth Street, Mattoon, Illinois 61938 ("Midwest")."

   B. Section 1.20 of the Partnership Agreement is amended as follows:

   "1.20 "Limited Partner" means each of AirTouch, Midwest, and AMPS and any person admitted as an additional or substitute limited partner of the Partnership in accordance with this Agreement and the Act, in such Person's capacity and as a limited partner of the Partnership. Any Person may be both a General Partner and a Limited Partner of the Partnership."

   C. Section 1.25 of the Partnership Agreement is amended as follows:

   "1.25 "Percentage Interest" of a Partner means the respective percentages set forth below next to each Partner's name:

DHM\Amendment No 7 SMSA Limited Partnership

|          |                      |
|----------|----------------------|
| AMPS     | 46.364% GP Interest  |
| AMPS     | 13.636% LP Interest  |
| Midwest  | 27.353% LP Interest  |
| AirTouch | 12.647% LP Interest" |

D. Section 15.9 of the Partnership Agreement is amended as follows:

"15.9 Notices. All notices given by any Partner under this Agreement shall be in writing, by registered or certified mail, postage prepaid, addressed as follows (or to such other address as a Partner may specify in such a notice to all other Partners):

| General and Limited Partner: | Ameritech Mobile Phone Service of Illinois, Inc.<br>2000 W. Ameritech Center Drive<br>Hoffman Estates, IL 60195 5000<br>Attn: General Counsel |
|---|---|
| Limited Partners: | Midwest Cellular Associates<br>121 South 17th Street<br>Mattoon, IL 61938<br>Attn: President |
| | AirTouch Communications, Inc.<br>PO Box 96085<br>3350 161st Avenue, S.E.<br>Bellevue, WA 98008 9685<br>Attn: Jill Evans |

Such notices shall be effective on the third business day subsequent to the date of mailing."

E. The other terms and conditions of the Partnership Agreement shall remain in full force and effect.

2. Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF,    the undersigned have caused this Agreement and Amendment No. 7 to be duly executed by their authorized representatives as of the day first written above.

General and Limited Partner:
AMERITECH MOBILE PHONE SERVICE
OF ILLINOIS, INC.

Attest: _____

By: _____

Its: _____

Its: _____

DHM\Amendment No 7 SMSA Limited Partnership

Limited Partner:
MIDWEST CELLULAR ASSOCIATES
an Illinois General Partnership
By:  CONSOLIDATED COMMUNICATIONS
     MOBILE SERVICES INC.,
     Managing Partner

Attest: _____        By: _____

Its: _____           Its: _____VP/CFO_____

DHMAmendment No 7 SMSA Limited Partnership

Limited Partner:
AIRTOUCH COMMUNICATIONS, INC.

Attest: _____     By: _____

Its: _____     Its: VP and CFO _____

FORM APPROVED

ATTORNEY

DHM\Amendment No 7 SMSA Limited Partnership

AMENDMENT NO. 6
TO THE

AGREEMENT ESTABLISHING

ILLINOIS SMSA LIMITED PARTNERSHIP


Amendment No. 6 made as of August 6, 1990, by and among Ameritech Mobile Phone Service of Illinois, Inc. ("AMPS"), U S West NewVector Group, Inc. ("NewVector"), Midwest Cellular Associates ("Midwest"), and Ameritech Mobile Communications, Inc. ("AMCI") (hereinafter collectively the "Partnership");

WHEREAS, the parties hereto desire to amend the Agreement to reflect (1) a 1% ownership interest in the Illinois Four Limited Partnership ("IL RSA-4"), and (2) the addition of the following territory of IL RSA-4 to the Partnership:

Macoupin (I-55 Corridor)

NOW, THEREFORE, the parties hereto agree and consent to the following:

1. Capitalized terms not otherwise defined herein shall have the same meaning that they have in the Agreement.

2. Partnership ownership of a 1% interest in the IL RSA-4 Partnership.

3. Appendix B of the Agreement is further amended by the addition of the following territory of IL RSA-4 to the Partnership:

Macoupin (I-55 Corridor)

IN WITNESS WHEREOF, the undersigned have caused this Amendment No. 6 to be duly executed by their authorized representatives as of the date first written above.

General Partner:
AMERITECH MOBILE PHONE SERVICE OF
    ILLINOIS, INC.

By: _____
    ROBERT N. REILAND

Title: ASSISTANT SECRETARY

Limited Partner:

MIDWEST CELLULAR ASSOCIATES,
    an Illinois General Partnership
By:   CONSOLIDATED COMMUNICATIONS
    MOBILE SERVICES, INC.,
    Managing Partner

By: _____

Title: _____

Limited Partner:

AMERITECH MOBILE COMMUNICATIONS,
    INC.

By: _____
    DENNIS L. MIERS

Title: VICE PRESIDENT

Limited Partner:

U S WEST NEWVECTOR GROUP, INC.

By: _____

Title: _____

IN WITNESS WHEREOF, the undersigned have caused this Amendment No. 6 to be duly executed by their authorized representatives as of the date first written above.

General Partner:
AMERITECH MOBILE PHONE SERVICE OF
    ILLINOIS, INC.

By: _____

Title: _____

Limited Partner:

MIDWEST CELLULAR ASSOCIATES,
    an Illinois General Partnership
By: CONSOLIDATED COMMUNICATIONS
    MOBILE SERVICES, INC.,
    Managing Partner

By: _____

Title: _____

Limited Partner:

AMERITECH MOBILE COMMUNICATIONS,
    INC.

By: _____

Title: _____

Limited Partner:

U S WEST NEWVECTOR GROUP, INC.

By: _____

Title: _____

IN WITNESS WHEREOF, the undersigned have caused this Amendment No. 6 to be duly executed by their authorized representatives as of the date first written above.

General Partner:
AMERITECH MOBILE PHONE SERVICE OF
    ILLINOIS, INC.

By: _____

Title: _____


Limited Partner:

MIDWEST CELLULAR ASSOCIATES,
    an Illinois General Partnership
By:  ILLINOIS CONSOLIDATED MOBILE
        COMMUNICATIONS, INC.,
    Managing Partner

By: _____

Title: _____


Limited Partner:

AMERITECH MOBILE COMMUNICATIONS,
    INC.

By: _____

Title: _____


Limited Partner:

U S WEST NEWVECTOR GROUP, INC.

By: _____

Title: _____
    Vice President, Bus. Dev. and External
                                    Affairs

AMENDMENT NO. 5

TO THE

AGREEMENT ESTABLISHING
ILLINOIS SMSA LIMITED PARTNERSHIP


Amendment No. 5 made as of August 6, 1990, by and among Ameritech Mobile Phone Service of Illinois, Inc. ("AMPS"), U S West NewVector Group, Inc. ("NewVector") Midwest Cellular Associates ("Midwest"), and Ameritech Mobile Communications, Inc. (hereinafter collectively the "Partnership");

WHEREAS, the parties hereto desire to amend the Agreement to reflect (1) the Partnership's 20% ownership interest in the Illinois Valley Cellular RSA 2-III Partnership ("IL RSA 2-III") serving the following counties:

> Ford
> Livingston
> Iroquois


NOW, THEREFORE, the parties hereto agree and consent to the following:

1.  Capitalized terms not otherwise defined herein shall have the same meaning as they have in the Agreement.

2.  Partnership ownership of a 20% interest in the IL RSA 2-III Partnership.

3.  The provision of MTSO services for the following counties in the IL RSA 2-III Partnership:

    > Ford
    > Livingston
    > Iroquois

4.  Notwithstanding anything herein to the contrary, no action or forbearance shall be directed by the Partners, and in no event shall AMPS, AMCI or NewVector be required to participate in any action or forbearance, which is reasonably believed by AMPS, AMCI or NewVector to be violative of the Modification of Final Judgment, as amended from time to time.

IN WITNESS WHEREOF, the undersigned have caused this Amendment No. 5 to be duly executed by their authorized representatives as of the date first written above.

General Partner:
AMERITECH MOBILE PHONE SERVICE
   OF ILLINOIS, INC.

By: _Robert N. Reiland_
    ROBERT N. REILAND

Title: _ASSISTANT SECRETARY_

Limited Partner:

MIDWEST CELLULAR ASSOCIATES,
   an Illinois General Partnership
By:  CONSOLIDATED COMMUNICATIONS
    MOBILE SERVICES, INC.,
    Managing Partner

By: _____

Title: _____

Limited Partner:

AMERITECH MOBILE COMMUNICATIONS,
  INC.

By: _Dennis L. Myers_
    DENNIS L. MYERS

Title: _VICE PRESIDENT_

Limited Partner:

U S WEST NEWVECTOR GROUP, INC.

By: _____

Title: _____

IN WITNESS WHEREOF, the undersigned have caused this Amendment No. 5 to be duly executed by their authorized representatives as of the date first written above.

General Partner:
AMERITECH MOBILE PHONE SERVICE
 OF ILLINOIS, INC.

By: _____

Title: _____

Limited Partner:

MIDWEST CELLULAR ASSOCIATES,
 an Illinois General Partnership
By: CONSOLIDATED COMMUNICATIONS
  MOBILE SERVICES, INC.,
  Managing Partner

By: _____

Title: _____

Limited Partner:

AMERITECH MOBILE COMMUNICATIONS,
 INC.

By: _____

Title: _____

Limited Partner:

U S WEST NEWVECTOR GROUP, INC.

By: _____

Title: _____

IN WITNESS WHEREOF, the undersigned have caused this Amendment No. 5 to be duly executed by their authorized representatives as of the date first written above.

General Partner:
AMERITECH MOBILE PHONE SERVICE
     OF ILLINOIS, INC.

By: _____

Title: _____

Limited Partner:

MIDWEST CELLULAR ASSOCIATES,
     an Illinois General Partnership
By:   ILLINOIS CONSOLIDATED
           MOBILE COMMUNICATIONS, INC.,
           Managing Partner

By: _____

Title: _____

Limited Partner:

AMERITECH MOBILE COMMUNICATIONS,
     INC.

By: _____

Title: _____

Limited Partner:

U S WEST NEWVECTOR GROUP, INC.

By: _____

Title: ___Vice President, Bus. Dev. and External___
                                                    Affairs

AMENDMENT NO. 4

TO THE

AGREEMENT ESTABLISHING
ILLINOIS SMSA LIMITED PARTNERSHIP

Amendment No. 4 made as of August 6, 1990, by and among Ameritech Mobile Phone Service of Illinois, Inc. ("AMPS"), U.S. West NewVector Group, Inc. ("New Vector"), Midwest Cellular Associates ("Midwest"), and Ameritech Mobile Communications, Inc. ("AMCI") (hereinafter collectively the "Partnership");

WHEREAS, The parties hereto desire to add a portion of Illinois Rural Service Area No. 5 ("RSA No. 5") in which cellular service is provided pursuant to the agreement to include the following counties:

MASON

LOGAN

DEWITT

PIATT

MOULTRIE

NOW, THEREFORE, the parties hereto agree and consent to the following:

1. Capitalized terms not otherwise defined herein shall have the same meaning that they have in the Agreement.

2. Appendix B of the Agreement is amended by the addition of RSA No.5.

IN WITNESS WHEREOF, the undersigned have caused this Amendment No. 4 to be duly executed by their authorized representatives as of the date first written above.

General Partner:
AMERITECH MOBILE PHONE SERVICE
    OF ILLINOIS, INC.

By: _Robert N. Reiland_
    ROBERT N. REILAND
Title: _ASSISTANT SECRETARY_

Limited Partner:
MIDWEST CELLULAR ASSOCIATES
    an Illinois General Partnership
BY: CONSOLIDATED COMMUNICATIONS
        MOBILE SERVICES, INC.,
        Managing Partner

By:_____

Title:_____

Limited Partner:
AMERITECH MOBILE COMMUNICATIONS,
    INC.

By: _Dennis L. Myers_
    DENNIS L. MYERS
Title: _VICE PRESIDENT_

Limited Partner:
US WEST NEWVECTOR GROUP, INC.

By: _____

Title: _____

IN WITNESS WHEREOF, the undersigned have caused this Amendment No. 4 to be duly executed by their authorized representatives as of the date first written above.

General Partner:
AMERITECH MOBILE PHONE SERVICE
  OF ILLINOIS, INC.

By: _____

Title: _____


Limited Partner:
MIDWEST CELLULAR ASSOCIATES
  an Illinois General Partnership
BY: CONSOLIDATED COMMUNICATIONS
  MOBILE SERVICES, INC.,
  Managing Partner

By: _____

Title: _____


Limited Partner:
AMERITECH MOBILE COMMUNICATIONS,
  INC.

By: _____

Title: _____


Limited Partner:
US WEST NEWVECTOR GROUP, INC.

By: _____

Title: _____

IN WITNESS WHEREOF, the undersigned have caused this Amendment No. 4 to be duly executed by their authorized representatives as of the date first written above.

General Partner:
AMERITECH MOBILE PHONE SERVICE
    OF ILLINOIS, INC.

By: _____

Title: _____

Limited Partner:
MIDWEST CELLULAR ASSOCIATES
    an Illinois General Partnership
BY: ILLINOIS CONSOLIDATED
    MOBILE COMMUNICATIONS, INC.,
    Managing Partner

By:_____

Title:_____

Limited Partner:
AMERITECH MOBILE COMMUNICATIONS,
    INC.

By: _____

Title: _____

Limited Partner:
~~US WEST NEWVECTOR GROUP, INC.~~
U S WEST NewVector Group, Inc.
By: _____

Title: Vice President, Bus. Dev. and External
       _____ Affairs

### AGREEMENT AND AMENDMENT NO. 3

#### TO THE

#### AGREEMENT ESTABLISHING
#### ILLINOIS SMSA LIMITED PARTNERSHIP

#### AMONG

#### AMERITECH MOBILE PHONE SERVICE OF ILLINOIS, INC.

#### U S WEST NEWVECTOR GROUP, INC.

#### MIDWEST CELLULAR ASSOCIATES

#### AND

#### AMERITECH MOBILE COMMUNICATIONS, INC.

Agreement and Amendment No. 3 (this "Agreement") to the Agreement of Limited Partnership of Illinois SMSA Limited Partnership dated as of February 5, 1987, as amended (the "Partnership Agreement") made as of this 14th day of December, 1989, by and among Ameritech Mobile Phone Service of Illinois, Inc. ("AMPS"), U S West NewVector Group, Inc. ("NewVector"), Midwest Cellular Associates ("Midwest")  (AMPS, NewVector and Midwest are sometimes collectively referred to herein as the "Partners") and Ameritech Mobile Communications, Inc. ("AMCI").

WHEREAS, American Information Technologies Corporation ("AITC"), AMCI, Mt. Pulaski Cellular Company ("Mt. Pulaski") and Mt. Pulaski Telephone and Electric Company of Mt. Pulaski, Ill. are parties to an Acquisition Agreement (the "Acquisition Agreement") whereby Mt. Pulaski will merge with and into AMCI with AMCI as the surviving corporation (the "Merger");

WHEREAS, the execution of the Acquisition Agreement triggered the Partners' right of first refusal under the Partnership Agreement;

WHEREAS, upon the consummation of the transactions contemplated by the Acquisition Agreement (the "Transaction"), AMCI will succeed (by operation of law) to Mt. Pulaski's ownership interest in the Illinois SMSA Limited Partnership (the "Partnership") (Mt. Pulaski's ownership interest in the

Partnership is hereinafter referred to as the "Mt. Pulaski Interest");

WHEREAS, in order to consummate the Transaction, it is necessary to obtain the acknowledgement and consent of the Partners;

WHEREAS, Midwest and NewVector each desire to waive their right of first refusal;

WHEREAS, Midwest and NewVector each desire to make a capital contribution to the Partnership; and

WHEREAS, the Partners and AMCI desire to amend the Partnership Agreement in certain respects.

Now, therefore, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the parties hereto agree as follows (certain terms not otherwise defined herein have the meaning set forth in the Partnership Agreement):

1.   Conditions to Performance.  The obligations of each of the parties hereto are subject to the satisfaction of the following condition:

(a)   Consummation of Merger.  The Acquisition Agreement shall have been executed by each of the parties thereto and the Merger shall have been consummated.

2.   Limited Partners' Consent to Transaction.  Each of NewVector and Midwest hereby acknowledge and consent to the Transaction.

3.   Limited Partners' Waiver of Rights.  Each of NewVector and Midwest hereby waive any and all rights they may have in and to the Mt. Pulaski Interest (arising out of the Transaction) pursuant to the terms of the Partnership Agreement, including any rights afforded under Section 8.2 of the Partnership Agreement.

4.   Limited Partners' Acknowledgement of Substitution. Each of NewVector and Midwest hereby acknowledge AMCI as a substitute Limited Partner under the Partnership Agreement (as contemplated by Section 8.5 of the Partnership Agreement) in substitution of and replacement of Mt. Pulaski, thereby, pursuant to the Transaction, succeeding to all of the rights, interests, liabilities and obligations of Mt. Pulaski under the Partnership Agreement.

-2-

**5.    General Partner's Acknowledgement and Consent.**
AMPS hereby acknowledges and consents to the Transaction and,
pursuant to Section 8.5(b) of the Partnership Agreement, AMPS
hereby consents to the admission of AMCI as a Limited Partner in
the Partnership, in substitution of and replacement of Mt.
Pulaski, thereby, pursuant to the Transaction, succeeding to all
of the rights, interests, obligations and liabilities of Mt.
Pulaski under the Partnership Agreement.

**6.    NewVector and Midwest Contribution of Capital.**
Midwest and NewVector each desire to contribute (to their
respective Capital Accounts) the following amounts to the
Partnership as Capital Contributions:

|          |             |
|----------|-------------|
| Midwest  | $2,735,300  |
| NewVector| $1,264,700  |

**7.    AMCI's Limited Right of Indemnification.**

A.    Should AMCI or any member of its consolidated
group (including AMCI, the "Group") be required to pay any
federal or state income taxes due to their recognition of any
gain for federal or state income tax purposes resulting from
either (i) a Disposition of any portion of the Mt. Pulaski
Interest or (ii) any distribution by the Partnership pursuant to
the Partnership Agreement (including without limitation, the
situation where such gain reduces a tax benefit, such as a loss
or deduction, in one year, and such benefit is no longer
available in a subsequent year, thus increasing federal or state
income taxes in the subsequent year), NewVector and Midwest agree
that they shall severally, but not jointly, indemnify the Group
by paying AMCI, on behalf of the Group, the following portions of
the sum of (x) such federal and state income taxes and (y) the
federal and state income tax liability on the receipt of the
payment of the amount specified in clause (x) and amounts payable
under this clause (y) (such grossed-up indemnity payment being
referred to as the "Tax Liability"):  Midwest - 27.353%; and
NewVector - 12.647%.  Midwest's and NewVector's total obligations
to indemnify AMCI pursuant to this Section 7, however, shall in
no event exceed the following amounts:  Midwest - $1,644,305.01;
and NewVector - $760,264.89.

B.    If AMCI, AMPS or any Affiliate thereof decides to
dispose of a portion (but less than all) of its Partnership
Interest, a portion of the General Partnership Interest of AMPS
shall be converted to a Limited Partnership interest and disposed
of prior to any disposition of the Mt. Pulaski Interest;
provided, however, in no event shall the General Partner Interest
owned by AMPS ever represent less than one percent of the total
Percentage Interests of the Partnership.

-3-

C.    Upon its determination that any taxes subject to
paragraph A above will be required within the next 12 months to
be paid by a member of the Group, AMCI shall send to Midwest and
NewVector a written statement containing a computation of the
amount of the related Tax Liability and the date(s) on which the
Group is or will be required to make actual payment of such
taxes.  Midwest and NewVector shall make their respective
indemnity payments within ten business days of the later of (i)
the actual receipt of such written statement from AMCI or (ii)
the actual tax payment date(s) set forth on such notice;
provided, however, that if Midwest and NewVector deliver to AMCI
within ten business days after actual receipt of such written
statement from AMCI their written objection, in reasonable
detail, to such computation, AMCI shall cause the independent
certified public accounting firm AMCI uses in the ordinary course
to recompute the amount of the Tax Liability and send Midwest and
NewVector a written statement of such recomputation, in which
case Midwest and NewVector shall make their respective indemnity
payments within five business days of the later of (x) the actual
receipt of such written statement from such accountants or (y)
the actual tax payment date(s) set forth on such notice.

8.    Satisfaction of Section 8.5(a).  Each of the
Partners and AMCI agree that the plan of merger executed by and
among AMCI, Mt. Pulaski and AITC (a copy of which is attached
hereto as Exhibt A) satisfies the condition (regarding Substitute
Limited Partners) set forth in Section 8.5(a) of the Partnership
Agreement.

9.    Amendment to Partnership Agreement.  The
Partnership Agreement is amended as follows:

A.    The first paragraph of the Partnership Agreement
is amended as follows:

THIS AGREEMENT is made as of the 5th day of February,
1987, by and between Ameritech Mobile Phone Service of Illinois,
Inc., a corporation organized and existing under the laws of the
State of Illinois and having its principal place of business at
1515 Woodfield Road, Schaumburg, Illinois 60173 ("AMPS"),
Ameritech Mobile Communications, Inc., a corporation organized
under the laws of the State of Delaware and having its principal
place of business at 1515 Woodfield Road, Suite 1400, Schaumburg,
Illinois 60173 ("AMCI"), U S West NewVector Group, Inc., a
corporation organized and existing under the laws of the State of
Colorado and having its principal place of business at 3350 161st
Avenue S.C., Bellevue, Washington 98008-1329 ("NewVector") and
Midwest Cellular Associates, a general partnership organized and
existing under the laws of the State of Illinois and having its
principal place of business at 121 South Seventeenth Street,
Mattoon, Illinois 61938 ("Midwest").

-4-

B.    Section 1.25 of the Partnership Agreement is
amended as follows:

"Percentage Interest" of a Partner means the
respective percentages set forth below next to
each Partner's name:

| | |
|---|---|
| AMPS | 46.364% |
| Midwest | 27.353% |
| NewVector | 12.647% |
| AMCI | 13.636% |

C.    Section 1.20 of the Partnership Agreement is
amended as follows:

"Limited Partner" means each of NewVector,
Midwest, and AMCI and any person admitted as an
additional or substitute limited partner of the
Partnership in accordance with this Agreement and
the Act, in such Person's capacity and as a
limited partner of the Partnership.  Any Person
may be both a General Partner and a Limited
Partner of the Partnership.

D.    Section 15.9 of the Partnership Agreement is
amended to add the following language at the end of the Section:

Ameritech Mobile Communications, Inc.
1515 Woodfield Road
Suite 1400
Schaumburg, Illinois 60173

E.    Section 5.4 of the Partnership Agreement is
amended as follows:

5.4  Allocations of Tax Profits and Tax Losses.  Except
as otherwise provided in Section 5.6 and except as otherwise
required by regulations prescribed under Sections 706(d) and
704(b) of the Code (or their successors), Tax Profits and Tax
Losses for each fiscal year of the Partnership shall be
apportioned ratably to each day of such year and each day's share
of such Tax Profits and Tax Losses shall be allocated to the
Partners in proportion to their respective Percentage Interests
on such date.

F.    Section 5.6(b) of the Partnership Agreement is
amended as follows:

-5-

(b) Notwithstanding paragraph (a) above, to the extent that either Section 704(c) or Section 704(b) of the Code (or their successors) and regulations prescribed thereunder otherwise require, such Tax Losses and Tax Profits with respect to such property contributed to the Partnership shall be allocated in accordance with such Code sections (or their successors) and regulations.

G.    Section 5.7 of the Partnership Agreement is amended as follows:

5.7 <u>Distributions</u>. Subject to Sections 9.4, 9.5, 11.2 and 11.3, funds of the Partnership from all sources (other than Capital Contributions), less appropriate reserves as are determined by the General Partner to be reasonably necessary for administrative and operating expenses, loan payments and other costs and expenses and contingencies, shall be distributed no less than quarterly and as promptly as practicable after the end of each fiscal quarter, provided, however, that the General Partner shall make no distribution from the Partnership until after the Limited Partner Capital Contributions provided for in Amendment No. 2 to this Agreement dated December 14, 1989 have been expended. Each distribution pursuant to this Section 5.7 shall be made to the Partners in proportion to the weighted average of their respective Percentage Interests during the relevant fiscal quarter (or during any other fiscal period with respect to which a distribution may be made).

H.    Section 4.12 of the Partnership Agreement is amended to delete paragraphs (c), (d) and (e) in their entirety.

I.    Section 4.5 of the Partnership Agreement is amended as follows:

4.5 <u>Failure to Make Additional Capital Contribution</u>.

(a) Should any Partner notify the General Partner that it does not intend to make an Additional Capital Contribution, or fail to pay its Additional Capital Contribution when due, all or any number of the other Partners may make a loan (the "Loan") to the Partnership, on a pro rata basis according to their then current respective Percentage Interests, in an aggregate amount equal to the Additional Capital Contribution and such Loan shall be made in lieu of making the Additional Capital Contribution. Such Loans shall bear interest at a rate equal to the rate specified in Section 4.6(x) plus 10% per annum. Notwithstanding Section 5.7 of this Agreement, all funds of the Partnership from all sources, less appropriate reserves as are determined by the General Partner to be reasonably necessary for administration and operating expenses (including other loan payments and other costs, expenses and contingencies), shall be used to repay the

-6-

Loans and interest thereon prior to the payment of any other
distribution to the Partners under the Partnership Agreement.
Any such Loan shall be made to the Partnership on the date set
forth in a notice from the General Partner to the Partner making
such Loan, which date shall not be less than two days from the
date of such notice and shall be the first day of a month.  The
General Partner may make such a Loan as a Limited Partner, if it
so desires.

      (b)  In the event any Loan is treated for tax or other
purposes (either by a court of competent jurisdiction or the
Internal Revenue Service) as a Capital Contribution (a "Converted
Capital Contribution"), then all such Converted Capital
Contributions shall be deemed to have a priority over all other
Capital Contributions and, notwithstanding Section 5.7 of this
Agreement, all funds of the Partnership from all sources, less
appropriate reserves as are determined by the General Partner to
be reasonably necessary for administrative and operating expenses
(including loan payments and other costs and expenses and
contingencies), shall be returned to the Partners making the
Loans until such time as such Partners have recovered the entire
amount of their respective Converted Capital Contributions plus
an amount equal to the interest on the Loan under paragraph (a)
above.

      10.  <u>Counterparts</u>.  This Agreement may be executed in
two or more counterparts, each of which shall be deemed to be an
original but all of which together shall constitute one and the
same instrument.

      *   *   *   *   *

-7-

RSL450A.TXT

IN WITNESS WHEREOF, the undersigned have caused this Agreement and Amendment No. _23_ to be duly executed by their authorized representatives as of the day first written above.

General Partner:
**AMERITECH MOBILE PHONE SERVICE OF ILLINOIS, INC.**

Attest: _____

Its: _Assistant Secretary_

By: _____

Its: _Vice President_

Limited Partner:
MIDWEST CELLULAR ASSOCIATES,
an Illinois General Partnership
By:  CONSOLIDATED COMMUNICATIONS
MOBILE SERVICES INC.,
Managing Partner

Attest: _C.R. Chaplin_         By: _S L Grissom_

Its: _Secretary_              Its: _Treasurer_

RSL450A.TXT

Limited Partner:
U S WEST NEWVECTOR GROUP, INC.

Attest: _____ By: _____

By: _____        Its: _Vice President - External Affairs_
      Assistant Secretary

RSL450A.TXT

**Limited Partner:**
**AMERITECH MOBILE**
**COMMUNICATIONS, INC.**

Attest: _____

Its: ___Vice President___

By: _____

Its: ___Vice President___

*Review memo to file LAW DEPT. CONTROL NO. _____
is attached.*

## CONTRACT APPROVAL REQUEST

ORIGINATING DEPARTMENT            *External Affairs*

EMPLOYEE ORIGINATING CONTRACT     *Kraemer*     EXT. *7968*

VENDOR'S NAME                     *Illinois SMSA Limited*
    ADDRESS      *Partnership*

    TELEPHONE

TYPE OF SERVICE/PRODUCT UNDER CONTRACT   *Amendments 4, 5, 6*

TERMS AND CONDITIONS  (BEGINNING DATE)   *to pre-existing partner-*
      (ENDING DATE)    *ship which incorporates*
      (TOTAL AMOUNT)   *routine and RSA owner-*
      (OTHER COSTS)    *ship identification.*

(1)  The above information must be complete before delivery of this form and the original contracts to the Law Department.

(2)  The contracts must be complete duplicate originals, including referenced exhibits.

(3)  The attached original contracts should be executed by or on behalf of the Vendor before submitting for review.

-------------------------------------------------------------

### REVIEW AND APPROVAL

LAW DEPARTMENT REVIEW      BY: _____ DATE *12-18-9*
           NAME

FINANCE DEPARTMENT APPROVAL  BY: _____ DATE *12/18/20*
           NAME   JOHN M. STACHOWIAK

EXECUTIVE DEPARTMENT APPROVAL  BY: _____ DATE_____
           NAME    REYNIE ORTIZ

(1)  Deliver one original, fully-executed contract to Vendor.

(2)  Deliver one original, fully-executed contract with fully-executed Contract Approval Request to Finance Department, Accounts Payable, for retention.

(3)  Recommendation:  Originating department should keep a file copy of the signed contract.

(Rev. 01/19/88)

LAW DEPARTMENT
DEC 26 1990

3/2/90
+ FIREPR
—Bne.

AMENDMENT NO. 2

TO THE

AGREEMENT ESTABLISHING
ILLINOIS SMSA LIMITED PARTNERSHIP

AMONG

AMERITECH MOBILE PHONE SERVICE OF ILLINOIS, INC.

INLAND CELLULAR TELEPHONE COMPANY

MT. PULASKI CELLULAR COMPANY

U S WEST NEWVECTOR GROUP, INC.

MIDWEST CELLULAR ASSOCIATES

AND

PRAIRIE CELLULAR TELEPHONE COMPANY

Amendment No. 2 made as of September 1, 1989, by and among Ameritech Mobile Phone Service of Illinois, Inc. ("AMPS"), Inland Cellular Telephone Company ("Inland"), Mt. Pulaski Cellular Company ("Mt. Pulaski"), U S West NewVector Group, Inc. ("New Vector"), Midwest Cellular Associates ("Midwest") and Prairie Cellular Telephone Company ("Prairie") (hereinafter collectively the "Partnership");

WHEREAS, pursuant to Section 8.2.1(e) of the Illinois SMSA Limited Partnership Agreement dated February 5, 1987 and an Assignment dated November 30, 1987 (Exhibit "A"), Inland assigned one-half of its Partnership Interest to Prairie;

WHEREAS, pursuant to Amendment No. 1 to the Illinois SMSA Limited Partnership dated November 30, 1987, Prairie Cellular Telephone Co. was admitted as a Limited Partner to the Partnership;

WHEREAS, the parties hereto desire to amend the Agreement to reflect the sale of Inland's 7.50% Limited Partnership interest to Midwest Cellular Associates, a limited partner to the Partnership Agreement, and the sale of Prairie's 7.50% Limited Partnership interest to Midwest Cellular Associates, a limited partner to the Partnership Agreement.

NOW, THEREFORE, the parties hereto agree and consent to the following:

1. Capitalized terms not otherwise defined herein shall have the same meaning as they have in the Agreement.

- 1 -

   2.  Percentage ownership interests after the sale of Inland
Cellular Telephone Co. and Prairie Cellular Telephone Co.'s inter-
est to Midwest Cellular Associates will be as follows:

|  |  |
|---|---:|
| Ameritech Mobile Phone Service of Illinois, Inc. | 51.00% |
| Mt. Pulaski Cellular Company | 15.00% |
| U S West NewVector Group, Inc. | 10.75% |
| Midwest Cellular Associates | 23.25% |
|  | 100.00% |

   3.  Midwest Cellular Associates is hereby made a Limited
Partner with respect to the 7.5% Limited Partnership Interest
purchased from Inland, and the 7.5% Limited Partnership Interest
purchased from Prairie.

   IN WITNESS WHEREOF, the undersigned have caused this Amendment
No. 2 to be duly executed by their authorized representatives as of
the date first written above.

General Partner:
AMERITECH MOBILE PHONE SERVICE
OF ILLINOIS, INC.

Attest: _Robert W Ried_
Title: _ASST. SECRETARY_

By: _____
Title: _Vice President_

60/vrane

- 2 -

Limited Partner:

INLAND CELLULAR TELEPHONE CO.

Attest: _Marilyn Schum_
Title: _Admin. Asst._

By: _[signature]_
Title: _Vice President_

- 3 -

Limited Partner:

MT. PULASKI CELLULAR COMPANY

Attest: _Donna Wylis._
Title: _Office Manager_

By: _JR Bodman_
Title: _President_

- 4 -

Limited Partner:

U S WEST NEWVECTOR GROUP, INC.

Attest: *Milo R. Kraeme*    By:

Title: Assistant Secretary    Title: Vice President,

External Affairs

Limited Partner:

MIDWEST CELLULAR ASSOCIATES,
an Illinois General Partnership
By:  ILLINOIS CONSOLIDATED
MOBILE COMMUNICATIONS, INC.,
Managing Partner

Attest: _C. R. Chaplin_
Title: _Secretary_

By: _____
Title: _President_

- 6 -

Limited Partner:

PRAIRIE CELLULAR TELEPHONE CO.

Attest: _Marilyn Schum_
Title: _Admin Act._

By: _[signature]_
Title: _Vice Pres [illegible]_

- 7 -

AMENDMENT NO. 1

TO THE

AGREEMENT ESTABLISHING
ILLINOIS SMSA LIMITED PARTNERSHIP

AMONG

AMERITECH MOBILE PHONE SERVICE OF ILLINOIS, INC.

INLAND CELLULAR TELEPHONE CO.

MT. PULASKI CELLULAR COMPANY

U S WEST NEWVECTOR GROUP, INC.

MIDWEST CELLULAR ASSOCIATES

AND

PRAIRIE CELLULAR TELEPHONE CO.


Amendment No. 1 made as of November 30, 1987, by and among
Ameritech Mobile Phone Service of Illinois, Inc. ("AMPS"), Inland
Cellular Telephone Co. ("Inland"), Mt. Pulaski Cellular Company,
("Mt. Pulaski"), U S West NewVector Group, Inc. ("NewVector"),
Midwest Cellular Associates ("Midwest") and Prairie Cellular
Telephone Co. ("Prairie")(hereinafter collectively the
"Partnership");

WHEREAS, pursuant to Section 8.2.1(e) of the Illinois SMSA
Limited Partnership Agreement dated February 5, 1987 and an
Assignment dated November 30, 1987 (Exhibit "A"), Inland assigned
one-half of its Partnership Interest to Prairie.

WHEREAS, the parties hereto wish to add Prairie Cellular
Telephone Co. as a new Limited Partner to the Partnership;

NOW THEREFORE, the parties hereto agree and consent to be
bound as follows:

1.   Prairie Cellular Telephone Co. is admitted to the Partnership
     in the capacity of a Limited Partner, with all the duties,
     powers and rights of a Limited Partner.

3.   The Agreement is amended as follows:

     (a)  Section 15.9 is amended to add the following language at
          the end thereof:

- 1 -

Prairie Cellular Telephone Co.
1400 West Anthony Drive
Post Office Box 3000
Champaign, Illinois 61281
Attention:  President

4.  Percentage ownership interests after the addition of Prairie
Cellular Telephone Co. will be as follows:

| | |
|---|---|
| Ameritech Mobile Phone Service of Illinois, Inc. | 51.00% |
| Mt. Pulaski Cellular Company | 15.00% |
| U S West NewVector Group, Inc. | 10.75% |
| Midwest Cellular Associates | 8.25% |
| Inland Cellular Telephone Co. | 7.50% |
| Prairie Cellular Telephone Co. | 7.50% |
| | 100.00% |

IN WITNESS WHEREOF, the undersigned have caused this Amendment
No. 1 to be duly executed by their authorized representatives as of
the day first written above.

General Partner:
AMERITECH MOBILE PHONE SERVICE
OF ILLINOIS, INC.

Attest:  _____      By: _____
Title: ASSISTANT SECRETARY          Title: PRESIDENT

- 2 -

Limited Partner:
INLAND CELLULAR TELEPHONE CO.

Attest: _George E. Bradford_          By: _John L. Capel Jr._
      Title: _Secretary_          Title: _President_

- 3 -

Limited Partner:
MT. PULASKI CELLULAR COMPANY

Attest _____  By: _____
    Title: SECRETARY        Title: PRESIDENT

- 4 -

Limited Partner:
U S WEST NEWVECTOR GROUP, INC.

Attest: _____    By: _____

Title: Secretary    Title: President

Joseph C. O'Neil    John E. DeFeo

- 5 -

Limited Partner:
MIDWEST CELLULAR ASSOCIATES,
an Illinois General Partnership
By:  ILLINOIS CONSOLIDATED
MOBILE COMMUNICATIONS, INC.,
Managing Partner

Attest: *C.R. Chaplin*
Title: Secretary

By: *Richard D. Lumy*
Title: Chairman of the Board
of Directors

- 6 -

Limited Partner:
PRAIRIE CELLULAR TELEPHONE CO.

Attest: _____          By: _____
Title: _____               Title: _____

- 7 -

### ASSIGNMENT

THIS ASSIGNMENT is made this 30th day of November, 1987 by INLAND CELLULAR TELEPHONE CO. ("Assignor") to PRAIRIE CELLULAR TELEPHONE CO. ("Assignee").

### W I T N E S S E T H:

WHEREAS, Assignor is a limited partner of the Illinois SMSA Limited Partnership and holds a fifteen percent (15%) ownership interest in said Partnership; and

WHEREAS, Assignor, on the date hereof, is selling and assigning one half of its ownership interest for a 7.5% interest as a limited partner in the Illinois SMSA Limited Partnership to Assignee; and

WHEREAS, this Agreement or disposition is provided for in paragraph 8.2.1(e) of the Agreement of the Limited Partnership of the Illinois SMSA Limited Partnership dated February 5, 1987.

NOW, THEREFORE, for One Dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by execution hereof, Assignor hereby assigns, transfers and sets over to Assignee fifty percent (50%) of Assignor's right, title and interest in said Illinois SMSA Limited Partnership (said fifty percent (50%) of Assignor's right, title and interest being a 7.5% total ownership interest in said Illinois SMSA Limited Partnership) on the date hereof, including without limitation, the profits, losses and distributions accruing to the Interest from and after the date hereof and the capital account of Assignor related to the Interest, free and clear of any and all liens, claims, security interests, charging orders, encumbrances and restrictions of any nature whatsoever.

IN WITNESS WHEREOF, Assignor has caused this Assignment to be executed on the date set forth above.

Assignor:

INLAND CELLULAR TELEPHONE CO.

Name:    James L. Capel, Jr.
Title:    President

ATTEST:

By:
Name:    George E. Bradord
Title:    Secretary

## ACCEPTANCE

The undersigned, being the Assignee above-mentioned, does hereby accept the foregoing Assignment subject to all of the terms and provisions thereof and agrees to be bound by all of the provisions of and to assume all of the liabilities of a limited partner provided for in the Agreement of the Limited Partnership of the Illinois SMSA Limited Partnership dated February 5, 1987.

Dated this 30th day of November, 1987.

Assignee:

PRAIRIE CELLULAR TELEPHONE CO.

Name:    William W. Capel
Title:    President

ATTEST:

By:
   Name:    Francis J. Jahn
   Title:    Secretary