**E-FILED**
Tuesday, 25 January, 2005  04:31:05 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT A

AGREEMENT ESTABLISHING

MIDWEST CELLULAR ASSOCIATES

between

ILLINOIS CONSOLIDATED MOBILE COMMUNICATIONS INC.

and

CASS COUNTY TELEPHONE COMPANY

Dated as of October 3/, 1986

# TABLE OF CONTENTS

**Article**                                                                     **Page**

I       FORMATION OF PARTNERSHIP . . . . . . . . . . .        2

II      DEFINITIONS . . . . . . . . . . . . . . .        3

III     PARTNERSHIP OPERATIONS . . . . . . . . . . .        4

IV      CAPITALIZATION OF PARTNERSHIP . . . . . . .        5

V       ALLOCATIONS AND DISTRIBUTION . . . . . . .        6

VI      RIGHTS AND POWERS OF PARTNERSHIP,
        MANAGING PARTNER AND PARTNERS . . . . . . .        7

VII     OBLIGATIONS OF MANAGING PARTNER . . . . . .        10

VIII    BANKING, ACCOUNTING, BOOKS AND RECORDS . . .        11

IX      PARTNERS OTHER THAN MANAGING PARTNER . . . .        12

X       TRANSFER OF PARTNER'S INTEREST . . . . . . .        12

XI      DISSOLUTION AND TERMINATION OF
        PARTNERSHIP . . . . . . . . . . . . . . . .        13

XII     EXCULPATION AND INDEMNIFICATION . . . . . .        15

XIII    AMENDMENTS . . . . . . . . . . . . . . .        15

XIV     TECHNOLOGOY AND INFORMATION . . . . . . . .        15

XV      MISCELLANEOUS PROVISIONS . . . . . . . . . .        17

AGREEMENT ESTABLISHING

MIDWEST CELLULAR ASSOCIATES


THIS AGREEMENT is made as of the *31st* day of
October, 1986, by and between ILLINOIS CONSOLIDATED MOBILE
COMMUNICATIONS INC. ("Consolidated"), a corporation organized
and existing under the laws of the State of Illinois and
having its principal place of business at 121 South 17th
Street, Mattoon, Illinois 61938, and CASS COUNTY TELEPHONE
COMPANY ("Cass County"), a corporation organized and existing
under the laws of the State of Illinois and having its
principal place of business at 211 South Main Street,
Virginia, Illinois.  Each of Consolidated and Cass County is
hereinafter sometimes referred to as a "Partner" and both are
hereinafter referred to as the "Partners."


W I T N E S S E T H:


WHEREAS, Consolidated is a wholly-owned subsidiary
of Consolidated Communications, Inc. and is engaged in
planning for the provision of Cellular Service (as such term
is defined in Article II hereof); and

WHEREAS, Consolidated's Affiliate Illinois
Consolidated Telephone Company presently provides wireline
telephone service in an area located within that certain
Metropolitan Statistical Area which is defined as the "MSA"
in Article II hereof; and

WHEREAS, Consolidated desires to participate in
providing such Cellular Service; and

WHEREAS, Cass County desires to participate in
providing Cellular Service; and

WHEREAS, the Federal Communications Commission
("FCC") in its cellular orders set forth in An Inquiry Into
The Use of The Bands 825---845 MHz and 870-890 MHz for
Cellular Communications Systems; and Amendment of Parts 2 and
22 of the Commission's Rules Relative to Cellular
Communications Systems (CC Docket No. 79-318), 86 F.C.C.2d
469 (1981) ("Final Decision"), modified as set forth in
reconsideration order 89 F.C.C.2d 58 (1982) ("Reconsideration
Order"), and as further modified as set forth in
reconsideration order FCC 82-308 (released July 8, 1982)

("Further Reconsideration Order") (the Final Decision, the Reconsideration Order and the Further Reconsideration Order being collectively referred to herein as the "Cellular Radio Decisions") stated that (a) a pressing need exists for expeditious implementation of cellular service, (b) one of the two frequency allocations for providing cellular service within designated metropolitan areas would be assigned to a wireline carrier having an exchange presence in that metropolitan area, (c) it expected that the wireline carriers would commence providing cellular service promptly, and (d) it strongly urged wireline carriers eligible and desiring to provide cellular service in any such designated metropolitan area to reach mutually acceptable arrangements to provide such service;

WHEREAS, the Partners desire to further the objectives of the FCC set forth in the Cellular Radio Decisions in expeditiously providing cellular service to the public and believe that this Agreement, as so encouraged by the FCC, is consistent with the FCC's cellular communications policy and is lawful and in the public interest; and

NOW, THEREFORE, it is mutually agreed that:

## ARTICLE I.

### FORMATION OF PARTNERSHIP

1.1 <u>Formation</u>.  The Partners mutually covenant and agree and hereby do form a general partnership pursuant to the provisions of the Illinois Uniform Partnership Act, Ill. Ann. Stat. Ch. 106 1/2 §§ 1-43 (Smith-Hurd 1952), in accordance with the further terms and provisions hereof.

1.2 <u>Name and Office</u>.  (a)  The name of the Partnership is "Midwest Cellular Associates," and its business shall be carried on in this name with such variations and changes as the Managing Partner deems necessary to comply with requirements of the jurisdictions in which operations are conducted or as the Managing Partner deems necessary to change for any reasonable business purpose.

(b)  The principal office and place of business of the Partnership shall be maintained at 121 South 17th Street, Mattoon, Illinois 61938, or at such other location within Illinois as the Managing Partner may from time to time select, upon prior written notice to the other Partner.

2

1.3  **Business Purpose**.  The purpose of the
Partnership is to acquire, own and, if appropriate or
desirable, sell or otherwise dispose of the Partnership
Investment or investments in similarly situated partnerships.

1.4  **Effectiveness of the Agreement**.  The Partners
recognize that the FCC's Rules require that the Operating
Partnership apply to the FCC to substitute the Operating
Partnership as the applicant for a cellular system
construction permit, and that, in so doing, partners in the
Operating Partnership must notify the FCC that such filing is
the result of an agreement or understanding.  Therefore, this
Agreement shall become effective upon the occurrence of both
(i) the FCC having entered an order granting the application
of the Operating Partnership and (ii) the FCC having
conditionally dismissed or authorized the conditional
dismissal or authorized the conditional withdrawal of any
individual application by the partners in the Operating
Partnership to provide Cellular Service.  The Partners agree
to take no action inconsistent with the provisions of this
Agreement during the period of time before the foregoing
actions by the FCC and shall reasonably support the
Partnership's interest in obtaining the foregoing FCC actions.

### ARTICLE II.

### DEFINITIONS

2.1  **Affiliate**.  A person, association,
co-partnership, partnership, corporation, or joint-stock
company or trust (hereinafter "person") that, directly or
indirectly, through one or more intermediaries, controls, is
controlled by, or is under common control with another person
that is a Partner.  Control shall be defined as (i) ownership
of a majority of the voting power of all classes of voting
stock or (ii) ownership of a majority of the beneficial
interests in income and capital of an entity other than a
corporation.

2.2  **Capital Contribution**.  Funds paid or property
contributed to the Partnership for the purchase of the
Partnership Interests issued pursuant to Article V.

2.3  **Cellular Service**.  Any and all service
authorized by the FCC under Part 22 of its cellular rules as
promulgated under the Cellular Radio Decisions and provided
pursuant to the terms of this Agreement.

3

2.4 __CGSA__.  The Cellular Geographic Service Area designated in the attached Appendix B, which is generally contained within the boundaries of the MSA and which constitutes the geographical limits of the area in which Cellular Service will initially be provided by the Operating Partnership.

2.5 __Income and Losses__.  The income and losses of the Partnership as of the close of the Partnership's fiscal year or any other fiscal period, determined in accordance with generally accepted accounting principles.

2.6 __Initial Capital Account Amount__.  The respective amounts initially credited to the capital account established for the Partners pursuant to Section 5.1.

2.7 __Managing Partner__.  The Managing Partner shall be Consolidated.

2.8 __Operating Partnership__.  Illinois Cellular Associates Limited Partnership, a limited partnership organized under the laws of the State of Illinois.

2.9 __Partnership Interest__.  The ownership of a Partner in the Partnership at any particular time determined by the ratio which such Partner's aggregate Capital Contributions bears to the aggregate Capital Contributions of all the Partners.

2.10 __Partnership Investment__.  A twenty-five percent (25%) Limited Partner's interest in Illinois Cellular Associates Limited Partnership, a limited partnership organized under the laws of the State of Illinois.

2.11 __MSA__.  The Metropolitan Statistical Area designated in the attached Appendix C.

ARTICLE III.

PARTNERSHIP OPERATIONS

3.1 __Management and Operating Services__.  The Managing Partner, on behalf of the Partnership, shall be responsible for making all decisions with respect to the Partnership Investment, including, without limitation, actions required of or permitted to Partners under the Limited Partnership Agreement and Certificate of Limited Partnership for the Operating Partnership.  The Partners hereto agree that the Managing Partner shall perform all

4

activities and functions as the Managing Partner may deem necessary or appropriate to enter into, carry out and perform such actions.

The Managing Partner shall provide management and accounting services to the Partnership consisting of, but not limited to, maintaining books of record, opening bank accounts, preparing accounting reports (in accordance with generally accepted accounting principles, as varied by appropriate regulatory authorities), and preparing other records or reports necessary to meet regulatory and legal filings, as the Managing Partner may deem necessary or appropriate.

3.2  <u>Operating and Management Expenses</u>.  The Managing Partner shall arrange for the Partnership to engage engineering, legal, accounting and other third party services reasonably required in connection with the Partnership business.  The costs of such services shall be billed directly to the Partnership to the extent practicable.  The Managing Partner shall be reimbursed by the Partnership monthly for any reasonable and necessary expenditures, including reasonable and necessary administrative and overhead expenses, incurred by the Managing Partner on behalf of the Partnership.  The Managing Partner shall not be entitled to profit in rendering such services to the Partnership as described in this paragraph, it being understood that the Managing Partner will be entitled to its proportionate allocated share of Income and Losses as provided in Article V.  Expenses incurred prior to the date of this Agreement shall not be reimbursed.

ARTICLE IV.

CAPITALIZATION OF PARTNERSHIP

4.1  <u>Initial Capital Contributions</u>.  Initial Capital Contributions shall be as set forth in Appendix A hereto.  Such initial Capital Contributions shall result in the following respective Partnership Interests for the Partners:

(A)  95.00% for Consolidated

(B)  5.00% for Cass County

Initial Capital Contributions shall be made within 30 days following receipt of written requests by the Managing Partner or within such longer period specified by the

5

Managing Partner in its written request; provided, however, that no initial Capital Contributions shall be required to be made prior to issuance by the FCC of a construction permit to the Operating Partnership. Capital Contributions may only be requested by the Managing Partner as they are needed to meet the financial obligations of the Partnership and operating and management expenses as set forth in Section 3.2.

4.2  Additional Capital Contributions. From time to time additional capital may be called for by the Managing Partner if required to fund the Operating Partnership. Such additional funding shall be due and payable on the date set forth in a written notice requesting an additional Capital Contribution given by the Managing Partner to each Partner, which date shall not be less than 30 days following the date of the notice. Should any Partner decline to make such additional Capital Contribution, or fail to pay its contribution when due, the other Partner may contribute such amount, thereby increasing in such proportion the other Partner's Partnership Interests. In such event, the Partnership Interest of a non-participating Partner shall be diluted accordingly, and such Partner shall be limited in its right to provide future additional capital in proportion to its Partnership Interest as so revised.

4.3  Capital Contributions in Cash. Funding of both initial and additional Capital Contributions to the Partnership shall be in cash and not real or personal property.


ARTICLE V.

ALLOCATIONS AND DISTRIBUTIONS

5.1  Capital Accounts. A capital account shall be established for each Partner in such Partner's Initial Capital Account Amount. Such capital account shall be increased to reflect allocable shares of Income, as defined in Section 2.5, and additional Capital Contributions pursuant to Section 4.2 and decreased to reflect allocable shares of Losses, as defined in Section 2.5, and cash distributions made by the Partnership. For purposes of this Section 5.1, Income and Losses shall be apportioned ratably to each day of the fiscal period, and each day's share shall be allocated pursuant to the Partnership Interests on such date. In the case of distributions in kind pursuant to Section 11.3, capital accounts shall be adjusted in accordance with Section 11.3.

6

5.2  Tax Allocations Among Partners.  All items of income, gain, loss, deduction, and credit (including items of tax preference) of the Partnership for federal income tax purposes shall be apportioned ratably to each day of the Partnership's taxable year and each day's share of such items shall be allocated to the Partners in proportion to their respective Partnership Interests on such days.

5.3  Distributions.  Funds of the Partnership from all sources, less appropriate reserves or allowances determined by the Managing Partner to be reasonably necessary for future administrative and operating expenses, loan payments, and other costs and expenses and contingencies, shall be distributed on a fiscal quarterly basis as promptly as practicable after the end of each quarter.  Each distribution pursuant to this Section 5.3 shall be made to the Partners in proportion to the daily weighted average of their respective Partnership Interests as in effect from time to time during the relevant quarterly time period.

### ARTICLE VI.

### RIGHTS AND POWERS OF PARTNERSHIP, MANAGING PARTNER, AND PARTNERS

6.1  Partnership Powers.  In furtherance of the business purpose specified in Section 1.3, the Partnership, and the Managing Partner on behalf of the Partnership, shall be empowered to do or cause to be done any and all acts reasonably deemed by the Managing Partner to be necessary or appropriate in furtherance of the purposes of the Partnership or forebear from doing any act if the Managing Partner reasonably deems such forebearance necessary or appropriate in furtherance of the purposes of the Partnership, including without limitation, the power and authority:

(a)  to enter into, perform, and carry out contracts and agreements of every kind necessary or incidental to the accomplishment of the Partnership's purposes, including, without limitation, contracts and agreements with the partners of the Operating Partnership and with the Operating Partnership, and to take or omit such other or further action in connection with the Partnership's business as may be necessary or desirable in the opinion of the Managing Partner to further the purposes of the Partnership;

7

    (b)  to borrow from banks and other lenders on such terms and conditions as shall be approved by the Managing Partner and to secure any such borrowings by mortgaging, pledging, granting security interests in, or assigning assets and revenues of the Partnership to the extent deemed necessary or desirable by the Managing Partner;

    (c)  to invest such funds as are temporarily not required for Partnership purposes in short-term debt obligations selected by the Managing Partner, including government securities, certificates of deposit of domestic commercial banks, commercial paper, bankers' acceptances, and other money market instruments; and

    (d)  to carry on any other activities necessary to, in connection with, or incidental to any of the foregoing.

    6.2  <u>Powers of the Managing Partner</u>.  In addition to those powers vested pursuant to Section 6.1, the Managing Partner hereby is vested with the power to:

    (a)  manage, supervise, and conduct the affairs of the Partnership;

    (b)  make all elections, investigations, evaluations, and decisions, binding the Partnership thereby, that may be necessary, or appropriate in connection with the business purposes of the Partnership;

    (c)  incur obligations or make payments in the name of the Partnership or, if necessary, on behalf of the Partnership in the Managing Partner's own name; and

    (d)  execute all instruments of any kind or character which the Managing Partner in its discretion shall deem necessary or appropriate in connection with the business purposes of the Partnership.

    6.3  <u>Rights of Other Partners</u>.  Each Partner that is not a Managing Partner shall have the right to:

    (a)  inspect and copy, through employees of such Partner or its duly authorized agents or representatives, any of the Partnership books of

8

record, accounting records, financial statements,
or other records or reports;

(b) have on demand a true and full
information of all things affecting the Partnership
and a formal account of Partnership affairs;

(c) audit, at its own expense and once every
calendar year, the Partnership books of record,
accounting records, and financial statements of the
Partnership;

(d) have dissolution and winding up by decree
of court when permitted under the Illinois Uniform
Partnership Act;

(e) meet with representatives of the Managing
Partner at a special meeting as requested by a
Partner for the purpose of discussing any other
matter relating to the business or operation of the
Partnership, such meeting to take place at the
principal offices of the Partnership or of the
Managing Partner or any other location mutually
acceptable to all Partners; and

(f) inspect and copy, through employees of
such Partner or its duly authorized agents or
representatives upon reasonable notice to the
Managing Partner, the books of record, accounting
records, financial statements, or other records or
reports of the Managing Partner relating to its
operation of the Partnership.

6.4 <u>Ownership or Conduct of Other Businesses</u>.
Subject to the provisions of Sections 7.7 and 7.8, the
Partners may engage in or possess an interest in other
business ventures of every kind and description. Neither the
Partnership nor any Partner shall have any rights by virtue
of this Agreement in such independent business ventures or
the income or profits therefrom.

## ARTICLE VII.

### OBLIGATIONS OF MANAGING PARTNER

7.1 <u>Duty of the Managing Partner</u>. The Managing
Partner will at all times act in a fidiciary capacity and in
the best interests of the Partnership.

9

7.2  <u>Conduct of Business</u>.  The Managing Partner shall execute all contracts, agreements, and instruments the Managing Partner reasonably may deem necessary or desirable to carry on the purpose of the Partnership.

7.3  <u>Filings</u>.  The Managing Partner shall file all certificates, notices, statements, or other instruments required by law for the formation, operation, and termination of the Partnership and its business in all appropriate jurisdictions.  The Managing Partner shall also act as the "tax matters partner," as that term is defined in Section 6231(a)(7) of the Internal Revenue Code of 1954, as amended, and shall prepare and file all necessary Partnership tax returns.  The Managing Partner shall advise the Partners of any elections under applicable tax laws that may affect Partnership Income or Losses.

7.4  <u>Maintain Accounts</u>.  Pursuant to the provisions of this Agreement, the Managing Partner shall maintain or cause to be maintained capital accounts on the books and records of the Partnership in respect of each Partnership Interest.

7.5  <u>Financial Reports</u>.  The Managing Partner shall furnish to the Partners quarterly and annual Partnership financial statements.  Quarterly financial statements will be furnished to the Partners within 30 days after the close of each quarter and be certified by an officer of the Managing Partner.  Year-end financial statements will be made available to the Partners within 120 days after the close of the fiscal year and be certified by an officer of the Managing Partner.

7.6  <u>Performance of Partnership Obligations</u>.  The Managing Partner shall use its best efforts to cause the Partnership to observe and perform each and every obligation under all agreements and undertakings made by the Partnership or imposed on the Partnership by law or regulatory authority.

7.7  <u>Independent Activities Within Area</u>.  Nothing herein shall preclude the Managing Partner or an Affiliate thereof from reselling Cellular Service provided by the Operating Partnership or acting as an agent or distributor for the Partnership in the sale or lease of terminal equipment used in connection with Cellular Service provided by the Partnership, under such Partner's own name or otherwise, independent from the Partnership in any area in which the Partnership provides Cellular Service.  Neither the Managing Partner nor any Affiliate thereof shall be funded or

10

staffed by the Partnership for any such activity and any
transaction between the Managing Partner or any Affiliate and
the Partnership shall be on an arm's length basis and at
prices, and on terms and conditions, equivalent to the
prices, terms, and conditions available to the Partnership
from third parties that are not Affiliates of the Partnership
or the Managing Partner.  Except as permitted above, neither
the Managing Partner nor any Affiliates thereof shall be
permitted, directly or indirectly, to provide Cellular
Service or engage in the sale or lease of terminal equipment
used in connection therewith in competition with the
Partnership in any area in which the Operating Partnership is
providing or is licensed to provide Cellular Service.

     7.8  <u>Independent Activities in Other Areas</u>.
Nothing herein shall preclude the Managing Partner or an
Affiliate thereof from engaging in any Cellular Service or
the sale or lease of terminal equipment used in connection
therewith independent from the Partnership in areas other
than the MSA.

## ARTICLE VIII.

### BANKING, ACCOUNTING, BOOKS AND RECORDS

     8.1  <u>Banking</u>.  All funds of the Partnership shall
be deposited in a separate bank account or accounts as shall
be established and designated by the Managing Partner.
Withdrawals from any such bank accounts shall be made upon
such signature or signatures as the Managing Partner may
designate.

     8.2  <u>Maintenance of Books and Accounting Method</u>.
The Managing Partner shall keep or cause to be kept full and
accurate accounts of the transactions of the Partnership in
proper books of account in accordance with generally accepted
accounting principles, as varied by the appropriate
regulatory authorities.  Such books and records shall be
maintained or available on notice at the principal place of
business of the Managing Partner and be made available for
reasonable inspection, examination, and copying by the
Partners or their respective duly authorized agents or
representatives upon reasonable notice to the Managing
Partner.

     8.3  <u>Fiscal Year; Partnership Tax Returns</u>.  The
fiscal year of the Partnership shall begin on the first day
of January in each year and end on the 31st day of December

11

in each year. The Managing Partner shall cause to be filed
the federal income tax partnership return and all other tax
returns or reports required to be filed for the Partnership
for all applicable tax years, and shall furnish as promptly
as practicable a statement of each Partner's allocated share
of income, gains, losses, deductions, and credits for such
taxable year.

## ARTICLE IX.

### PARTNERS OTHER THAN MANAGING PARTNER

9.1 <u>Partners Not to Take Part in Business</u>.
No Partner, other than the Managing Partner, shall take part
in, or interfere in any manner with, the conduct or control
of the Partnership business, nor shall any such Partner have
any right or authority to act for or bind the Partnership.

## ARTICLE X.

### TRANSFER OF PARTNER'S INTEREST

10.1 <u>Assignment</u>. The Managing Partner may
transfer or assign its Managing Partner's Interest or any
portion thereof, only after written notice to all the other
Partners. All other Partners may assign their Partner's
Interest or any portion thereof, only after written notice to
all Partners and the unanimous consent of all the other
Partners to permit such transfer. Any such transfer or
assignment shall be subject to required regulatory approval.

10.2 <u>Withdrawal</u>. Withdrawal of either Partner
will cause the dissolution and termination of the Partnership
in accordance with the terms of Article XI except in the case
of assignments as provided in Section 10.1. No Partner may
withdraw until it has given the other Partner 30 days notice.

## ARTICLE XI.

### DISSOLUTION AND TERMINATION OF PARTNERSHIP

11.1 <u>Dissolution</u>. The Partnership shall be
dissolved and terminated if:

12

(a) the FCC grants the application of the Operating Partnership subject to terms and conditions that are unacceptable to the Managing Partner and all available administrative and judicial appeals of such FCC approval have been finally exhausted;

(b) the Cellular Radio Decisions are not continued in substantially the same form and such change materially adversely affects the Partnership's ability to conduct its business and all available administrative and judicial appeals regarding such Cellular Radio Decisions have been finally exhausted;

(c) the FCC finally denies licenses to the Operating Partnership empowering it to construct and provide Cellular Service;

(d) the Operating Partnership applies for and is finally denied state or other regulatory approvals or is granted such approval subject to terms and conditions that are unacceptable to the Managing Partner on the grounds that such denial or conditional grant has a materially adverse effect on the Operating Partnership's ability to conduct its business; or

(e) the Partners unanimously agree to dissolve and terminate the Partnership and receive any approvals required by the FCC or any other regulatory authority for such dissolution and termination.

Regarding (c) and (d) above, any such denial of regulatory approval shall not be considered finally denied until all available administrative and judicial appeals of such denial have been finally exhausted.

11.2 Distribution Upon Dissolution. Upon dissolution of the Partnership, the Managing Partner shall proceed, subject to the provisions herein, to liquidate the Partnership and apply the proceeds of such liquidation or to distribute Partnership assets, in the following order of priority:

(a) to creditors, including Partners who are creditors, to the extent otherwise permitted by law, in satisfaction of liabilities of the Partnership other than liabilities for distribution to Partners under Article X;

13

        (b)   to the establishment of any reserve or
allowance the Managing Partner may deem reasonably
necessary for any contingent or unforeseen
liabilities or obligations of the Partnership.
Such reserve may be paid over by the Managing
Partner to any attorney at law, or other party as
escrow agent to be held for disbursement in payment
of any of the aforementioned liabilities and, at
the expiration of such period as shall be deemed
advisable by the Managing Partner, for distribution
of the balance, in the manner hereinafter provided
in this Paragraph;

        (c)   to Partners and former Partners in
satisfaction of liabilities for distributions under
Article X; and

        (d)   to Partners first for the return of their
capital accounts as set forth in Section 5.1 in
proportion to the Partners' respective capital
accounts at the time of such dissolution, with any
remaining Partnership assets being distributed in
proportion to the Partners' respective Partnership
Interests on the date of dissolution.

    11.3   Distributions in Cash or in Kind.  Upon
dissolution, the Managing Partner may in its discretion
(a) liquidate all or a portion of the Partnership assets and
apply the proceeds of such liquidation in the priorities set
forth in Section 11.2 or (b) hire independent recognized
appraisers to appraise the value of the Partnership assets
not sold or otherwise disposed of (the cost of such appraisal
to be considered a debt of the Partnership), allocate any
unrealized gain or loss to the Partners' capital accounts as
though the properties in question had been sold on the date
of distribution and, after giving effect to any such
adjustment, distribute those assets in accordance with the
priorities as set forth in Section 11.2.  In the case of any
distribution in kind of Partnership assets under this Section
to a Partner, the value of the asset determined by the
appraisal as provided above shall be applied against the
Partner's capital account.

    11.4   Time for Liquidation.  A reasonable amount of
time shall be allowed for the orderly liquidation of the
assets of the Partnership and the discharge of liabilities to
creditors so as to enable the Managing Partner to minimize
any losses which otherwise might be incurred.

14

11.5  <u>Managing Partner Not Liable for Return of</u>
<u>Distribution</u>.  The Managing Partner shall not be liable for
any distribution required pursuant to Section 11.2(b), (c)
and (d) and such distribution shall be made solely from
available Partnership assets, if any.


ARTICLE XII.

EXCULPATION AND INDEMNIFICATION

12.1  <u>Exculpation of the Managing Partner</u>.  The
Managing Partner, its officers, directors, shareholders and
agents will not be liable for any loss to the Partnership or
the other Partner by reason of any act or failure to act
unless the Managing Partner was guilty of willful misconduct
or gross negligence.

12.2  <u>Indemnification of the General Partner</u>.  The
Partnership shall indemnify the Managing Partner, its
officers, directors, shareholders and agents, against any
loss or damage incurred by the Managing Partner (including
legal expenses) by reason of any acts performed or not
performed by the Managing Partner, for and on behalf of the
Partnership, unless Managing Partner was guilty of willful
misconduct or gross negligence.  The Managing Partner shall
indemnify the Partnership against any damages incurred by
reason of the Managing Partner's willful misconduct or gross
negligence.


ARTICLE XIII.

AMENDMENTS

13.1  <u>Amendments</u>.  This Agreement may not be
amended except upon written consent of all Partners.


ARTICLE XIV.

TECHNOLOGY AND INFORMATION

14.1  <u>Technology License</u>.  The Managing Partner
shall, on behalf of the Partnership, obtain the right to use
hardware and software technology associated with Cellular
Service.  The Managing Partner is hereby authorized, on
behalf of the Partnership, to engage in negotiations and to
enter into contracts for licenses to use cellular hardware,

15

software, or related processes.  In general, such contracts shall be merely right to use contracts and will not vest any title in any Partner to this Agreement.

    14.2  <u>Proprietary Information</u>.  All information relating to the business of the Partnership, the Operating Partnership and operation of the Cellular Service, including but not limited to specification, microfilm, photocopies, keypunch cards, magnetic tapes, drawings, sketches, models, samples, tools, technical information, data, employee records, maps, customer information, financial reports, and market data marked or identified in writing as proprietary (all hereinafter designated as "Proprietary Information") furnished to or obtained by a Partner from any other Partner or from the Partnership or the Operating Partnership, whether written or oral or in other form, shall remain the property of the disclosing Partner, the Partnership or the Operating Partnership, as the case may be.  All copies of such information whether written, graphic, or other tangible form shall be returned to the disclosing Partner, the Partnership or the Operating Partnership, as the case may be, upon the disclosing Partner's or such Partnership's request, except that one copy may be retained for archival purposes.  Unless otherwise agreed, no obligation hereunder shall extend beyond five years from the date of receipt of such information and the obligation does not apply to such Proprietary Information as was previously known to the receiving Partner free of any obligation to keep it confidential or has been or is subsequently made public by the disclosing Partner or a third party.  Such Proprietary Information shall be kept confidential by the receiving Partner and shall be used only for performing the obligations contained in this Agreement and may be used for such other purposes only upon such terms as may be agreed upon between the disclosing Partner, the Partnership or the Operating Partnership, as the case may be, and the receiving Partner in writing.  Nothing contained herein shall be deemed to preclude any Partner from making use of proprietary information in connection with activities permitted under Sections 7.7.

16

## ARTICLE XV.

### MISCELLANEOUS PROVISIONS

15.1  <u>Warranties</u>.  Each Partner warrants as follows:

(a)  it has the corporate power and authority to enter into, execute and perform this Agreement and the transactions contemplated hereby, and such acts have been duly authorized by all necessary corporate action, and

(b)  this Agreement does not breach any of its existing agreements with other parties.

15.2  <u>Table of Contents and Headings</u>.  The table of contents and the headings of the Sections of this Agreement are inserted for convenience only and shall not be deemed to constitute a part hereof.

15.3  <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of and be binding upon the Partners and any additional or substitute Partner, and to their respective successors and assigns, except that nothing contained in this Section shall be construed to permit any attempted assignment or other transfer which would be unauthorized by or void pursuant to any other provision of this Agreement.

15.4  <u>Severability</u>.  Every provision of this Agreement is intended to be severable.  If any term of provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the remainder of the Agreement; provided, however, that the general intent of this Agreement shall not be voided thereby.

15.5  <u>Non-Waiver</u>.  No provision of this Agreement shall be deemed to have been waived unless such waiver is contained in a written notice given to the Partner claiming such waiver, and no such waiver shall be deemed to be a waiver of any other or further obligation or liability of the Partner in whose favor the waiver was given.

15.6  <u>Applicable Law</u>.  This Agreement and the rights and obligations of the Partners shall be interpreted in accordance with the laws of the State of Illinois.  The Partnership will be bound by and fully comply with any applicable provisions of the equal employment opportunity laws, including any executive orders issued thereunder.

17

15.7 **Entire Agreement**. This Agreement constitutes the entire Partnership Agreement between the Partners and shall supersede all previous negotiations, commitments, representations, and writings with respect to the subject matter hereof.

15.8 **Notices**. All notices given by any Partner to any other Partner under this Agreement shall be in writing, registered or certified mail, postage prepaid, addressed as follows (or to such other address as a Partner may specify in such a notice to all other Partners):

Illinois Consolidated Mobile
 Communications Inc.:

121 South 17th Street
Mattoon, Illinois 61938
Attention: President

Cass County Telephone
 Company:

211 South Main Street
Virginia, Illinois 62691

Such notices shall be effective on the third business day subsequent to the date of mailing.

15.9 **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be considered an original.

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed by their duly authorized representatives as of the date first written above.

ILLINOIS CONSOLIDATED MOBILE
 COMMUNICATIONS INC.

By: _____
Title: _____

CASS COUNTY TELEPHONE COMPANY

By: _____
Title: PRESIDENT

18

## APPENDIX A

### INITIAL CAPITAL CONTRIBUTIONS

A.    Managing Partner Consolidated


B.    Partner Cass County

APPENDIX B


(map)

## APPENDIX C

### GEOGRAPHIC DESCRIPTION
### OF
### CHAMPAIGN, ILLINOIS
### METROPOLITAN STATISTICAL AREA (MSA)

Champaign, Illinois MSA includes the following Counties: