**E-FILED**
Tuesday, 25 January, 2005  04:34:35 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT B

AGREEMENT OF LIMITED PARTNERSHIP

OF

ILLINOIS SMSA LIMITED PARTNERSHIP

Dated as of February 5, 1987

INDEX

                                                                    Page

PREAMBLE. . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

ARTICLE I        Definitions. . . . . . . . . . . . . . . . . . .    3

        1.1      Act. . . . . . . . . . . . . . . . . . . . . .      3
        1.2      Additional Capital Contribution. . . . . . . .      3
        1.3      Affiliate. . . . . . . . . . . . . . . . . . .      3
        1.4      Agreed Value . . . . . . . . . . . . . . . . .      3
        1.5      Agreement. . . . . . . . . . . . . . . . . . .      4
        1.6      AMC . . . . . . . . . . . . . . . . . . . . . .     4
        1.7      Appraised Value. . . . . . . . . . . . . . . .      4
        1.8      Capital Account. . . . . . . . . . . . . . . .      4
        1.9      Capital Contribution . . . . . . . . . . . . .      4
        1.10     Cellular Radio Decisions . . . . . . . . . . .      4
        1.11     Cellular Service . . . . . . . . . . . . . . .      5
        1.12     CGSA . . . . . . . . . . . . . . . . . . . . .      5
        1.13     Code . . . . . . . . . . . . . . . . . . . . .      5
        1.14     Default. . . . . . . . . . . . . . . . . . . .      5
        1.15     Disposition. . . . . . . . . . . . . . . . . .      5
        1.16     FCC. . . . . . . . . . . . . . . . . . . . . .      5
        1.17     First Capital Contribution . . . . . . . . . .      5
        1.18     General Partner. . . . . . . . . . . . . . . .      6
        1.19     Income and Losses. . . . . . . . . . . . . . .      6
        1.20     Limited Partner. . . . . . . . . . . . . . . .      6
        1.21     Negotiated Percentage Interest . . . . . . . .      6
        1.22     Person . . . . . . . . . . . . . . . . . . . .      7
        1.23     Partners . . . . . . . . . . . . . . . . . . .      7
        1.24     Partnership Interest . . . . . . . . . . . . .      7
        1.25     Percentage Interest. . . . . . . . . . . . . .      7
        1.26     Proprietary Information. . . . . . . . . . . .      7
        1.27     Recipient. . . . . . . . . . . . . . . . . . .      7
        1.28     Second Capital Contribution. . . . . . . . . .      7
        1.29     Tax Capital Account. . . . . . . . . . . . . .      7
        1.30     Tax Profits and Tax Losses . . . . . . . . . .      8

ARTICLE II       Formation of Limited Partnership . . . . . . .      8

        2.1      Formation. . . . . . . . . . . . . . . . . . .      8
        2.2      Name and Office. . . . . . . . . . . . . . . .      8
        2.3      Business Purpose . . . . . . . . . . . . . . .      8
        2.4      Effectiveness of the Agreement . . . . . . . .      9
        2.5      Term of Partnership. . . . . . . . . . . . . .     10

ARTICLE III      Regulatory Matters . . . . . . . . . . . . . .     10

        3.1      Contingency. . . . . . . . . . . . . . . . . .     10
        3.2      Cooperation. . . . . . . . . . . . . . . . . .     10

|  |  |  | Page |
|---|---|---|---|
| ARTICLE IV | Capital of Partnership . . . . . . . . . . | | 11 |
| 4.1 | Capital of the Partnership . . . . . . . . . | | 11 |
| 4.2 | First Capital Contribution . . . . . . . . . | | 11 |
| 4.3 | Second Capital Contribution. . . . . . . . . | | 11 |
| 4.4 | Additional Capital Contributions . . . . . . | | 11 |
| 4.5 | Failure to Make Additional Capital Contribution . . . . . . . . . . | | 12 |
| 4.6 | Interest upon Failure to Make Capital Contribution . . . . . . . . . | | 13 |
| 4.7 | Minimum Percentage Interest of General Partner. . . . . . . . . . . | | 14 |
| 4.8 | Amendment of Certificate . . . . . . . . . | | 14 |
| 4.9 | Capital Contributions in Cash; Exception . . . . | | 14 |
| 4.10 | Limitation on Liability of Limited Partners . . . . . . . . . . . . | | 15 |
| 4.11 | Additional Limited Partners. . . . . . . . . | | 15 |
| 4.12 | Procedure to Admit New Limited Partner . . . . . | | 16 |
| ARTICLE V | Allocations and Distributions. . . . . . . . | | 18 |
| 5.1 | Capital Accounts . . . . . . . . . . . . | | 18 |
| 5.2 | Allocations of Income and Losses . . . . . . . | | 18 |
| 5.3 | Allocations of Income and Losses on Winding Up. . . . . . . . . . . | | 18 |
| 5.4 | Allocations of Tax Profits and Tax Losses . . . . . . . . . . . . | | 18 |
| 5.5 | Allocations of Tax Credits . . . . . . . . . | | 19 |
| 5.6 | Tax Allocations for Contributed Property . . . . . . . . . . . . . | | 19 |
| 5.7 | Distributions. . . . . . . . . . . . . . | | 20 |
| 5.8 | No Return of Capital or Interest on Capital Contribution . . . . . . . . . | | 20 |
| ARTICLE VI | Management, Powers, Duties, Reimbursement and Rights; Transactions with Partners . . . . | | 21 |
| 6.1 | Management . . . . . . . . . . . . . . | | 21 |
| 6.2 | Powers of the General Partner. . . . . . . . . | | 22 |
| 6.3 | Fiduciary Duty of General Partner. . . . . . . . | | 24 |
| 6.4 | Liability of General Partner . . . . . . . . | | 24 |
| 6.5 | Reimbursement. . . . . . . . . . . . . . | | 24 |
| 6.6 | Ownership or Conduct of Other Businesses . . . . | | 25 |
| 6.7 | Exculpation and Indemnification. . . . . . . . | | 26 |
| 6.8 | Rights of Limited Partners . . . . . . . . . | | 27 |
| 6.9 | Limited Partners Not to Take Part in Business . . . . . . . . . . . . . | | 28 |

-ii-

|  |  | Page |
|---|---|---|
| ARTICLE XI | Dissolution and Termination. | 48 |
| 11.1 | Dissolution. | 48 |
| 11.2 | Distributions Upon Dissolution | 50 |
| 11.3 | Distributions in Cash or in Kind | 51 |
| 11.4 | Time for Liquidation | 52 |
| 11.5 | Termination. | 52 |
| 11.6 | General Partner Not Liable for Distributions. | 52 |
| 11.7 | General Partner's Right to Continue to Provide Cellular Service. | 52 |
| ARTICLE XII | Power of Attorney. | 52 |
| 12.1 | Grant of Power of Attorney | 52 |
| 12.2 | Irrevocable and Coupled With an Interest | 54 |
| 12.3 | Survival of Power of Attorney. | 54 |
| 12.4 | Limitation on Power of Attorney. | 55 |
| ARTICLE XIII | Amendments | 55 |
| 13.1 | Amendments | 55 |
| 13.2 | Execution of Amended Agreements. | 56 |
| ARTICLE XIV | Technology and Information | 56 |
| 14.1 | Technology License | 56 |
| 14.2 | Proprietary Information. | 56 |
| ARTICLE XV | Miscellaneous Provisions | 57 |
| 15.1 | Warranties | 57 |
| 15.2 | Table of Contents and Headings | 58 |
| 15.3 | References | 58 |
| 15.4 | Successors and Assigns | 58 |
| 15.5 | Severability | 58 |
| 15.6 | Waiver | 58 |
| 15.7 | Applicable Law | 59 |
| 15.8 | Entire Agreement | 59 |
| 15.9 | Notices. | 59 |
| 15.10 | Arbitration. | 60 |
| 15.11 | Counterparts | 61 |

## AGREEMENT ESTABLISHING
## ILLINOIS SMSA LIMITED PARTNERSHIP

THIS AGREEMENT is made as of the 5th day of February, 1987, by and between Ameritech Mobile Phone Service of Illinois, Inc., a corporation organized and existing under the laws of the State of Illinois and having its principal place of business at 1515 Woodfield Road, Schaumburg, Illinois 60173 ("AMPS"), Inland Cellular Telephone Co., a corporation organized and existing under the laws of the State of Illinois and having its principal place of business at 1400 West Anthony Drive, Post Office Box 3000, Champaign, Illinois 61281 ("Inland"), Mt. Pulaski Cellular Company, a corporation organized and existing under the laws of the State of Illinois and having its principal place of business at 228 South Chicago Street, Post Office Box 100, Lincoln, Illinois 62656 ("Mt. Pulaski"), U S West NewVector Group, Inc., a corporation organized and existing under the laws of the State of Colorado and having its principal place of business at 3350 161st Avenue S.C., Bellevue, Washington 98008-1329 ("NewVector") and Midwest Cellular Associates, a general partnership organized and existing under the laws of the State of Illinois and having its principal place of business at 121 South Seventeenth Street, Mattoon, Illinois 61938 ("Midwest").

WHEREAS, AMPS is a wholly-owned subsidiary of Ameritech Mobile Communications, Inc. and is engaged in planning for the provision of Cellular Service (as hereinafter defined);

WHEREAS, Ameritech Mobile Communications, Inc. through AMPS, desires to provide Cellular Service;

WHEREAS, Inland, Mt. Pulaski, NewVector and Midwest desire to participate in providing such Cellular Service;

WHEREAS, the parties have entered into a Settlement Agreement dated as of February 5, 1987 providing for the Partnership hereby contemplated;

WHEREAS, the Federal Communications Commission ("FCC") in its Cellular Radio Decisions (as hereinafter defined) stated that (a) a pressing need exists for expeditious implementation of cellular service, (b) one of the two frequency allocations for providing cellular service within designated metropolitan areas would be assigned to a wireline carrier having an exchange presence in that metropolitan area, (c) it is expected that the wireline carriers would commence providing cellular service promptly, and (d) it strongly urged wireline carriers eligible and desiring to provide cellular service in any such designated metro- politan area to reach mutually acceptable arrangements to provide such service;

WHEREAS, the Partners (as hereinafter defined) desire to further the objectives of the FCC set forth in the Cellular Radio Decisions by expeditiously providing cellular service to the public and believe that this Agreement, as so encouraged by the FCC, is consistent with the FCC's cellular communications policy and is lawful and in the public interest;

WHEREAS, the areas with respect to which the Partners hereto presently provide wireline telephone service are contiguous or proxi- mately located, a community of interests exists therein, and such areas

2

can most economically and efficiently be served by a unified cellular system; and

WHEREAS, the Partners desire to form a limited partnership in order to fund, establish and provide Cellular Service;

NOW THEREFORE, it is mutually agreed that:

ARTICLE I

DEFINITIONS

1.1  "Act" means the Illinois Revised Uniform Limited Partnership Act, as amended.

1.2  "Additional Capital Contribution" of a Partner means any amount that such Partner is entitled to contribute to the capital of the Partnership pursuant to Section 4.4.

1.3  "Affiliate" means, when used with reference to a specified Person, (a) any Person that directly or indirectly through one or more intermediaries controls or is controlled by or is under common control with the specified Person, (b) any Person that is an officer of, partner in, or trustee of, or serves in a similar capacity with respect to, the specified Person or of which the specified Person is an officer, partner or trustee, or with respect to which the specified Person serves in a similar capacity and (c) any Person that, directly or indirectly, is the beneficial owner of 10% or more of any class of equity securities of, or otherwise has a substantial beneficial interest in, the specified Person or of which the specified Person is directly or indirectly the owner of 10% or more of any class of equity securities or in which the specified Person has a substantial beneficial interest.  Notwithstanding the foregoing, for purposes of Article VIII the term "Affiliate" shall exclude an individual and, further provided that no Disposition to an

- 3 -

Affiliate shall take place unless such Affiliate meets all FCC
requirements.

1.4  "Agreed Value" means, at any particular time and with respect
to any real or personal property (other than cash) contributed to the
Partnership by a Partner, zero dollars ($0.00).

1.5  "Agreement" means this Agreement of Limited Partnership, as
originally executed and as amended, modified, supplemented or restated
from time to time, as the context requires.

1.6  "AMPS" means Ameritech Mobile Phone Service of Illinois,
Inc., a corporation organized and existing under the laws of the State
of Illinois.

1.7  "Appraised Value" of any assets distributed to the Partners in
kind pursuant to Section 11.3 means the value placed upon such assets by
the appraisers hired by the General Partner pursuant to Section 11.3 to
appraise such assets.

1.8  "Capital Account" of a Partner means, at any particular time,
the amount of the Capital Contribution of such Partner at such time (a)
reduced by (i) any Losses allocated to such Partner and (ii) any distri-
butions made to such Partner by the Partnership and (b) increased by any
Income allocated to such Partner and (c) as adjusted pursuant to Section
4.12.

1.9  "Capital Contribution" of a Partner means, at any particular
time, the sum of (a) the amount of cash then contributed to the
Partneship by such Partner plus (b) the Agreed Value of any real or
personal property other than cash then contributed to the Partnership by
such Partner; provided, however, that no cash or real or personal
property contributed to the Partnership by a Partner shall be included

- 4 -

in the Capital Capital Account of such Partner prior to the date it was due to the Partnership.

1.10 "Cellular Radio Decisions" means the decisions and orders of the FCC set forth in <u>An Inquiry Into The Use of The Bands 825-845 MHZ and 870-890 MHZ for Cellular Communications Systems; and Amendment of Parts 2 and 22 of the Commission's Rules Relative to Cellular Communications Systems</u> (CC Docket No. 79-318), 86 F.C.C.2d 469 (1981), as modified in 89 F.C.C.2d 58 (1982), as further modified in 90 F.C.C.2d 571 (1982) and as such decisions and orders may be further amended, modified or supplemented, as the context requires.

1.11 "Cellular Service" means any and all service authorized by the FCC under Part 22 of its cellular rules as promulgated under the Cellular Radio Decisions and provided pursuant to the terms of this Agreement.

1.12 "CGSA" means the Cellular Geographic Service Area(s) designated in Appendix B.

1.13 "Code" means the Internal Revenue Code of 1986, as amended from time to time.

1.14 "Default" has the meaning set forth in Section 9.2.

1.15 "Disposition" means any sale, exchange, assignment or any other transfer of all or any portion of any Limited Partner's Partnership Interest to any Person.

1.16 "FCC" means the Federal Communications Commission or any successor thereto.

1.17 "First Capital Contribution" of a Partner means the amount set forth in Appendix A opposite such Partner's name in the column entitled "First Capital Contribution".

1.18 "General Partner" means Ameritech Mobile Phone Service of Illinois, Inc., a corporation organized and existing under the laws of the State of Illinois, and any Person admitted as an additional or substitute general partner of the Partnership in accordance with this Agreement and the Act, in such Person's capacity as a general partner of the Partnership.

1.19 "Income" and "Losses" mean the income and losses, respectively, of the Partnership, determined in accordance with generally accepted accounting principles; provided, however, that (a) Income and Losses will be determined as though real and personal property other than cash contributed to the Partnership as part of the Capital Contribution of a Partner had been purchased by the Partnership at the Agreed Value of such property and (b) Income and Losses will be deemed to include income and losses that would have accrued to the Partnership if any assets distributed in kind to the Partners in accordance with Section 11.3 had been sold by the Partnership on the date of such distribution for an amount equal to their Appraised Value.

1.20 "Limited Partner" means each of Inland, Mt. Pulaski, NewVector, and Midwest and any Person admitted as an additional or substitute limited partner of the Partnership in accordance with this Agreement and the Act, in such Person's capacity as a limited partner of the Partnership.  Any Person may be both a General Partner and a Limited Partner of the Partnership.

1.21 "Negotiated Percentage Interest" of a Partner means the new ownership interest percentage of a new Limited Partner as negotiated by the General Partner to be effective upon admission of a new partner pursuant to Section 4.11.

1.22 "Person" means any individual, partnership, corporation, trust or other entity.

1.23 "Partners" means the General Partner and all Limited Partners, unless otherwise provided herein.  "Partner" shall mean any one of the Partners.  If one Person is both a General Partner and a Limited Partner, the term "Partner," when used with reference to such Person, shall be deemed to refer to such Person in each of such capacities severally.

1.24 "Partnership Interest" of a Partner means the entire ownership interest of such Partner in the Partnership at any particular time.

1.25 "Percentage Interest" of a Partner means, at any particular time, the ratio that such Partner's Capital Account bears at such time to the aggregate Capital Accounts of all the Partners.

1.26 "Proprietary Information" has the meaning set forth in Section 14.2.

1.27 "Recipient" means any Person who receives all or any portion of any Limited Partner's Partnership Interest by sale, exchange, assignment or any other transfer from any Limited Partner.

1.28 "Second Capital Contribution" of a Partner means the amount set forth in Appendix A opposite such Partner's name in the column entitled "Second Capital Contribution."

1.29 "Tax Capital Account" of a Partner means a capital account maintained for such Partner in accordance with tax accounting principles and shall include, at any particular time, the amount of cash or real or personal property other than cash then contributed to the Partnership by such Partner (a) reduced by (i) any Tax Losses allocated to such Partner

- 7 -

and (ii) any distributions made to such Partner by the Partnership and (iii) nondeductible expense items chargeable to capital (b) increased by (i) any Tax Profits allocated to such Partner and (ii) tax exempt income.

1.30 "Tax Profits" and "Tax Losses" mean the profits and losses, respectively, of the Partnership for federal income tax purposes including, without limitation, each item of Partnership income, gain, loss and deduction.

## ARTICLE II
## FORMATION OF LIMITED PARTNERSHIP

2.1 <u>Formation.</u>  The Partners mutually covenant and agree and hereby do form a limited partnership pursuant to the provisions of the Act, in accordance with the further terms and provisions hereof.

2.2 <u>Name and Office.</u> (a)  The name of the Partnership is Illinois SMSA Limited Partnership and its business shall be carried on in this name with such variations and changes as the General Partner deems necessary to comply with applicable law  or as the General Partner deems desirable for any reasonable business purpose.

(b)  The principal office and place of business of the Partnership shall be maintained at 1515 Woodfield Road, Schaumburg, Illinois 60173, or at such other location as the General Partner may from time to time select, upon prior written notice to the Limited Partners.

2.3 <u>Business Purpose.</u>  The purpose of the Partnership shall be to fund, establish and provide Cellular Service and to engage in any and all activities related or incidental thereto.  It is understood and agreed that Cellular Service provided by the Partnership shall initially be limited to the CGSAs, but may, subject to the provisions of this

- 8 -

Agreement and applicable licensing requirements, be expanded in the sole discretion of the General Partner to include other areas within the MSAs.

The Partners hereby each agree to file a separate wireline application for any cellular market contiguous to the MSAs which are the subject of this Agreement.  In the event that any Partner is selected by lottery or otherwise as the permittee or licensee for any such market, such Partner hereby agrees to use best efforts to transfer all its interest in such market, subject to FCC approval, to the Partnership. In no event shall any Partner who transfers its interest in any cellular market to the Partnership claim any right to increased participation in the Partnership or any other form of compensation for such transfer.

2.4  Effectiveness of the Agreement.  The Partners recognize that Sections 1.65 and 22.29 of the FCC's Rules, 47 C.F.R. 1.65 and 22.29, require that this Agreement be approved by the FCC.  Therefore, except to the extent necessary to obtain approval of this Agreement and any other necessary governmental approval for potential Partnership activity, and except as otherwise provided in this Section 2.4, the obligations of the Partners pursuant to this Agreement shall be contingent upon the FCC having entered an order approving or having otherwise approved this Agreement and the transfer of wireline interests in the Springfield, Bloomington/Normal, Champaign/Urbana/Rantoul, and Decatur MSAs, and the FCC having authorized dismissal or withdrawal of any individual application by the Partners to provide Cellular Service. Notwithstanding the foregoing, (a) upon signing of this Agreement, each Partner shall contribute to the Partnership, in cash, its First Capital Contribution as provided in Section 4.2 and the General Partner shall

file a certificate of limited partnership on behalf of the Partnership
pursuant to the Act and make all other filings and qualifications with
governmental authorities it deems necessary or desirable, (b) the
Partners specifically acknowledge that the contingency of their other
obligations pending FCC approval shall not permit any Partner to take
any action inconsistent with the provisions of this Agreement during the
period of time before this Agreement is approved by the FCC and (c) the
Partners shall support the Partnership's applications for approval of
this Agreement before the FCC and any other governmental authority.

2.5  <u>Term of Partnership</u>.  The term of the Partnership shall be
from the date of the first filing, pursuant to the Act, of a certificate
of limited partnership on behalf of the Partnership until February 5,
2037, unless sooner terminated as hereinafter provided.

ARTICLE III

REGULATORY MATTERS

3.1  <u>Contingency</u>.  The permits or licenses to be issued by regula-
tory authorities in connection with the provision of Cellular Service
may be contingent during the pendency of litigation or regulatory action
concerning the present wireline allocation; however, except as otherwise
provided in Section 2.4, the pendency of such litigation or regulatory
action shall not affect the Partners' obligations under this Agreement.

3.2  <u>Cooperation.</u>  The Partners pledge their best efforts and
mutual cooperation to obtain all necessary approvals and make all the
filings to provide Cellular Service.

- 10 -

## ARTICLE IV

## CAPITAL OF PARTNERSHIP

4.1  Capital of the Partnership.  The capital of the Partnership shall be the amounts contributed to the Partnership by the Partners as Capital Contributions from time to time as provided in this Agreement.

4.2  First Capital Contribution.  Concurrently with the execution of this Agreement, each Partner shall contribute to the capital of the Partnership, in cash, its First Capital Contribution.

4.3  Second Capital Contribution.  The General Partner may at any time require that each of the Partners contribute to the capital of the Partnership its Second Capital Contribution.  Each Partner's Second Capital Contribution shall be due on the date set forth in a written notice from the General Partner to the Limited Partners, which date shall be not less than thirty days from the date of such notice and shall be the first day of a month.

4.4  Additional Capital Contributions.  From time to time additional capital may be required by the Partnership to fund expansion or operation of Cellular Service.  In the event the General Partner determines that additional capital is so needed, it shall give each other Partner written notice of the additional capital needed and each Partner shall be entitled to contribute to the capital of the Partnership as an Additional Capital Contribution an amount equal to (but not less than) the product of (i) the total amount of such additional capital times (ii) such Partner's then current Percentage Interest.  Each Partner's Additional Capital Contribution shall be due on the date set forth in the notice from the General Partner, which date shall not be less than thirty days from the date of such notice and shall be the first day of a

- 11 -

month; provided, however, that in no event shall the time period between the date of the mailing of notice and the due date be less than forty-five days.  Each Limited Partner shall notify the General Partner, within fifteen days of receipt of the notice from the General Partner, whether or not such Limited Partner will make such Additional Capital Contribution when due.  Such notification to the General Partner shall be binding upon the Limited Partner.

4.5  <u>Failure to Make Additional Capital Contribution</u>.  Should any Partner notify the General Partner that it does not intend to make an Additional Capital Contribution, or fail to pay its Additional Capital Contribution when due, all or any portion of the other Partners may contribute pro rata, according to their then current respective Percentage Interests, an aggregate amount equal to the Additional Capital Contribution not made by the non-participating Partner or Partners, thereby increasing in such proportion the other Partners' Percentage Interests.  The amount contributed by a participating Partner shall be determined by multiplying the Additional Capital Contribution not made by the non-participating Partner or Partners by a ratio, the numerator of which is the participating Partner's Percentage Interest and the denominator of which is the aggregate of the Percentage Interests of all participating Partners.  Any such contribution shall be due on the date set forth in a notice from the General Partner to the Partner making such contribution, which date shall not be less than two days from the date of such notice and shall be the first day of a month. The General Partner may make any such contribution as a Limited Partner, if it so desires.  Such non-participating Partner shall be limited in its right to provide Additional Capital Contributions in the future

pursuant to Section 4.4 to its Percentage Interest at the time that the General Partner gives notice of any such future Additional Capital Contribution.

4.6  Interest upon Failure to Make Capital Contribution.  If any Partner (a) fails to make its Second Capital Contribution when due or (b) notifies the General Partner pursuant to Section 4.4 that it will make an additional Capital Contribution to the Partnership but fails to make such Additional Capital Contribution when due, it shall pay to the Partnership upon demand an amount equal to the interest that would accrue on a principal amount equal to its Second Capital Contribution or such Additional Capital Contribution, as the case may be, from the date the same was due until (i) in the case of an Additional Capital Contri- bution, the earlier of (A) date such Additional Capital Contribution is paid, or is deemed to have been paid in full pursuant to the last sentence of this Section 4.6 or (B) the date such Partner withdraws from the Partnership, voluntarily or involuntarily, or (ii) in the case of a Second Capital Contribution, until the date such Partner withdraws from the Partnership, voluntarily or involuntarily.  Such interest shall be equal to the sum of (x) the average (rounded to the nearest one- hundredth of 1%) of the respective rates per annum announced by each of Citibank, N.A., The Chase Manhattan Bank, N.A. and Morgan Guaranty Trust Company of New York as its prime rate from time to time during the relevant period, plus (y) 1% per annum.  Notwithstanding the provision for interest contained in this Section 4.6, no Partner shall have the right to make its Second Capital Contribution or any Additional Capital Contribution after the date that its Second Capital Contribution or such Additional Capital Contribution, as the case may be, was due and nothing

- 13 -

contained in this Section 4.6 shall be in limitation of the provisions of Article IX. For the purposes of this Section 4.6, if one Partner contributes capital to the Partnership pursuant to Section 4.5 as a result of the failure of another Partner to make an Additional Capital Contribution, the Additional Capital Contribution of the Partner who failed to make such additional Capital Contribution shall be deemed to have been paid to the extent of such contribution.

4.7 <u>Minimum Percentage Interest of General Partner</u>. Notwithstanding anything to the contrary contained in this Agreement, the General Partner shall make sufficient Capital Contributions to the Partnership so that its Percentage Interest in its capacity as General Partner shall at all times, while it is a General Partner, be at least one percent.

4.8 <u>Amendment of Certificate</u>. Each Partner hereby agrees to execute, promptly upon the written request of the General Partner, all certificates of amendment to the Partnership's certificate of limited partnership and all other documents deemed necessary by the General Partner to reflect additional capital contributed to the Partnership pursuant to Section 4.3, 4.4 or 4.5, whether or not such certificates or other documents are required to comply with applicable law.

4.9 <u>Capital Contributions In Cash; Exception</u>. All contributions to the capital of the Partnership shall be in cash and not real or personal property other than cash and shall be paid to the General Partner in immediately available funds for the account of the Partnership; provided, however, that AMPS (either in its capacity as General Partner or in its capacity as a Limited Partner or both) may contribute, in lieu of or in addition to cash, real or personal property other than cash as all or part of its Second Capital Contribution at its Agreed

Value.  Any such real or personal property other than cash shall be deemed to be the equivalent for the purposes of this Agreement of a contribution in cash to the capital of the Partnership in the amount of its Agreed Value.

4.10 <u>Limitation on Liability of Limited Partners</u>.  Except as otherwise provided in Sections 4.6 and 8.6, the liability of each Limited Partner to provide funds or any other property to the Partnership shall be limited to the amount of Capital Contributions which the Limited Partner makes or is required to make pursuant to Sections 4.2 and 4.3 or makes or agrees to make pursuant to Section 4.4 or 4.5.  No Limited Partner shall have any further liability to contribute cash or other property to the Partnership for, or in respect of, the liabilities or obligations of the Partnership or shall be personally liable for any obligations of the Partnership.

4.11 <u>Additional Limited Partners</u>.  In providing Cellular Service within the MSAs, the General Partner may invite one or more wireline carriers to become additional limited partners hereunder subject to approval by all Limited Partners.  In providing Cellular Service in areas adjoining the MSA, the General Partner shall have the right to invite one or more wireline carriers who are not affiliated with the General Partner to become additional limited partners hereunder subject to the approval of the General Partner plus two Limited Partners, only one of which is Inland, Mt. Pulaski or any transferee or successor of Inland or Mt. Pulaski.  Subject to the further provisions of this Section 4.11, each Limited Partner hereby agrees to execute and deliver any amendment to this Agreement deemed by the General Partner to be necessary or desirable to reflect any such admission.  The terms and

conditions of the admission of any wireline carrier shall be as determined by the General Partner, subject to Section 8.7 and subject to the approval of the General Partner plus two Limited Partners, only one of which is Inland, Mt. Pulaski or any transferee or successor of Inland or Mt. Pulaski. No such wireline carrier shall be admitted to the Partnership until such wireline carrier has adopted and agreed in writing to be bound by all the provisions of this Agreement, as the same may have been amended, and has delivered to the General Partner all documents reasonably required by the General Partner or required by the Act to effect such admission. In the event that the General Partner proposes the addition of a new Limited Partner, written notice thirty days prior to the time for final approval by the Limited Partners as described above shall be given to the existing Limited Partners. Such written notice shall contain information as to the identity of the proposed Limited Partner, the Negotiated Percentage Interest (as defined below) for such Limited Partner, and the price proposed to be paid by such Limited Partner.

4.12 <u>Procedure to Admit New Limited Partners</u>. The following procedure shall be followed in the event a new Limited Partner is to be admitted to the Partnership pursuant to Section 4.11:

a) Prior to admission of a new Limited Partner, the General Partner shall determine the new Limited Partner's Negotiated Percentage Interest and the price to be paid for such Negotiated Percentage Interest; provided, however, that the price paid shall not be less than the net book value attributable to such percentage interest.

b) As of the last day of the month prior to the effective date of admission of a new Limited Partner (the "Cutoff Date") there will be a

specific accounting of Income and Losses for both financial reporting and tax accounting purposes in conformance with Section 5.2; provided, however, that such specific accounting shall be in lieu of a Section 5.2 allocation and shall cover the shorter of (i) the fiscal year to the Cutoff Date or, (ii) the period beginning on the day following the date of the last specific accounting to the Cutoff Date.

c)  Based upon the specific accounting provided for in Section 4.12(b), the General Partner shall allocate to the Capital Account of the new Limited Partner, as of the effective date of admission, the dollar amount necessary to establish the new Limited Partner's Capital Account at the Negotiated Percentage Interest taking into account the allocations and distributions made pursuant to Section 4.12(d) and Section 4.12(e).

d)  The difference between the amount paid by the new Limited Partner and the established Capital Account of the new Limited Partner shall be distributed among the Capital Accounts of those Partners in the Partnership who were Partners on the Cutoff Date in proportion to their Capital Accounts.

e)  If the General Partner determines that cash is not needed by the Partnership, then, prior to establishing the new Limited Partner's Capital Account in accordance with the provisions of this Section 4.12, the General Partner may make a distribution of all or any portion of the excess cash to all Partners who were such on the Cutoff Date in proportion to their Capital Accounts.

ARTICLE V

ALLOCATIONS AND DISTRIBUTIONS

5.1  Capital Accounts.  The General Partner shall establish a
Capital Account and a Tax Capital Account for each Partner upon receipt
of such Partner's First Capital Contribution and shall maintain such
accounts in accordance with this Agreement.

5.2  Allocations of Income and Losses.  Income and Losses for each
fiscal year of the Partnership shall be apportioned ratably to each day
of such year and each day's share of such Income and Losses shall be
allocated to the Partners in proportion to their respective Percentage
Interests on such date.

5.3  Allocations of Income and Losses on Winding Up.  If, upon the
dissolution of the Partnership and the winding up of its affairs, assets
of the Partnership are distributed to the Partners in kind in accordance
with Section 11.3, the General Partner shall determine the Income and
Losses that would have accrued to the Partnership if such assets had
been sold by the Partnership on the date of such distribution for an
amount equal to their Appraised Value.  Such Income and Losses shall be
allocated to the Partners in proportion to their respective Percentage
Interests on the date of such distribution and shall be reflected in
their Capital Accounts.

5.4  Allocations of Tax Profits and Tax Losses.  Except as
otherwise provided in Section 5.6 and except as otherwise required by
regulations prescribed under Section 706(d) of the Code, or its succes-
sors, Tax Profits and Tax Losses for each fiscal year of the Partnership
shall be apportioned ratably to each day of such year and each day's

- 18 -

share of such Tax Profits and Tax Losses shall be allocated to the Partners in proportion to their respective Percentage Interests on such date.

5.5  Allocations of Tax Credits.  Tax credits for federal income tax purposes for each fiscal year of the Partnership shall be apportioned ratably to each day of such year and each day's share of such tax credits shall be allocated to the Partners in proportion to their respective Percentage Interests on such date, except that:

(a)  To the extent that the Code and the regulations prescribed thereunder otherwise provide, such tax credits shall be allocated in accordance with the Code and regulations; and

(b)  Any investment tax credit shall be allocated only to those Partners who were partners (for federal income tax purposes) on the date the property with respect to which such credit was earned was placed in service by the Partnership, in proportion to their respective Percentage Interests on such date.

5.6  Tax Allocations for Contributed Property.  (a) Depreciation and gain or loss recognized for federal income tax purposes with respect to property contributed to the Partnership shall be allocated to the Limited Partners (other than a Limited Partner who is also the General Partner) as though such property had been purchased by the Partnership at its Agreed Value.  The remainder of any depreciation and gain or loss recognized for federal income tax purposes with respect to such contributed property shall be allocated to the General Partner in respect of its General Partner's Interest and Limited Partner's Interest proportionately.

- 19 -

(b)  Notwithstanding paragraph (a) above, to the extent that
Section 704(c) of the Code, or its successors, and regulations
prescribed thereunder otherwise require, such Tax Losses and Tax
Profits with respect to such property contributed to the
Partnership shall be allocated in accordance with such Code
sections, or its successors, and regulations.

5.7  <u>Distributions.</u>  Subject to Sections 9.4, 9.5, 11.2 and
11.3, funds of the Partnership from all sources (other than Capital
Contributions), less appropriate reserves as are determined by the
General Partner to be reasonably necessary for administrative and
operating expenses, loan payments and other costs and expenses and
contingencies, shall be distributed no less than quarterly and as
promptly as practicable after the end of each fiscal quarter.  Each
distribution pursuant to this Section 5.7 shall be made to the
Partners in proportion to the weighted average of their respective
Percentage Interests during the relevant fiscal quarter (or during
any other fiscal period with respect to which a distribution may be
made).

5.8  <u>No Return of Capital or Interest on Capital Contribution</u>.
No Limited Partner shall have any right to demand or receive the
return of its Capital Contribution to the Partnership.  It is the
intent of the Partners that no distribution or allocation (or any
part of any distribution or allocation) made to any Partner
pursuant to this Article V shall be deemed a return or withdrawal
of capital, even if such distribution or allocation represents (in
whole or in part) an allocation of depreciation or any other
non-cash item accounted for as a loss or deduction in calculating

- 20 -

the Partnership's income and that no Partner shall be obligated to pay any such amount to or for the account of the Partnership or any creditor of the Partnership. However, if any court of competent jurisdiction holds that, notwithstanding the provisions of this Agreement, any Partner is obligated to make any such payment, such obligation shall be the obligation of such Partner and not of any other Partner or the Partnership. No Partner shall be entitled to interest on any Capital Contribution to the Partnership or on such Partner's Capital Account, notwithstanding any disproportion therein as between the Partners.

ARTICLE VI

MANAGEMENT, POWERS, DUTIES, REIMBURSEMENT AND RIGHTS;
TRANSACTIONS WITH PARTNERS

6.1 <u>Management</u>. (a) The General Partner shall have exclusive management and control of the business of the Partnership and all decisions regarding the management of the affairs of the Partnership shall be made by the General Partner, except as provided in subsection (c) of this Section 6.1. The General Partner shall have all the rights and powers of a general partner as provided in the Act and as otherwise provided by law and any action taken by the General Partner shall constitute the act of and serve to bind the Partnership. In dealing with the General Partner acting on behalf of the Partnership, no Person shall be required to inquire into the authority of the General Partner to bind the Partnership. Persons dealing with the Partnership are entitled to rely conclusively upon the power and authority of the General Partner as set forth in this Agreement.

(b) The General Partner on behalf of the Partnership shall be responsible for obtaining interconnection with the landline network, for

- 21 -

operating and maintaining the Cellular Service system, and for marketing Cellular Service.  In carrying out the Partnership's responsibility to provide Cellular Service, the Partners hereto agree that the General Partner shall perform all activities and functions as the General Partner may deem necessary or appropriate to market, sell, establish, operate, maintain and manage the Cellular Service.

(c)  The General Partner shall devote such time to the Partnership's business as it, in its sole discretion, shall deem to be necessary to supervise the Partnership and its business in an efficient manner; but nothing contained in this Agreement shall preclude the employment, at the expense of the Partnership, of any agent or other third party (including without limitation any Affiliate of the General Partner, subject to Section 6.10) to operate and manage all or any portion of the property, business or operations of the Partnership, subject to the control of the General Partner and consistent with the General Partner's fiduciary duty to the Partnership and applicable regulatory requirements.

6.2  Powers of the General Partner.  In addition to and not in limitation of those powers vested in the General Partner pursuant to the other provisions of this Agreement or the Act, the General Partner hereby is vested with the power:

(a)  to manage, supervise and conduct the affairs of the Partnership and in connection therewith, to do or cause to be done any and all acts reasonably deemed by the General Partner to be necessary or appropriate in furtherance of the purposes of the Partnership or forbear from doing any act if the General Partner reasonably deems such forbearance necessary or

- 22 -

appropriate in furtherance of the purposes of the Partnership; and

(b)  to borrow from any Person (including any Partner or any Affiliate of any Partner) on behalf of the Partnership on such commercially reasonable terms and conditions as shall be approved by the General Partner and to secure any such borrowings by mortgaging, pledging or assigning assets and revenues of the Partnership to the extent deemed necessary or desirable by the General Partner (provided, however, that any such borrowing from a Partner or any Affiliate of a Partner shall bear interest at a commercially reasonable rate); and

(c)  to employ and dismiss from employment on behalf of the Partnership any and all employees, agents, independent contractors, managers, attorneys and accountants; and

(d)  to acquire and hold in the name of the Partnership, directly or through license, all real and personal property, equipment, software and other assets required to provide Cellular Service, including assets contributed to the Partnership by the General Partner; and

(e)  to make all elections (including tax elections), investigations, evaluations and decisions, binding the Partnership thereby, that may be necessary or appropriate in connection with the business purposes of the Partnership; and

(f)  to incur obligations or make payments on behalf of the Partnership in its own name or in the name of the Partnership; and

(g)  to execute on behalf of the Partnership all docu-
ments, agreements and instruments of any kind or character
which the General Partner in its discretion shall deem neces-
sary or appropriate in connection with the business purposes
of the Partnership; and

(h)  from time to time to increase the coverage area of
Cellular Service within any CGSA or to apply for regulatory
approval to expand the geographic area of any CGSA, provided
that such expansion must be into contiguous areas; and

(i)  To carry on any other activities necessary to, in
connection with or incidental to any of the foregoing.

6.3  Fiduciary Duty of General Partner.  The General Partner shall
be under a fiduciary duty to conduct the affairs of the Partnership in
the interests of the Partnership, including the safekeeping and use of
all Partnership funds and assets and the use thereof for the exclusive
benefit of the Partnership.

6.4  Liability of General Partner.  Notwithstanding anything to the
contrary contained in this Agreement, (a) no provision of this Agreement
shall limit or shall be deemed to limit the general liability of the
General Partner for the debts and obligations of the Partnership and (b)
the General Partner shall be subject to the restrictions and liabilities
of a partner in a partnership without limited partners.

6.5  Reimbursement.  The Partnership shall reimburse the General
Partner monthly for any reasonable and necessary costs and expenses
incurred by the General Partner on behalf of the Partnership in
providing Cellular Service plus administrative and general overhead
expenses, including, but not limited to, marketing, maintenance, message

charges, facilities, engineering, customary legal, accounting and audit fees, expenses of development and implementation of billing procedures, expenses of preparing tax returns and reports, taxes, travel, office rent, telephone, salaries (including social security, relief, pensions and other benefits), and other incidental business expenses incurred by the General Partner on behalf of the Partnership in connection with the provision of Cellular Service.  The allocation of allocated costs shall be determined in accordance with the schedule entitled Allocation of Costs attached hereto.  Without limitation of the foregoing provisions of this Section 6.5, the Partnership shall reimburse the General Partner, promptly upon the receipt by the Partnership of the Partners' Second Capital Contributions, for all such expenses incurred by the General Partner prior to the formation of the Partnership in connection with the future provision of Cellular Service, including without limitation the expenses incurred in connection with the formation of the Partnership.  Only expenses incurred after February 5, 1987 shall be reimbursed.  Each reimbursement of costs and expenses pursuant to this Section 6.5 shall be made regardless of whether any distributions are made to the Limited Partners and shall be in addition to other payments or benefits described herein.  A reasonable return on the capital of the General Partner advanced on behalf of the Partnership in connection with activities related to the Partnership shall be considered an expense of the General Partner incurred on behalf of the Partnership and the General Partner shall be reimbursed for such expense pursuant to this Section 6.5.

6.6  <u>Ownership or Conduct of Other Businesses</u>.  The General Partner shall not be required to manage the Partnership as its sole and

exclusive function and may have other business interests and engage in other activities in addition to those relating to the Partnership. Neither the Partnership nor any Partner shall have any right by virtue of this Agreement or the partnership relationship created hereby in or to such other ventures or activities or to the income or proceeds derived therefrom.  The pursuit of such ventures, even if competitive with the business of the Partnership, shall not be deemed wrongful or improper; provided that no Partner shall be permitted to provide cellular service directly or indirectly in competition with the Partnership except as may result from an overlap of adjacent cellular systems.  No Partner nor any Affiliate of any Partner shall be obligated to present any particular investment opportunity to the Partnership even if such opportunity is of a character which, if presented to the Partnership, could be taken by the Partnership, and each of them shall have the right to take for its own account (individually or otherwise) or to recommend to others any such particular investment opportunity.

6.7  _Exculpation and Indemnification._  Neither the General Partner, nor any employee, officer, director, partner, stockholder or Affiliate of the General Partner, or of an Affiliate of the General Partner, shall be liable, responsible or accountable in damages or otherwise to the Partnership or any Limited Partner for any act taken or omission to act on behalf of the Partnership within the scope of the authority conferred on such Person by this Agreement or by law or any act or omission that was consented to or approved of by the Limited Partners unless such act or omission was performed or omitted with gross negligence, fraudulently or, in bad faith or constituted willful misconduct.  The Partnership shall indemnify and hold harmless any Person who was or is a party or is

threatened to be made a party to any threatened, pending or completed
action, suit or proceeding, whether civil, criminal, administrative or
investigative (including any action by or in the right of the Partner-
ship) by reason of any acts, omissions or alleged acts or omissions
arising out of that Person's activities as a General Partner or as an
employee, officer, director, partner, stockholder or Affiliate of the
General Partner, or of an Affiliate of the General Partner, on behalf of
the Partnership or in the furtherance of the interests of the Partner-
ship, against losses, damages or expenses for which such Person has not
otherwise been reimbursed (including attorneys' fees, judgments, fines
and amounts paid in settlement) actually and reasonably incurred by that
Person in connection with such action, suit or proceeding, so long as
that Person did not act with gross negligence, fraudulently, in bad
faith or in a manner constituting willful misconduct.  The termination
of any action, suit or proceeding by judgment, order, settlement, or
upon a plea of nolo contendere or its equivalent, shall not of itself
create a presumption that such Person acted with gross negligence,
fraudulently, in bad faith or in a manner constituting willful miscon-
duct.

6.8  Rights of Limited Partners.  Each Limited Partner shall have
the right to:

(a)  inspect and copy, from time to time upon reasonable
demand, any of the Partnership books of record, accounting
records, financial statements or other records or reports;

(b)  have upon reasonable demand true and full infor-
mation regarding the state of business and financial condition
of the Partnership, and a formal account of Partnership

- 27 -

affairs whenever circumstances render it just and reasonable; and

    (c)  audit, at its own expense and once every calendar year, the Partnership books of record, accounting records, and financial statements of the Partnership; and

    (d)  have dissolution and winding up by decree of court in accordance with the Act; and

    (e)  have a quarterly status report on the operations of the Partnership, and to call a meeting with representatives of the General Partner to consult with the General Partner as to the operation of the Partnership.

6.9  <u>Limited Partners Not to Take Part in Business</u>.  No Limited Partner, acting in its capacity as a Limited Partner, shall participate in the control of the business of the Partnership or have any right or authority to act for or bind the Partnership.

6.10  <u>Service Contract with Affiliate of General Partner</u>.  The General Partner is hereby expressly authorized and empowered (and all prior actions in connection therewith are ratified), on behalf of the Partnership, to enter into an agreement with an Affiliate of the General Partner relating to the provision of administrative and management services to the Partnership provided that reimbursement pursuant to such agreement shall be made only for costs and expenses incurred in providing such services at cost, without allowance for profit.

6.11  <u>Resale of Cellular Service</u>.  Nothing herein shall preclude any Partner or any Affiliate of any partner from reselling Cellular Service or selling or leasing terminal equipment used in connection with Cellular Service independently from the Partnership whether within or

outside any CGSA.  Neither any Partner nor any Affiliates of any Partner shall be funded or staffed by the Partnership for such provision of Cellular Service or resale activity and any transactions between any Partner or any Affiliate of any Partner and the Partnership shall be on prices, terms and conditions equivalent to the prices, terms and conditions of any agreements between the Partnership and other resellers of Cellular Service or sellers or lessors of terminal equipment.

6.12 <u>Cellular Service in Other Areas.</u>  No Partner or Affiliate of a Partner shall provide Cellular Service independently of the Partnership within any CGSA subject to this Agreement.  If any Partner or any Affiliate of any Partner wishes to provide Cellular Service independently of the Partnership within any such CGSA, such Partner shall withdraw from the Partnership in accordance with (and such withdrawal shall be subject to the provisions of) Article IX or X before such Partner or any Affiliate of such Partner makes any application for regulatory approval to provide Cellular Service within any such CGSA. Nothing herein shall preclude any Partner or any Affiliate of any Partner from providing Cellular Service independently of the Partnership in areas other than any CGSA subject to this Agreement.

6.13 <u>Licenses.</u>  The General Partner and Limited Partners shall cause to be transferred to the Partnership's name all licenses, permits or other regulatory approvals that are necessary to provide Cellular Service pursuant to this Agreement and that are held by the General Partner or any such Limited Partner.

## ARTICLE VII

### BANKING, ACCOUNTING, REPORTS, RECORDS AND TAX MATTERS

7.1  <u>Banking</u>.  All funds of the Partnership shall be deposited in
such interest-bearing or non-interest-bearing bank account or accounts
as shall be established and designated by the General Partner or
invested by the General Partner in short-term debt obligations of any
issuer (including any Partner or any Affiliate of any Partner) selected
by the General Partner including, without limitation, government
securities, certificates of deposit of commercial banks (domestic or
foreign), commercial paper, bankers' acceptances and other money market
instruments.  Withdrawals from any such bank account(s) shall be made
upon such signature or signatures as the General Partner may designate.
The funds of the Partnership may be consolidated with funds of any other
entity affiliated with the General Partner.

7.2  <u>Maintenance of Books and Accounting Method.</u>  The General
Partner shall keep or cause to be kept full and accurate accounts of the
transactions of the Partnership in proper books of account in accordance
with generally accepted accounting principles, as varied by appropriate
regulatory authorities.  The General Partner shall also keep or cause to
be kept books of account for federal income tax purposes maintained in
accordance with tax accounting principles.

7.3  <u>Financial Reports</u>.  The General Partner shall furnish to each
Limited Partner annual audited Partnership financial statements examined
by a recognized firm of independent certified public accountants and
quarterly unaudited Partnership financial statements.  Quarterly unau-

dited financial statements will be furnished to the Limited Partners within forty-five business days after the close of each quarter and be certified by an officer of the General Partner. Year-end audited financial statements shall be furnished to the Limited Partners within ninety business days after the close of the fiscal year. Notwithstanding the foregoing, upon written approval of the General Partner plus two Limited Partners, only one of which is Inland, Mt. Pulaski or any transferee or successor of Inland or Mt. Pulaski, the requirement of year-end audited financial statements may be waived annually for up to two consecutive years.

7.4 <u>Fiscal Year; Partnership Tax Returns.</u> The fiscal year of the Partnership shall end on December 31 of each year. The General Partner shall cause to be filed the federal income tax partnership return and all other tax returns required to be filed for the Partnership for all applicable tax years, and shall furnish as promptly as practicable to each Limited Partner a statement of its allocated share of income, gains, losses, deductions and credits for such taxable year. The General Partner shall cause the Partnership to file returns and to provide, in writing, information to Partners, as required in accordance with Section 6050K of the Code.

7.5 <u>Tax Elections.</u> The General Partner in its sole discretion may make, on behalf of the Partnership, the election referred to in Section 754 of the Code or any similar provision enacted in lieu thereof, upon the transfer of any Partnership Interest in accordance with this Agreement, if the transferee so requests and agrees to pay the Partnership's expenses in making the accounting adjustments resulting from such

election.  Each of the Partners shall upon request supply the
information necessary to give proper effect to such election.

ARTICLE VIII

TRANSFER OF PARTNER'S PARTNERSHIP
INTEREST; ADMISSION OF LIMITED PARTNER

8.1  Limitation on Transfer.  (a) There shall be no Disposition of
all or any portion of any Limited Partner's Partnership Interest and no
Disposition of any portion of any General Partner's Partnership Interest
whereby the proposed transferee would obtain such interest as a Limited
Partner, and the Partnership need not recognize any such Disposition,
unless:

(i)    the Partner desiring Disposition has delivered to
the General Partner a duly executed and acknowledged counter-
part of the instrument making such Disposition and has given
prior notice to all Partners of its intent to make a
Disposition; and

(ii)  The Partner desiring Disposition has obtained the
written consent of the General Partner to such Disposition,
which consent may not be unreasonably withheld; and

(iii) Any necessary prior consents have been obtained
from the appropriate regulatory authorities.

(iv)  In the case of Inland, the debt obligations
incurred in connection with Ameritech Mobile Communications,
Inc.'s funding of Inland's Capital Contributions shall be
discharged and paid in full prior to the Disposition by Inland
of all or any portion of its Partnership interest.

(v)  In the case of Mt. Pulaski, the debt obligations

- 32 -

incurred in connection with Ameritech Mobile Communications, Inc.'s funding of Mt. Pulaski's Capital Contribution shall be discharged and paid in full prior to the Disposition by Mt. Pulaski of all or any portion of its Partnership interest. (Hereinafter the debt obligations between Mt. Pulaski and Inland are referred to as the "Loan" or collectively as the "Loans".)

(b) The Disposition of all or any portion of a Limited Partner's Partnership Interest shall not release the Limited Partner making the Disposition from any of its liabilities incurred under this Agreement prior to the effective date of the admission of a substitute limited partner, if any, for such Limited Partner's Partnership Interest.

(c) Each Limited Partner shall advise the General Partner, in writing, of any Disposition, in whole or in part, of its Partnership Interest in accordance with Section 6050K of the Code.

8.2 <u>Right of First Refusal</u>. In addition to any other limitation contained in this Agreement, before any Limited Partner makes a Disposition of all or any portion of its Partnership Interest and before any General Partner makes a Disposition of any portion of its Partnership Interest to a proposed transferee who would become a substitute limited partner, it shall offer, by giving written notice to the General Partner, that Partnership Interest (or portion thereof) to all of the other Partners for the price at which and the terms under which the purchaser has offered in writing to pay for such Partnership Interest (or portion thereof). The General Partner, in turn, shall forward such notice to all other Partners. Each Partner shall initially be entitled to purchase that fraction of the Partnership Interest (or portion

thereof) intended to be sold equal to its Percentage Interest divided by
the Percentage Interests of all Partners other than the selling Partner.
If any Partner declines to exercise its right of purchase hereunder, the
other Partners electing to exercise that right shall be entitled to
purchase the portion of the Partnership Interest intended to be sold
that has been declined by such Partner in amounts allocably determined
pursuant to reapplication of the principles set forth in the preceding
sentence, excluding from consideration the Percentage Interests of the
selling and declining Partners.  Each Partner other than the selling
Partner shall notify the General Partner and the selling Partner, in
writing, of its intention to exercise or not to exercise its purchase
rights hereunder within thirty days following its receipt of the offer
of sale.  The General Partner shall promptly notify each Partner of the
elections by the other Partners.  The Partners that have not previously
declined to exercise their rights of purchase shall, if necessary,
notify the General Partner of their intentions with respect to that
portion of the selling Limited Partner's Partnership Interest still
subject to a right of purchase within ten days of receipt of any such
notice from the General Partner.  If, at the time the selling Limited
Partner offers its Partnership Interest (or portion thereof) to the
other Partners pursuant to this Section 8.2, AMPS is the only other
Partner, AMPS may in its sole discretion assign its rights of purchase
under this Section 8.2 to any other Person or Persons.  No portion of a
Partner's Partnership Interest (or portion thereof) offered for purchase
under this Section 8.2 may be purchased by any other Partner pursuant to
this Section 8.2 unless the entire Partnership Interest (or portion

- 34 -

thereof) offered is purchased by one or more Partners or permitted Assignees of Partner(s).

Notwithstanding the foregoing:  (1) Midwest shall have the sole right to acquire the first fifteen percent (15%) of the sum total of all Limited Partners' Partnership Interests proposed or offered for Disposition subsequent to the formation of the Partnership; and (2) AMPS' right to acquire the interest of any Limited Partner pursuant to this paragraph shall be subject to a right of first refusal for Midwest to purchase such interest.  Midwest's rights under this paragraph also shall apply in the circumstances set forth in Section 4.5.

Loan Documents relied upon for funding by and between AMPs or its Affiliates, Mt. Pulaski and Inland shall not override Midwest's rights of first refusal except that AMPs or its Affiliates have rights superior to Midwest's in the event of a default under the Loan documents or in the event of a repayment by Mt. Pulaski or Inland or their transferees or successors of such Loan by tender of the partnership interest.  In either such event, AMPs or its Affiliates agrees to offer such interest to Midwest for its then current fair market sales value.  In the event the parties are unable to agree on fair market sales value, such value shall be determined by an appraiser chosen by the parties for such purpose.  If the parties are unable to agree on an appraiser, or if the valuation as determined by the appraiser is not acceptable to one of the parties, then fair market sales value shall be determined by a panel of three appraisers, one of which shall be chosen by each of the parties and the third appraiser shall be chosen by the other two, and the determination of value by such panel of appraisers shall be binding upon the parties.